UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

MALIBU BOATS, LLC,                          )
                                            )
            Plaintiff,                      )
                                            )
v.                                          )        No. 3:18-CV-15-TAV-HBG
                                            )
SKIER'S CHOICE, INC.,                       )
                                            )
            Defendant.                      )

## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the referral Order [Doc. 41] of the District Judge.

Now before the Court are the parties' competing claim construction briefs. This case involves three different patents, relating to Plaintiff's surf wake system for watercrafts. The parties presented the Court with thirteen (13) claim terms to construe. *See* [Doc. 33] (Joint Claim Construction and Prehearing Statement). On February 11, 2019, the parties appeared before the Court for a hearing pursuant to *Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996) ("*Markman*"). Attorneys Cameron Westin, David Almeling, and Matthew Googe appeared on behalf of Plaintiff. Attorneys Ian McFarland, John Winemiller, Michael LaBrie, and Zachary Oubre appeared on behalf of Defendant. During the hearing, the parties reported to the Court that oral argument was unnecessary on three of the disputed claims.[1] The Court has considered the briefing filed by the parties, including the supplemental briefs [Docs. 46, 49], and the oral arguments presented at the hearing. Accordingly, and for the reasons explained below, the Court **RECOMMENDS** the disputed terms be construed as follows:

_____

[1] *See infra* note 4.

1. "Upright" be construed as "oriented generally vertically with respect to the boat, allowing for slight inclination";

2. "Upright Water Diverter" be given its plain and ordinary meaning, except with respect to the term "upright," which should be construed as above;

3. "Surf Wake" be construed as "a wake whose size, shape, or other characteristics have been enhanced for surfing";

4. "wherein when said port side water diverter produces said starboard side surf wake for right-foot-forward wake surfing, a port side wake is substantially unsuitable for left-foot-forward wake surfing, and when said starboard side water diverter produces said port side surf wake for left-foot-forward wake surfing, a starboard side wake is substantially unsuitable for right-foot-forward wake surfing" be given its plain and ordinary meaning;

5. "wake surf settings" be construed as "settings that can affect the resulting surf wake";

6. "Flap" be given its plain and ordinary meaning;

7. "the water-sports boat is configured to change from enhancing the starboard wave to enhancing the port wave when a surfer desires to change from surfing an enhanced starboard wave to surfing an enhanced port wave or to change from enhancing the port wave to enhancing the starboard wave when the surfer desires to change from surfing the enhance port wave to surfing the enhanced starboard wave" be given its plain and ordinary meaning;

8. "Past the transom/past an edge of the transom" be construed as "beyond the side of the transom";

9. "First respective edge" be construed as "port side edge";

10. "Second respective edge" be construed as "starboard side edge";

11. "the wake surf system configurable by an operator purposefully selecting which of the port wave and the starboard wave to enhance to improve surfing thereon" be given its plain and ordinary meaning;

12. "Pivotally coupled" be given its plain and ordinary meaning; and

13. "Manual Actuator" be given its plain and ordinary meaning.

2

The Court will first review the background of this case and then turn to the parties' arguments with respect to claim construction.

## I.  BACKGROUND

The Complaint [Doc. 1] in this case was filed on January 12, 2018, alleging violations of three different patents on Plaintiff's wake surf technologies, including U.S. Patent No. 9,260,161 ("the '161 Patent," titled "Surf Wake System for a Watercraft"), U.S. Patent No. 8,578,873 ("the '873 Patent," titled "Surf Wake System for a Watercraft"), and U.S. Patent No. 9,199,695 ("the '695 Patent," titled "Surf Wake System for a Watercraft" ).  [Doc. 1 at ¶ 1].[2]

The Complaint alleges that Plaintiff is the market share leader in the inboard sport boat industry.  [*Id.*].  Plaintiff alleges that its wake surf technology modifies the wake formed by a boat traveling through water, which, in part, creates a better-quality surf wake, and, in the case of the '161 and '873 Patents, enables users to surf on either side of the boat's wake at the push of a button.  [*Id.* at ¶ 2].  Further, the Complaint alleges that Plaintiff's SURF GATE® technology has revolutionized the manner in which users who engage in wake surfing are able to utilize their boats.  [*Id.*].  Boats manufactured by Plaintiff that utilize patented SURF GATE® technology allow boaters, at the touch of a button, to configure a boat to create a better-quality surf wave on a desired side of the boat in a matter of seconds without having to shift passengers or weight.  [*Id.*].

The Complaint alleges that in response to the success of Plaintiff's SURF GATE® system, Defendant introduced surf systems on both its Moomba and Supra lines of boats, including the Moomba Flow and Supra Swell systems, which copied Plaintiff's innovative and entirely revolutionary redirection of at least water on one side to modify and improve the wake on the

_____

[2] The Court will refer to the '161, '873, and '695 Patents collectively as the "Patents."

3

opposite side.  [*Id.* at 1].  Defendant subsequently announced the Moomba Flow 2.0 and 3.0 surf

systems, and the Supra Swell 2.0 and 3.0 surf systems. [*Id.* at 7].  The Complaint alleges that

Defendant's surf systems infringe Plaintiff's intellectual property rights.  [*Id.*].  In addition, the

Complaint alleges that despite knowing of the Patents and that its surf systems infringe these

Patents, Defendant has and continues to infringe the Patents through making, using, selling, and/or

offering for sale within the United States the infringing products, through importing into the United

States the infringing products, and/or through inducing or contributing to infringement by

Defendant's customers.  [*Id.* at ¶ 31].

As mentioned above, the Court conducted a *Markman* hearing on February 11, 2019.  The

parties also filed supplemental briefing [Docs. 46, 49], which the Court has considered.[3]  The

parties dispute the construction of the following terms:[4]

| Claim Term | Plaintiff's Construction | Defendant's Construction |
| --- | --- | --- |

---

[3] The Court notes that in Plaintiff's response to Defendant's supplemental brief, Plaintiff asserts that Defendant's filing violates Local Rule 7.1.  Specifically, Local Rule 7.1 states that "[n]o additional briefs, affidavits, or other papers in support of or in opposition to a motion shall be filed without prior approval of the Court, except that a party may file a supplemental brief of no more than 5 pages to call to the Court's attention developments occurring after a party's final brief is filed."  E.D. Tenn. L.R. 7.1 (d).  Here, Defendant filed a supplemental brief addressing discovery responses Plaintiff recently produced in this case.  While Plaintiff asserts that its discovery responses contain information that was already publicly available and already part of the claim construction briefing, the Court finds the most appropriate course of action is to consider both parties' supplemental filings.

[4] The Court notes that the parties dispute thirteen (13) terms in the Patents.  During the hearing, the parties reported to the Court that oral argument was unnecessary on the following three claim terms: (1) "wherein when said port side water diverter produces said starboard side surf wake for right-foot-forward wake surfing, a port side wake is substantially unsuitable for left-foot-forward wake surfing, and when said starboard side water diverter produces said port side surf wake for left-foot-forward wake surfing, a starboard side wake is substantially unsuitable for right-foot-forward wake surfing," (2) "first respective edge," and (3) "second respective edge." The parties explained that while they are not in agreement with the construction of these terms, their construction will depend on how the Court construes the remaining disputed claims.

4

| | | |
|---|---|---|
| "Upright" ('873 Patent) | "oriented generally vertically with respect to the boat, allowing for slight inclination" | This term does not need construction as the term more properly construed is "upright water diverter." To the extent the Court finds otherwise, "upright" should be construed as follows: "oriented vertically with respect to the boat, allowing for slight deviation from vertical." |
| "Upright Water Diverter" ('873 Patent) | No construction necessary beyond "upright"; plain and ordinary meaning | "A water diverter having a pivot axis oriented vertically with respect to the boat, allowing for slight deviation from vertical" |
| "Surf Wake" ('873 Patent) | "a wake whose size, shape, or other characteristics have been enhanced for surfing" | "an enhanced wake produced by an upright water diverter as a boat moves through water" |
| "wherein when said port side water diverter produces said starboard side surf wake for right-foot-forward wake surfing, a port side wake is substantially unsuitable for left-foot-forward wake surfing, and when said starboard side water diverter produces said port side surf wake for left foot-forward wake surfing, a starboard side wake is substantially unsuitable for right-foot-forward wake surfing" ('873 Patent) | No construction necessary; plain and ordinary meaning | "an enhanced wake produced by an upright water diverter as a boat moves through water having characteristics which make it more suitable for right/left-forward surfing" |
| "Wake surf settings" ('873 Patent) | "settings that can affect the resulting surf wake" | "settings containing a specific rider's information and preferences" |
| "Flap" ('161 Patent) | No construction necessary; plain and ordinary meaning | "a water diverting structure having a pivot axis oriented vertically with respect to the boat, allowing for slight deviation from vertical" |
| "the water-sports boat is configured to change from enhancing the starboard wave to enhancing the port wave when a surfer desires to change from surfing an enhanced starboard wave to surfing an enhanced port wave or to change from enhancing the port wave to enhancing the starboard wave when the surfer desires to change from surfing the enhance port wave to surfing the enhanced starboard wave" ('161 Patent) | No construction necessary; plain and ordinary meaning | "boat feature responsive to the surfer so that the surfer may actuate a flap to change from enhancing the starboard wave to enhancing the port wave and vice versa" |

5

| "past the transom"/past an edge of the transom" ('161 Patent) | No construction necessary; plain and ordinary meaning. | "beyond the side of the transom" |
|---|---|---|
| "first respective edge" ('161 Patent) | No construction necessary; plain and ordinary meaning | "port side edge" |
| "second respective edge" ('161 Patent) | No construction necessary; plain and ordinary meaning | "starboard side edge" |
| "the wake surf system configurable by an operator purposefully selecting which of the port wave and the starboard wave to enhance to improve surfing thereon" ('695 Patent) | This term is a limitation on the claims; no further construction necessary; plain and ordinary meaning. | "the operator configuring the wake surf system to enhance the port wave or starboard wave to improve surfing thereon" |
| "pivotally coupled" ('695 Patent) | No construction necessary; plain and ordinary meaning. | "connected with a pivot axis oriented vertically with respect to the boat, allowing for slight deviation from vertical" |
| "manual actuator" ('695 Patent) | No construction necessary; plain and ordinary meaning. | "a mechanical device for putting the deployable element into action or motion that is operated by hand" |

## II.     STANDARD OF REVIEW

Claim construction is a question of law for the Court. *Markman*, 517 U.S. at 391. Generally, the words of a claim are "given their ordinary and customary meaning . . ." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F3d 1576, 1582 (Fed. Cir. 1996). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). "A person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* "Thus[,] the court starts the decision-making process by reviewing the same resources as would that person, viz., the patent specification and prosecution history." *Id.* (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1477 (Fed. Cir. 1998)). The specifications, however, are usually "the single best guide to the meaning of a disputed term." *Id.* at 1314. Courts may also look to other sources to "show what a person of skill

in the art would have understood disputed claim language to mean," including "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,* 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

There are two exceptions to the general rule that the ordinary meaning of the term controls: "(1) when a patentee sets out a definition and acts as his own lexicographer, or (2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012). "A patentee acts as his own lexicographer when he clearly sets forth a 'definition of the disputed claim term in either the specification or prosecution history' that acts to modify the ordinary meaning of the claim term." *Viking Corp. v. Victaulic Co.*, No. 1:13-cv-1319, 2014 WL 11129036, *3 (W.D. Mich. Nov. 4, 2014) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). In addition, "A patentee disavows the full scope of a claim term when the 'intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention.'" *Id.* (quoting *CCS Fitness In*c., 288 F.3d at 1366-67).

## III.    ANALYSIS

With the above guidance in mind, the Court will now turn to the disputed claim terms. As mentioned above, there are three Patents at issue in this litigation. The Court will address each of the Patents separately and in the order the claims were addressed in the parties' Joint Claim Construction and Prehearing Statement.

### A.    Patent '873

7

With respect to Patent '873, the parties dispute the following five terms: (1) "upright," (2) "upright water diverter," (3) "surf wake," (4) "wherein when said port side water diverter produces said starboard side surf wake for right-foot-forward wake surfing, a port side wake is substantially unsuitable for left-foot-forward wake surfing, and when said starboard side water diverter produces said port side surf wake for left-foot-forward wake surfing, a starboard side wake is substantially unsuitable for right-foot-forward wake surfing," and (5) "wake surf settings."

The Court will address each claim separately.

### 1. "Upright"

As mentioned above, Plaintiff proposes that the Court adopt the following construction: "oriented generally vertically with respect to the boat, allowing for slight inclination." In support of Plaintiff's construction, it argues that the Court has previously construed this term in several cases.

Defendant submits that this term does not need construction because the term more properly construed is "upright water diverter." In the event the Court finds otherwise, Defendant proposes the following construction: "oriented vertically with respect to the boat, allowing for slight deviation from vertical." Defendant argues that issue preclusion cannot be asserted against new and independent defendants, and therefore, it should not be bound by prior decisions. Defendant argues that in one case, the parties agreed to Plaintiff's proposed construction of "upright." Defendant asserts that the '873 Patent teaches that the operative limitation is "upright water diverter" and that its argument is supported by the claims. Further, Defendant argues that the specification does not distinguish between a water diverter that is upright and a water diverter that is not upright. Defendant insists that "upright water diverter" is the combination used throughout the Patent.

8

As mentioned by both parties, Plaintiff has been involved in several lawsuits in this jurisdiction with respect to its surf wake technology, *Malibu Boats, v. Nautique*, 3:13-CV-656 ("*Malibu* I"), *Malibu Boats LLC, v. MasterCraft Boat Company*, 3:15-CV-276 ("*Malibu* II"), and *Malibu Boats v. MasterCraft Boat Company*, 3:16-CV-82 ("*Malibu* III"). Specifically, in *Malibu* I, the District Judge construed the term "upright" as it relates to the '873 Patent—the same Patent at issue here. 122 F. Supp. 3d 722, 736 (E.D. Tenn. 2015).[5] The District Judge construed "upright" to mean "orientated generally vertically with respect to the boat, allowing for slight inclination." *Id.* at 737. The Court reasoned that the '873 Patent shows "water diverters that are upright even though they are slightly inclined." *Id.* at 736. The Court further found that "[i]n addition to this already inclined orientation, the patent[] explain[s] that the pivot axis may incline even further, including by at least 15° more." *Id.* (citing '873 Patent, col. 6, ll. 55-56). The Court rejected defendant's proposed construction (i.e., "vertical") because such a construction would exclude the embodiments with slightly inclined diverters. *Id.*

In addition, in *Malibu II*, the undersigned authored a Report and Recommendation, stating, "As an initial matter, the Court notes that the parties have agreed upon the construction of 'upright' as 'oriented generally vertically with respect to the boat, allowing for slight inclination.'" [Doc. 135 at 15] (citing *Malibu I*, 122 F. Supp. 3d at 737).[6]

The Court declines to depart from the previous construction of "upright," and therefore, recommends that "upright" be construed as "oriented generally vertically with respect to the boat

---

[5] The Court notes that in *Malibu* I, the District Judge also construed the term "upright" as used in U.S. Patent No. 8,539,897. 122 F. Supp. 3d at 736.

[6] Prior to the District Judge ruling on the Report and Recommendation in *Malibu* II, the parties agreed to settle the case. Thus, the Report and Recommendation was not adjudicated.

9

allowing for slight inclination." Defendant argues that it should not be bound by the Court's previous construction of this term. In this case, although the undersigned finds the previous construction helpful, the Court has considered Defendant's arguments to the contrary and has already conducted the *Markman* hearing on the claims that have already been construed, including the term "upright." *See Powervip, Inc. v. Static Control Components, Inc.*, No. 1:08-CV-382, 2011 WL 2669059, at *3 (W.D. Mich. July 6, 2011) (finding that "while not entitled to preclusive effect," the previous *Markman* "order is instructive and may properly be considered by the Court in rendering its own construction of the claims at issue"); *see also Texas Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580 (E.D. Texas 2012) (the court may defer to a prior claim construction, though it is not necessarily bound by it).

Defendant asserts that the proper term to construe is "upright water diverter," asserting that the claims reference "upright water diverter" and that the specification does not distinguish between a water diverter that is upright or a water diverter that is not upright. Specifically, Claims 1 and 20 are recited below with the disputed claim in italics:

> 1. A boat configured to generate a starboard side surf wake for at least right-foot-forward wake surfing and a port side surf wake for at least left-foot-forward wake surfing, said port side surf wake different from said starboard side surf wake, the boat comprising:
>
> a port side *upright water diverter* movable between a first and second position, wherein one of said first and second positions produces said starboard side surf wake;
>
> a starboard side *upright water diverter* movable between a first and second position, wherein one of said first and second positions produces said port side surf wake;
>
> a controller responsive to user input into an input device; and
>
> one or more actuators responsive to said controller to move said port side *water diverter* from one of said first and

10

second positions to the other of said first and second positions, and move said starboard side *water diverter* from one of said first and second positions to the other of said first and second positions, wherein when said port side *water diverter* produces said starboard side surf wake for right-foot-forward wake surfing, a port side wake is substantially unsuitable for the left-foot-forward wake surfing and when said starboard side *water diverter* produces said port side surf wake for the left-foot-forward wake surfing, a starboard side wake is substantially unsuitable for right-foot-forward wake surfing.

20. A boat configured to produce a right side surf wake and a left side surf wake different from said right side surf wake, both said right side surf wake and left side surf wake different from a wake of said boat moving through water without *water diverters* engaged, said boat comprising:

* * *

a right side *upright water diverter* operably connected to at least one of said actuators to move between a first and second position, wherein one of said first and second positions produces said left side surf wake; and

a left side *upright water diverter* operably connected to at least one of said actuators to move between a first and second position, wherein one of said first and second positions produces said right side surf wake, wherein when said right side *upright water diverter* produces said left side surf wake, a right side wake is not said right side surf wake, and when said left side *upright water diverter* produces said right side surf wake, a left side wake is not said left side surf wake.

The Court agrees with Plaintiff that "upright" simply modifies "water diverter." In addition, for the reasons more fully explained below, the Court disagrees with Defendant's proposed construction of "upright water diverter."

In the alternative, Defendant proposes that the Court construe "upright" as follows: "oriented vertically with respect to the boat, allowing for slight deviation from vertical." Defendant's proposed construction eliminates the word "generally," but construing "upright" to

11

mean "vertical" excludes "the disclosed embodiments with slightly inclined diverters." *Malibu* I, 122 F. Supp. 2d at 736. The previous construction of "upright" is more consistent with the embodiments that illustrate slightly inclined diverters. *See* '873 Patent, col. 6, ll. 55-65 (explaining that "upright water diverters" may be connected in an orientation that "may be substantially vertical, substantially parallel to the side edge, some other angle therebetween, or some angle slightly inclined with respect to the side edge"). Accordingly, the Court recommends that "upright" be construed as "oriented generally vertically with respect to the boat, allowing for slight inclination."

### 2. "Upright Water Diverter"

Plaintiff asserts that the Court should not construe the term "upright water diverter" beyond the term "upright." Plaintiff argues that the Court previously recommended that "water diverter" be given its plain and ordinary meaning. Plaintiff states that Defendant's proposed construction improperly requests this Court to re-decide this issue and improperly imports limitations into the claim language.

Defendant argues that the proper construction of "upright water diverter" is a "water diverting structure having a pivot axis oriented vertically with respect to the boat, allowing for slight deviation from vertical." Defendant asserts that its construction is supported by the claims, which provide that an upright water diverter modifies the wake as a boat travels through water. Further, Defendant states that the upright water diverter pivots, explaining that the claims provide that the structure is "moveable" from at least a "first position" to a "second position" so as to "produce" a surf wake. In addition, Defendant argues that the '873 Patent teaches that the axis of that pivot is vertical with respect to the boat, allowing for slight deviation from vertical. Defendant

12

further argues that Plaintiff disavowed the claim scope that would allow for a downwardly deploying structure and that Plaintiff's sliding embodiment assertions should be disregarded.

The Court has already declined to adopt Defendant's construction of "upright," (i.e., "oriented vertically with respect to the boat, allowing for slight deviation from vertical"), and the Court finds it unnecessary to address it again. Further, in *Malibu II*, the undersigned recommended that "water diverter" be given its plain and ordinary meaning because the ordinary meaning of the term controls unless the patentee becomes his own lexicographer or if the patentee disavows the full scope of the claim term in the specification or its prosecution. *See CCS Fitness*, 288 F.3d at 1366 ("Generally speaking, we indulge a heavy presumption that a claim term carries its ordinary and customary meaning.") (other quotations omitted). In the Report and Recommendation, the undersigned did not find that Plaintiff became its own lexicographer or that it disavowed the full scope of the claim term.[7]

Here, Defendant's proposed construction requires that an upright water diverter have a pivot axis. The Court agrees with Plaintiff that the plain language of the claims do not reference a "pivot axis" but instead require upright water diverters to be "movable between a first and second position." Specifically, Claims 1 and 20 provide, in relevant part and with the disputed term in italics:

> 1. A boat configured to generate a starboard side surf wake for at least right-foot-forward wake surfing and a port side surf wake for at least left-foot-forward wake surfing, said port side surf wake different from said starboard side surf wake, the boat comprising:

* * *

---

[7] *See supra* note 6.

a port side *upright water diverter* movable between a first and second position, wherein one of said first and second positions produces said starboard side surf wake;

a starboard side *upright water diverter* movable between a first and second position, wherein one of said first and second positions produces said port side surf wake;

20. A boat configured to produce a right side surf wake and a left side surf wake different from said right side surf wake, both said right side surf wake and left side surf wake different from a wake of said boat moving through water without *water diverters* engaged, said boat comprising:

* * *

a right side *upright water diverter* operably connected to at least one of said actuators to move between a first and second position, wherein one of said first and second positions produces said left side surf wake; and

a left side *upright water diverter* operably connected to at least one of said actuators to move between a first and second position, wherein one of said first and second positions produces said right side surf wake, wherein when said right side upright *water diverter* produces said left side surf wake, a right side wake is not said right side surf wake, and when said left side *upright water diverter* produces said right side surf wake, a left side wake is not said left side surf wake.

Defendant argues, and Plaintiff acknowledges, the specification describes water diverters as having a pivot axis. *See* '873 Patent, col. 2, ll. 43-47 ("Another aspect of the present invention is directed to a surf wake system including a flap for deflecting water traveling past a transom of the watercraft, a hinge for pivotally mounting the flap relative to the watercraft, the hinge having a pivot axis extending adjacent and along a side edge of the transom, and a positioner operably connected to the flap for positioning the flap relative to a longitudinal axis of the watercraft between a neutral position and an outward position."); *Id.* at col. 6, ll. 6-15 ("the water diverters

14

are in the form of flaps, pivotally mounted on respective hinges, which have a pivot axis extending adjacent and alongside of edge of the transom").

As the Federal Circuit has cautioned, however, courts should "avoid the danger of reading limitations from the specification into the claim." *Phillips,* 415 F.3d at 1323. The Court finds that adopting the Defendant's proposed construction, requiring an upright water diverter to have a pivot axis, ignores the Federal Circuit's instructions. Further, as Plaintiff emphasizes, various embodiments in the specification of the '873 Patent describe some water diverters connected about a pivot axis, while others do not pivot at all. *See GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (explaining that "it is improper to read limitations from a preferred embodiment described in the specification even if it is the only embodiment into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited") (quoting *Liebel Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004)). For example, Figure 18 (depicted below), represents an "exemplary embodiment of the present invention" that "includes flaps that are mounted to extend to rearward of transom" and "flaps may be mounted to slide along a track assembly mounted on the side of the hull." Patent '873, col. 14, ll. 64-67 and col. 15, ll. 1-3.



FIG. 18

Defendant asserts that its proposed construction is not in conflict with the above embodiment. The undersigned disagrees and further notes that this is not the first instance wherein the Court has noted that the '873 Patent encompasses diverters that do not pivot. Specifically, in

15

*Malibu* I, the Court noted, "While there are obvious differences between Nautique's and Malibu's systems, Malibu's patent[] *encompasses diverters that do not pivot*." 122 F. Supp. 3d at 737 (comparing '873 Patent, col. 25, ll. 4-9, which discloses in an independent claim, upright water diverters movable between a first and second position, *with* '873 Patent, col. 25, ll. 49-50 and col. 26, ll. 48-51, which discloses in dependent claims, diverters that pivot) (emphasis added). The Court notes that "a claim construction that would exclude the preferred embodiment 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'" *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) (quoting *Vitronics Corp. v.. Conceptronic, Inc.,* 90 F.3d 1576, 1583, 39 USPQ2d 1573, 1578 (Fed. Cir. 1996)).

Defendant states that Plaintiff's sliding embodiment assertions should be disregarded because they do not overcome Plaintiff's disavowal or otherwise show that the claimed upright water diverters may deploy downwardly. Defendant maintains that Plaintiff has disavowed claim scope that would allow for downwardly deploying structure. For instance, Defendant asserts that during prosecution of the '873 Patent, Plaintiff distinguished U.S. Patent No. 7,707,956 ("Moore"), stating that Moore teaches "front hinged trim tabs or plates," which are not upright. [Doc. 37 at 19]. Further, Defendant asserts that in distinguishing U.S. Patent No. 7,617,026 ("Gee") and U.S. Patent No. 6,006,689 ("Olofsson"), Plaintiff stated that trim devices are different than upright water diverters because the claimed upright water diverters require the structure to disrupt the flow of water along the side past the transom such that the flow of water is redirected outwardly and/or rearwardly, facilitating constructive interference of converging waves to form a surf wake. Defendant also asserts that Plaintiff's expert noted that the trim tabs like the prior art referenced in the '873 Patent cases a boat to lean and tilt—principles from which the '873 Patent teaches

16

away.[8]  Further, in Defendant's supplemental brief, it argues that in *Malibu* II, Plaintiff responded to discovery asserting similar positions as noted above.

The Court has considered the above arguments; however, as Plaintiff argued in its reply brief, none of the above statements made during prosecution or otherwise mention a "pivot axis oriented vertically with respect the boat," the limitation that Defendant urges the Court to adopt. *See Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 798 (Fed. Cir. 2019) (explaining that "[t]o operate as a disclaimer, the statement in the prosecution history must be clear and unambiguous, and constitute a clear disavowal of scope") (quoting *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007)).  Accordingly, the Court finds Defendant's argument not well taken, and the Court recommends that "water diverter" be given its plain and ordinary meaning.

### 3.    "Surf Wake"

With respect to "surf wake," Plaintiff proposes the following construction: "a wake whose size, shape, or other characteristics have been enhanced for surfing."   Plaintiff argues that the above construction was adopted by the undersigned in *Malibu* II and that this previous construction is consistent with the language of the '873 Patent.  Plaintiff argues that Defendant's construction requires a surf wake to be produced by an upright water diverter, despite the '873 Patent's description of prior art methods of producing a surf wake.   Further, Plaintiff argues that Defendant's proposed construction introduces significant ambiguity into the claims, which is contrary to the purpose of claim construction.

---

[8] Defendant also argues that Plaintiff disavowed the claim scope while prosecuting the '161 Patent.  The Court will analyze Defendant's arguments regarding the '161 Patent below.  *See infra,* section III, B(3).

Defendant asserts that its proposed construction, "an enhanced wake produced by an upright water diverter as a boat moves through water" is consistent with the language of the Patent.[9]  Defendant contends that Plaintiff's proposed construction of "surf wake" is indefinite and depends upon the subjective opinions and abilities of those practicing the alleged invention. Defendant argues that inventor testimony is consistent with the lack of objectivity.  Defendant argues that the specification also teaches that opinions on what is and is not a surf wake differ among those skilled in the art based upon their relative skill in the art.   Defendant states that although the specification references size, shape, and wake characteristics, it does not do so in a manner specifically defining "surf wake," but instead, does so in uncertain terms, describing things in isolation or in the disjunctive.

Further, Defendant states that Plaintiff's proposed construction injects indefinite terms, depends on the skill of the surfer, fails to provide notice of when the claimed invention is in practice, and is not required by the Patent.  Finally, Defendant argues that its use of "upright water diverters" in its proposed construction makes the claim term more definite by describing what creates the wake at issue and that the term "surfing" in Plaintiff's proposed construction is inconsistent with the specification that states the claimed invention is not limited to surfing.

The Court has considered the above arguments, and the Court recommends that "surf wake" be construed as "a wake whose size, shape, or other characteristics have been enhanced for surfing."  The Court finds that this construction is consistent with the language of the '873 Patent. Specifically, the Patent states as follows, "Generally, the present invention relates to a surf wake

_____

[9] During the hearing, the Court questioned whether one could have a surf wake if the boat was not moving.  [Doc. 45 at 100].  Defendant agreed that the phrase "as a boat moves through water" is not necessary and that the Court could strike that phrase.  [*Id.*].

18

system for a watercraft that is concerned with flow management of water passing the stern as the water craft is moving forward through a body of water, so that water is directed in such a manner to enhance size, shape, and/or other characteristics the resulting wake of the watercraft." '873 Patent, col. 5, ll. 46-51. Figures 6A, 6B, and 6C, depicted below, are illustrative. Figure 6A is a conventional wake that is not suitable for surfing. *Id.* at col. 9, ll. 36-40. Figure 6B (a starboard wake) and Figure 6C (a port side wake) show an enhanced wake suitable for surfing.



Fig. 6A

Fig. 6B

Fig. 6C

19

Further, the Court finds that Defendant's construction improperly narrows the term's scope. Defendant's construction adds the phrase, "produced by an upright water diverter," citing to Claims 1 and 20. Claims 1 and 20 state as follows, in relevant part:

Claim 1. A boat configured to generate a starboard side surf wake for at least right-foot-forward wake surfing and a port side surf wake for at least left-foot-forward wake surfing, said port side surf wake different from said starboard side surf wake, the boat comprising:

* * *

a port side upright water diverter movable between a first and second position, wherein one of said first and second positions produces said starboard side surf wake;

a starboard side upright water diverter movable between a first and second position, wherein one of said first and second positions produces said port side surf wake;

Claim 20. A boat configured to produce a right side surf wake and a left side surf wake different from said right side surf wake, both said right side surf wake and left side surf wake different from a wake of said boat moving through water without water diverters engaged, said boat comprising:

* * *

a right side upright water diverter operably connected to at least one of said actuators to move between a first and second position, wherein one of said first and second positions produces said left side surf wake; and

a left side upright water diverter operably connected to at least one of said actuators to move between a first and second position, wherein one of said first and second positions produces said right side surf wake, wherein when said right side upright water diverter produces said left side surf wake, a right side wake is not said right side surf wake, and when said left side upright water diverter produces said right side surf wake, a left side wake is not said left side surf wake.

20

The Court finds that the above claims show that the surf wake is produced by using several components and is not limited to the upright water diverters. Further, as explained above, other language in the Patent supports the Court's construction. *See* '873 Patent, col. 5, ll. 49-51 ("so that water is directed in such a manner to enhance size, shape, and/or other characteristics the resulting wake of the watercraft"). As Plaintiff notes, the embodiments describe "various other wake modifying devices," such as "a wake-modifying device to enhance the overall size of the wake formed by the watercraft," "pivotal centerline fins," or "extra weight or ballast." *Id.* at col. 6, ll. 16-36. The '873 Patent states, "Similarly, one will appreciate that positioning extra weight or ballast adjacent the transom may also be very beneficial in enhancing the size of a wake, with or without the use of a wake modifying device, however, such weight or ballast need not be used, nor is essential to be used in combination with the surf wake system of the present invention." *Id.* at col. 6, ll. 30-36. Thus, the Court agrees with Plaintiff that Defendant's limitation is not consistent with the language of the Patent.

Further, Defendant argues that the specification teaches that opinions on what is and is not a surf wake differ among those skilled in the art based upon their relative skill in the art. Specifically, the specification states, "For example, experienced surfers may prefer larger faster wakes, while novice surfers may want a smaller, slower manageable wake." *Id.* at col. 8, ll. 7-9. This statement, however, does not teach that the opinions on what constitute a surf wake differ—it simply teaches that surfers' preferences on surf wakes differ. Defendant asserts that "surf wake" is an indefinite term because it depends on the subjective opinions and abilities of those practicing the invention. Defendant cites to the testimony of Daniel Gasper, the named inventor on all three Patents. Defendant argues that when asked whether "surf wake" has a commonly understood meaning in the industry, Gasper testified, [i]t's pretty gray" and that "different people have

21

different meanings for surf wake." [Doc. 37-1 at 12]. Defendant asserts that other inventors testified and agreed that "surf wake" had no commonly understood meaning and that "surf wake" depended on the surfer. The Court has reviewed this testimony and does not find it inconsistent with the Court's recommendation. For instance, as noted above, Gasper testifies that the meaning of "surf wake" is "pretty gray," but later testifies that most people in the industry would agree that a "surf wake" is a wake that can be surfed on. [Doc. 37-1 at 12]. Defendant's construction of the term does not provide what the wake is enhanced for, rendering its construction ambiguous.

Finally, Defendant asserts that Plaintiff's insistence to specify "surfing" in the construction of "surf wake" is misplaced because the specification makes clear that the claimed invention is not limited to surfing. [Doc. 37 at 26] (citing '873 Patent, col. 10, ll. 18-20). The Court agrees with Plaintiff that the specification discloses that "the surf wake system" may be activated for other purposes but that a "surf wake" is one that has been enhanced for surfing. Defendant's citations to the specification discloses a wake that is suitable for surfing. *See* '873 Patent, col. 5, ll. 46-51, col. 8, ll. 23-25, col. 10, ll. 1-2, col. 13, ll. 18-19, col. 13, ll. 28-29. Accordingly, the Court recommends that "surf wake" be construed as "a wake whose size, shape, or other characteristics have been enhanced for surfing."

4. **"wherein when said port side water diverter produces said starboard side surf wake for right-foot-forward wake surfing, a port side wake is substantially unsuitable for left-foot-forward wake surfing, and when said starboard side water diverter produces said port side surf wake for left-food forward wake surfing, a starboard side wake is substantially unsuitable for right-foot-forward waking"**

Plaintiff asserts that no construction of this term is necessary and that the plain and ordinary meaning should apply. Plaintiff argues that this term was subject to a separate challenge in *Malibu I*, wherein defendant contended that the claim was indefinite under 35 U.S.C. § 112. Plaintiff

22

states that the Court concluded that the specification provided sufficient guidance as to the meaning of the term. Plaintiff asserts that the plain meaning of the term is readily apparent without further construction by the Court, particularly in light of the claim language's context. Plaintiff explains that the asymmetrical nature of the port side and starboard side wakes is described throughout the '873 Patent's specification. Plaintiff maintains that Defendant's proposed construction is unworkable because it incorporates Defendant's flawed construction of "surf wake" and abandons the claim's distinction between a port side wake and a starboard side wake. Plaintiff asserts that Defendant improperly asks the jury to decide whether the wake has undefined characteristics that make it more suitable for right-foot-forward surfing or for left-foot-forward surfing.

Defendant asserts that the disputed term should be construed as "an enhanced wake produced by an upright water diverter as a boat moves through water having characteristics which make it more suitable for right/left-foot forward surfing." Defendant contends that "substantially unsuitable" is indefinite because it depends on the subjective opinions and abilities of those practicing the alleged invention and that the inclusion of "upright water diverters" makes the disputed claim term more definite.

The Court recommends that construction of the disputed term is unnecessary because the term is readily apparent in light of the language in the claim. Specifically, the claim language, in relevant part, provides as follows and with the disputed term in italics:

1. A boat configured to generate a starboard side surf wake or at least right-foot-forward wake surfing and a port side surf wake for at least left-foot-forward wake surfing, said port side surf wake different from said starboard side surf wake, the boat comprising:

   one or more actuators responsive to said controller to move said port side water diverter from one of said first and second

23

positions to the other of said first and second positions, and move said starboard side water diverter from one of said first and second positions to the other of said first and second positions, *wherein when said port side water diverter produces said starboard side surf wake for right-foot-forward wake surfing, a port side wake is substantially unsuitable for left-foot-forward wake surfing and when said starboard side water divert produces said port side surf wake for left-foot-forward wake surfing, a starboard side wake is substantially unsuitable for right-foot-forward wake surfing*.

The Court agrees with Plaintiff that the asymmetrical nature of the port side and starboard side wakes is described through the '873 Patent's specification. As Plaintiff emphasizes, the specification provides:

> Various embodiments disclosed herein can relate to a boat configured to create an asymmetrical wake suitable for wake surfing. The boat can include first and second upright wake modifiers. The first wake modifier can be configured to engage to form a right side asymmetrical wake, and the second wake modifier can be confirmed to engage to form a left side asymmetrical wake. Each of the right and left side asymmetrical wakes can be different from a non-surf wake of the boat moving through water without first and second wake modifiers engaged.

'873 Patent, col. 3, ll. 58-67. In addition, the specification states, "Various embodiments disclosed herein can relate to a boat configured to generate a starboard side surf wake for at least goofy-foot wake surfing and a port side surf wake for at least regular-foot wake surfing, with the port side surf wake different from the starboard side surf wake." '873 Patent, col. 3, ll. 25-29; *see also Malibu* I, 122 F. Supp. 3d at 741 (rejecting defendant's claim that "substantially unsuitable for left or right-foot forward wake surfing" is indefinite, explaining that the "specification supports that starboard side surf wakes are generally more readily surfable by right-foot-forward wake surfers, that port side surf wakes are generally more readily surfable by left-foot-forward wake surfers, and that the wake on the same side as the deployed water diverter is not substantially suitable for surfing because it does not have a substantially smooth face or high peak").

24

With respect to Defendant's proposed construction, it seeks to incorporate its construction for "surf wake," which the Court has already declined to adopt as explained above. The Court further agrees that Defendant's proposed construction eliminates the asymmetrical nature of the claim. Accordingly, the Court recommends that "wherein when said port side water diverter produces said starboard side surf wake for right-foot forward wake surfing, a port side wake is substantially unsuitable for left-foot-forward wake surfing, and when said starboard water diverter produces said port side surf wake for left-foot-forward wake surfing, a starboard side wake is substantially unsuitable for right-foot-forward wake surfing" be given its plain and ordinary meaning.

### 5.     "Wake Surf Settings"

With respect to "wake surf settings," Plaintiff proposes the following construction: "settings that can affect the resulting surf wake." Plaintiff states that this construction is consistent with the broad range of wake surf settings described in the '873 Patent. Plaintiff argues that Defendant's construction attempts to exclude numerous examples of wake surf settings described in the '873 Patent's specification and narrowly limits "wake surf settings" to those containing a specific rider's information and preferences. Plaintiff argues that Defendant's proposed construction unduly limits the term and excludes several embodiments described in the '873 Patent.

Defendant proposes the following construction: "settings containing a specific rider's information and preferences." Defendant insists that the language in the '873 Patent is consistent with its construction. Defendant states that Plaintiff's construction should not be adopted because it incorporates the limitation "surf wake" and neither the claims, nor the specification provide that "wake surf settings" are necessarily limited to the claimed surf wake features.

The Court notes that during the *Markman* hearing in *Malibu* II, the undersigned proposed that "wake surf settings" be construed as "settings that can affect the resulting surf wake." Both parties agreed to the Court's proposal, so the Court recommended that the term be construed as "settings that can affect the resulting surf wake." The Court finds the previous construction consistent with the language in the '873 Patent and recommends that such construction be adopted in the present matter.

Specifically, Independent Claim 20 of the Patent provides for a "boat comprising a memory storing information including a plurality of wake surf settings." Dependent Claim 25 provides:

> The boat of claim 20 wherein said wake surf settings comprise at least one preset surf run, said preset surf run including predetermined transitions from said right side surf wake to said left side surf wake or vice versa and wherein said controller is configured to execute said preset surf run.

Th Court finds that Defendant's proposed construction unduly limits the term. The claims do not limit "wake surf settings" to a specific rider's information and preferences. Further, Dependent Claim 25 explicitly states that wake surf settings include "*at least one preset surf run.*" (Emphasis added).

Defendant points to the specification, arguing that it discloses "rider information as well as the Rider's preferences" and the "preferred wake surf settings may be stored in the control system." The specification provides as follows:

> Control system 32 may also include a memory that is configured to store information regarding watercraft configuration including static parameters such as hull shape, hull length, weight, etc., as well as dynamic parameters passenger weight, ballast, wedge, speed, fuel, depth, mind, etc. The memory may also include "Rider" information regarding the surfer (or boarder or skier) (including goofy/regular footed, weight, board length, board type, skill level, etc.). Moreover, the memory may be configured to store "presets" that include the information regarding a specific "Rider" including the Rider information as well as the Rider's preferences such as left

26

> or right wave, a preferred watercraft speed, a preferred wake height, etc. One will appreciate that the presets could be for the surf wake system as well as other parameters including POWER WEDGE setting, watercraft speed, goofy/regular footed, steep wave face, amount of weight, wave size, etc. One will appreciate that such presets would allow the watercraft operator to quickly reconfigure the surf wake system to accommodate various "Riders," for example very experienced professional wake surfers, beginner wake surfers, and anyone in between.

Patent '873 col. 11, ll. 50-67 and col. 12, ll. 1-3. Defendant's proposed construction improperly limits "wake surf settings" to "a specific rider's information and preferences" when, as illustrated by the above language, this is simply a feature. *Phillips*, 415 F.3d at 1323 (stating that courts should "avoid the danger of reading limitations from the specification into the claim"). Further, the above language uses the word "may" when referencing rider information and does not constitute a basis for limiting the term. Similarly, Defendant's citations to other language in the Patent are not grounds to adopt Defendant's construction. *See* '873 Patent, col. 11, ll. 50-66 and col. 12, ll. 1-7; col. 19, ll. 53-67 and col. 20, ll. 1-27; col. 21, ll. 6-43; and col. 24, ll. 17-27. Accordingly, the Court recommends that "wake surf settings" be construed as "settings that can affect the resulting wake."

## B. Patent '161

The parties dispute five terms with respect to the '161 Patent: (1) "flap," (2) "the watersports boat is configured to change enhancing from the starboard wave to enhancing the port wave when a surfer desires to change from surfing an enhancing starboard wave to surfing an enhanced port wave or to change from enhancing the port wave to enhancing the starboard wave when the surfer desires to change from surfing the enhance port wave to surfing the enhanced starboard

wave," (3) "past the transom/past an edge of the transom," (4) "first respective edge," and (5) "second respective edge."[10]

The Court will address these terms separately, unless otherwise noted.

### 1.     "Flap"

With respect to the term "flap," Plaintiff states that no construction is necessary. Plaintiff argues that each asserted claim of the '161 Patent requires port and starboard flaps. Plaintiff states that "flap" is both an intentionally familiar and broad term and one with a widely accepted ordinary meaning that would be readily apparent to a jury. Plaintiff argues that the specification also describes "flaps" in a broad and diverse fashion. Plaintiff states that Defendant's construction attempts to import several limitations into what constitutes "flap," and these limitations are not supported by the record.[11]

Defendant proposes the term "flap" be construed as "a water diverting structure having a pivot axis oriented vertically with respect to the boat, allowing for slight deviation from vertical." This is the same construction that Defendant proposes for "upright water diverter." Defendant asserts that the terms are synonymous. Defendant argues that Plaintiff fails to support the contention that "flap" as used in the '161 Patent has a meaning used in common parlance. Defendant states that the inventor, Adam McCall, testified that the term "flap" lacked a commonly understood meaning in Plaintiff's industry and that its meaning depended on context. Defendant argues that as a result, the scope of the term "flap" should be determined by the specification and

_____

[10] As noted above, the parties did not present oral argument on the disputed terms "first respective edge" and "second respective edge." *See supra* note 4.

[11] At the hearing, the undersigned inquired as to whether Plaintiff would like to offer a construction for "flap." [Doc. 45 at 138]. Plaintiff stated that in a previous case, it proposed the following construction: "structure that extends from another structure." [*Id.*].

28

disclosures of the '161 Patent. Defendant argues that that prosecution history supports its position. Defendant states that for instance, Plaintiff characterized "flap" and "upright water diverter" synonymously during the prosecution of this Patent.

The Court begins with the language found in the Claims, which provide, in relevant part, as follows:

> 1. A water-sports boat having a surf wake system for modifying a wake having eventually diverging port and starboard waves formed by the water-sports boat traveling through water to enhance the starboard wave to have a face substantially smoother than a face of the port wave or to enhance the port wave to have a face substantially smoother than a face of the starboard wave, the water-sports boat comprising:
>
> * * *
>
> a pair of *flaps* including a port *flap* and a starboard *flap*, each independently movable from a retracted position wherein a respective *flap* is substantially entirely retracted behind the transom such that no substantial portion of the respective *flap* extends past a port-side edge, a starboard-side edge, or in a bottom edge of the transom to a deployed position in which portions of a respective *flap* move past the transom to deflect water traveling along the hull of the water-sports and past the transom;
>
> wherein the port *flap*, when in the deployed position while the starboard *flap* is in the retracted position, enhances the starboard wave by making the face of the starboard wave substantially smoother than the face of the port wave;
>
> wherein the starboard *flap*, when in the deployed position while the port *flap* is in the retracted position, enhances the port wave by making the face of the port wave substantially smoother than the face of the starboard wave.

The dependent claims further describe flaps as follows: (1) in the deployed position, the respective flap extends outward beyond a side surface of the water-sports boat at the transom to deflect water traveling along the side and past the transom (claim 2); (2) each flap comprises a substantially planar member (claim 7); (3) each flap is approximately 10-15 inches high and

29

approximately 15-20 inches long (claim 8); and (4) each flap comprises at least one of plastic, stainless steel, wood and fiberglass (claim 9). Dependent Claim 3 describes a "plurality of positioners operably connected to a respective flap for positioning the respective flap relative to a longitudinal axis of the water-sports boat." Dependent 4 describes "at least one of the plurality of positioners is a linear actuator configured to selectively move a respective flap between the respective retracted and deployed positions." Dependent claim 14 further provides:

> The water-sports boat of claim 1, wherein:
>
> the port flap pivots between the retracted position and the deployed position about a pivot axis, wherein the port flap has a substantially planar portion that is substantially parallel to the pivot axis and an angled end portion that is offset from the substantially planar portion in a direction away from a centerline of the hull, wherein the angled end portion is configured to redirect water away from the hull when the port flap is in the deployed position, and wherein the substantially planar portion is between the pivot axis and the angled end portion; and
>
> the starboard flap pivots between the retracted position and the deployed position about a pivot axis, wherein the starboard deployed position about a pivot axis, wherein the starboard flap has a substantially planar portion that is substantially parallel to the pivot axis and an angled end portion that is offset from the substantially planar portion in a direction away from a centerline of the hull, wherein the angled end portion is configured to redirect water away from the hull when the starboard flap is in the deployed position, and wherein the substantially planar portion is between the pivot axis and the angled end portion.

*See also* Dependent Claim 15 (discussing that the port and starboard flaps pivot between the retracted position and the deployed position about a port hinge having a pivot axis).

Further, Independent Claim 19 describes the method of operating a water-sports boat to modify a wake, stating in relevant part, as follows:

> Positioning a port flap in a deployed position while a starboard flap is in a retracted position, wherein when the starboard flap is in the retracted position the starboard flap is substantially entirely retracted

30

behind a transom of the water-sports boat such that no substantial portion of the starboard flap extends past a port-side edge, a starboard-side edge, or a bottom edge of the transom, and wherein when the port flap is in the deployed position portions of the port flap move past the transom to defect water traveling along a hull of the water-sports boat to enhance the starboard wave by making the face of the starboard wave substantially smoother than the face of the port wave; and

moving the starboard flap to the deployed position and the port flap to the retracted position to change from enhancing the starboard wave to enhancing the port wave while the water-sports boat is moving through water at a speed suitable for surfing when a surfer desires to change from surfing an enhanced starboard wave to surfing an enhanced port wave, wherein when the port flap is in the retracted position the port flap is substantially entirely retracted behind the transom such that no substantial portion of the port flap extends past of a port-side edge, a starboard-side edge, or a bottom edge of the transom, and wherein when the starboard flap is in the deployed position portions of the starboard flap move past the transom to deflect water traveling along a hull of the water-sports boat to enhance the port wave by making the face of the port wave substantially smoother than the face of the starboard wave.

*See also* Dependent Claim 23 (explaining that moving one of the flaps to the deployed position while the other flap is in the retracted position enhances the wave "without needing to move weight from one side to the other in the at least one of ballast tanks, bags, or bladders") and Claims 24 and 25 (explaining that the port and starboard flaps pivot between the retracted position and the deployed position about a pivot axis and that the port and starboard flaps pivot between the retracted position and the deployed position about a port hinge having a pivot axis); *see also* Claims 29, 31, 34, 40, 41, and 44.

The Court has considered Defendant's argument that "flap" is synonymous with "upright water diverter." As discussed above, however, the Court does not recommend that Defendant's construction of "upright water diverter" be adopted. The Court further disagrees with Defendant's construction of the term "flap." Again, Defendant's construction requires flaps to have a pivot

31

axis (the same proposed construction of "upright water diverters"),[12] but nothing in the claims require flaps to have a pivot axis. While Dependent Claim 14 states that flaps "pivot[] between the retracted position and the deployed position about a pivot axis," courts have noted that "dependent claims are presumed to be narrower than the independent claims they rely on." *Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1370 (Fed. Cir. 2016); *see* also *Curtiss-Wright Flow Control Corp. v Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006) (explaining the "presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim"). In addition, Defendant's proposed construction would render Dependent Claim 14 superfluous. *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."). Finally, there is nothing in the claims that recite that the port side flap or the starboard side flap are "upright" as Defendant has defined the term.

Further, the Court has reviewed the specification and finds it inconsistent with Defendant's proposed construction. For instance, the specification recites, "In still another exemplary embodiment of the present invention, surf wake system 32 is similar to the systems described above but includes flaps 33, that are mounted to extend rearward of transom 35, as shown in Fig. 18. Flaps may be mounted to slide along a track assembly 86 mounted on the side of the hull, or alternatively, may be considered to extend directly outwardly from the hull." '161 Patent, col. 24, ll. 16-22. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (finding

---

[12] The Court notes that in the '873 Patent, Claim 2 states, "The boat of claim 1, wherein said water diverters comprise flaps." The Court agrees with Plaintiff that if Claim 2 is presumed to further limit Claim 1, "upright water diverter" and "flap" cannot be synonymous.

32

that a "construction that excluded a preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support," to find otherwise).

Defendant argues that during prosecution, Plaintiff used the claims "upright water diverter" and "flap" synonymously. Defendant relies on Plaintiff's December 23, 2013 Amendment and Reply, to the Office Action issued by the USPTO on July 26, 2013, which provides as follows:

> The Examiner has rejected claims 1-22 under 35 U.S.C. § 102 and 103 as being anticipated by, or unpatentable over one or more of the following references: U.S. Patent No. 6,012,408 to Castillo ("Castillo"). Castillo lacks the surf wake system of the present invention including upright water diverters (claim 1) or upright flaps (claim 7) independently movable to generate . . distinct port and starboard surf wakes, and extend substantially parallel to an intersection of the transom and respective port and starboard sides in both their neutral and deployed positions, as is called for by independent claims 1 and 7.

[Doc. 36-9 at 3]. Here, there are two different claims that were addressed, and the Court does not find the above language constitutes a clear statement that narrows the ordinary meaning of the term "flap." *CCS Fitness,* 288 F.3d at 1367 (explaining that the accused infringer must show something in the specification or prosecution history that overcomes the heavy presumption that terms are given their ordinary meaning).

Finally, Defendant cites to the testimony of Adam McCall, the named inventor of the '161 Patent. Defendant asserts that McCall testified that "flap" lacked a commonly understood meaning in the industry and that its meaning depended on context. Specifically, McCall testified as follows:

> Q.    Okay.  Do you understand the term "flap" to have a commonly understood meaning in Malibu's industry?
>
> A.    No.
>
> Q.    Okay.  What does the term "flap" mean to you? . . .

33

A.      I would have to understand the context that it's used in because I feel like that's – you know, that could be a number of things.

[Doc. 37-2 at 4-5].  The Court gives this testimony little weight, especially in light of the intrinsic evidence.  *Phillips*, 415 F.3d at 1317 ("However, while extrinsic evidence can shed useful light on the relevant art, we have explained that it is "less significant than the intrinsic record in determining the legally operative meaning of claim language.") (Internal quotations omitted).  McCall states that he would need to understand the context in order to articulate what the term means to him, and it is not clear to the Court when, or whether, he read the '161 Patent.  *Id.* at 1321 ("Properly viewed, the "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent.").  Accordingly, the Court finds Defendant's arguments not well taken, and the Court recommends that "flap" be given its plain and ordinary meaning.

**2.  "The water-sports boat is configured to change from enhancing the starboard wave to enhancing the port wave when a surfer desires to change from surfing an enhanced starboard wave to surfing an enhanced port wave or to change from enhancing the port wave to enhancing the starboard wave when the surfer desires to change from surfing the enhance port wave to surfing the enhanced starboard wave"**

Plaintiff argues that the claim term consists of several smaller, commonly used terms that are used in common parlance and have no special meaning in the art.  Plaintiff states that the easily understood context of when a water-sports boat switches from enhancing port waves to enhancing starboard waves and vice versa is described through the specification.  Plaintiff argues that Defendant's proposed construction rewrites the limitation entirely.  Plaintiff states that Defendant attempts to incorporate one narrow embodiment that includes a remote device into the independent claims.  Plaintiff argues that the specification includes two sentences that describe that the control system may also include a remote, which may allow a rider to actuate the surf wake system.

34

Plaintiff further states that Defendant relies on that description in an attempt to drastically rewrite the claims from "how 'the water-sports boat is configured to change . . . when a surfer desires to change' to a new limitation that requires 'boat feature' that is responsive to the surfer so that the surfer may actuate a flap.'" [Doc. 35 at 25].

Defendant proposes the following construction of the disputed term: "boat feature responsive to the surfer so that the surfer may actuate a flap to change from enhancing the starboard wave to enhancing the port wave and vice versa." Defendant asserts that the scope of the term is confusing and that it is not clear whether the term allows anyone to actuate a flap or whether it is limited to a surfer actuating the flap. Defendant states that the phrase "configured to" leads to the conclusion of the latter and that the surfer actuates the system as the "change from enhancing the starboard wave to enhancing the port wave" occurs "when a surfer desires to change from surfing an enhanced starboard wave to surfing an enhanced port wave or vice versa." [Doc. 37 at 40] Defendant asserts that to construe the term in a manner that allows any person on a boat to actuate the surf wake system would read an express limitation "when a surfer desires" out of the claims.

Further, Defendant argues that the phrase "when a surfer desires" was added to the Patent claims in an amendment dated July 29, 2015, submitted in conjunction with a response to a Final Office Action. Defendant argues that Plaintiff did not explain why the language was added, and therefore, the Court should presume that Plaintiff had a substantial reason related to patentability for including the language. Defendant asserts that Plaintiff's construction would render the amendment a nullity.

The disputed term is found in Independent Claims 1, 17, 29, and 34, which provide as follows:

A water-sports boat having a surf wake system for modifying a wake having eventually diverging port and starboard waves formed by the water-sports boat travelling through water to enhance the starboard wave to have a face substantially smoother than a face of the port wave or to enhance the port wave to have a face substantially smoother than a face of the starboard wave, the water-sports boat comprising:

* * *

wherein the water-sports boat is configured to change from enhancing the starboard wave to enhancing the port wave when a surfer desires to change from surfing an enhanced starboard wave to surfing an enhanced port wave or to change from enhancing the port waves to enhancing the starboard wave when the surfer desires to change from surfing the enhance port wave to surfing the enhanced starboard wave, and wherein the water-sports boat is configured to change from enhancing the starboard wave to enhancing the port wave or to change from enhancing the port wave to enhancing the starboard wave while moving through water at a speed suitable for surfing.

The Court agrees with Plaintiff that this term should be given its plain and ordinary meaning. The Court further finds that Defendant's proposed construction imposes a limitation that is not found in the claims. Specifically, Defendant's construction changes the claim from how the water-sports boat is configured. Defendant asserts that the "configured to" phrase leads to the conclusion that the surfer actuates the system, but the Court disagrees with this conclusion because there is nothing in the claims that require the surfer to actuate the system. The Court does not construe "when a surfer desires a change" to mean that the surfer actually performed the change.

Defendant notes that its construction is reinforced by the specification that teaches that the "control system" may include "a remote which may allow a rider to actuate the surf wake system," and clarifies that "riders are surfers." The specification provides, "Control system 32 may also include a remote which may allow a rider to actuate the surf wake system. For example, a remote may allow a rider to further deploy or retract flap 33, to an interim position to vary the size of

36

wake." '161 Patent, col. 11, ll. 24-27. The Court declines to interpret the word "may" as used in the specification to limit the claim. It appears to the Court that the above statement is merely an example, not a limitation. *Phillips*, 415 F.3d at 1323 ("To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so.").

Finally, Defendant asserts that "when a surfer desires" was added to the patent claims on July 29, 2015, as an amendment submitted in conjunction with a response to a Final Office Action. Defendant argues that Plaintiff added such language without an explanation, and therefore, the Court must presume that Plaintiff had a substantial reason related to patentability. As Plaintiff argued at the hearing, however, the amendment has been given effect because it is present in the claims. Defendant's construction, as explained above, improperly limits the claim by relying on a specification. Accordingly, the Court recommends that the term "the water-sports boat is configured to change from enhancing from the starboard wave to enhancing the port wave when a surfer desires to change from surfing an enhanced starboard wave to surfing an enhanced port wave or to change from enhancing the port wave to enhancing the starboard wave when the surfer desires to change from surfing the enhance port wave to surfing the enhanced starboard wave" be given its plain and ordinary meaning.

### 3. "past the transom/past an edge of the transom"

Plaintiff asserts that a construction is not necessary with respect to the disputed term. Plaintiff argues that Defendant is attempting to severely narrow the claims of the '161 Patent by limiting them to certain embodiments in the specification in an improper attempt to create a potential non-infringement position. Plaintiff argues that Defendant's construction violates the

37

doctrine of claim differentiation and renders other language in the claims superfluous. Plaintiff submits that Defendant's contention that the specification does not provide an explicit example of a flap deploying below a bottom edge of the transom is both factually flawed and legally irrelevant. Plaintiff maintains that the claim clearly encompasses deploying a portion of a flap beyond a port-side edge, a starboard-side edge, or a bottom edge of the transom.

Defendant proposes the following construction: "beyond the side of the transom." Defendant asserts that the '161 Patent does not discuss or depict an embodiment where flaps deploy moving past a bottom edge of the transom. Further, Defendant argues that Plaintiff disavowed flaps that deploy beyond the bottom edge of the transom during prosecution. Defendant asserts that the named inventors' testimony supports the limited scope of "past the transom." In addition, Defendant states that Plaintiff's arguments for broad claim scope should be disregarded. Defendant explains that in light of the specification, prosecution history, and inventor testimony, the doctrine of claim differentiation does not control. Further, Defendant argues that Plaintiff's superfluous "bottom edge" argument mischaracterizes the claim limitations. Defendant asserts that the specification does not support Plaintiff's construction.

The Court begins with the language found in the claims. Claim 1 provides, in relevant part, as follows and with the disputed term in italics:

> 1. A water-sports boat having a surf wake system for modifying a wake having eventually diverging port and starboard waves formed by the water-sports boat travelling through water to enhance the starboard wave to have a face substantially smoother than a face of the port wave or to enhance the port wave to have a face substantially smoother than a face of the starboard wave, the water-sports comprising:
>
> * * *
>
> a pair of flaps including a port flap and a starboard flap, each independently movable from a retracted position wherein a

38

respective flap is substantially entirely retracted behind the transom such that no substantial portion of the respective flap extends past a port-side edge, a star-board side edge, or a bottom edge of the transom to a deployed position in which portions of a respective flap move *past the transom* to deflect water traveling along the hull of the water-sports boat and *past the transom.*

Dependent Claim 2 recites "wherein in the deployed position, the respective flap extends outboard beyond a side surface of the water-sports boat at the transom to deflect water traveling along the side and past the transom." Dependent Claim 16 describes that "the port flap in the deployed position extends past the port-side edge of the transom; and the starboard flap in the deployed position extends past the starboard-side edge of the transom."

Further, Independent Claim 17 provides, in relevant part, with the disputed term in italics:

17. A water-sports boat having a surf wake system for modifying a wake having eventually diverging port and starboard waves formed by the water-sports boat travelling through water to enhance the starboard wave to have a face substantially smoother than a face of the port wave or to enhance the port wave to have a face substantially smoother than a face of the starboard wave, the water-sports boat compromising:

* * *

a pair of flaps including a port flap and a starboard flap, each independently movable from a retracted position to a deployed position in which portions of a respective flap deflect water traveling along the hull of the water-sports boat and *past the transom.*

Independent Claim 19 describes the method of operating a water-sports boat to modify a wake, explaining that when a flap (either port side or starboard side) is in the retracted position, it is "substantially entirely retracted behind a transom of the water-sports boat such that no substantial portion of the [respective] flap extends past a port-side edge, a starboard side edge, or bottom edge of the transom." When the flap is in the deployed position, "portions of the

[respective] flap move past the transom to defect water traveling along a hull of the water-sports boat." Independent Claim 29 recites that the water-sports boat comprises:

> a pair of flaps including a port flap and a starboard flap, each independently movable from a retracted position wherein at least portions of a respective flap are retracted behind the transom to a deployed position in which portions of a respective flap *move past an edge of the transom* to defect water traveling along the hull of the water-sports boat and *past the transom*.

*See also* Dependent Claim 34. Claims 44 and 45 state that the method comprises of positioning each respective flap (either port side flap or starboard side flap), "wherein when the [respective flap] is in the retracted position at least portions of the [respective flap] are retracted behind a transom of the water-sports boat, and wherein the [respective flap] is in the deployed position portions of the [respective flap] move past an edge of the transom to deflect water traveling along a hull of the water-sports boat . . ."

Both parties argue that the specification supports their arguments. Plaintiff argues that the specification discloses flaps extending "outboard of a transom" not merely to the sides, citing as an example, the summary of the invention, which provides, "The surf wake system may include a pair of upright water diverters including a port diverter and a starboard diverter, each independently movable from a neutral position to a deployed position in which a respective water diverter extends outboard of a transom of the watercraft to deflect water traveling along a hull of the watercraft and past the transom." '161 Patent, col. 1, l. 67 and col. 2, ll. 1-6. Plaintiff asserts that nowhere in the '161 Patent is extending "outboard of a transom" limited to outboard of a side of a transom, as opposed to outboard of a bottom of a transom.

Defendant also relies on the specification, citing as follows:

> Generally, the present invention relates to a surf wake system for a watercraft that is concerned with flow management of water passing the stern as the water craft [sic] is moving forward through a body

40

of water, so that water is directed in such a manner to enhance, size, shape and/or other characterizes the resulting wake of the watercraft. As will become apparent below, the surf wake system of the watercraft allows diversion of water passing along one side of the stern away from the usual converging area immediately behind the transom of the watercraft, so that the diverging water will enhance the resulting wake on the opposing side of the watercraft. In doing so, the surf wake system of the present invention allows the enhancement of wake without significant pitching or leaning of the watercraft to one side or the other.

'161 Patent, col. 5, ll. 1-14. Defendant further asserts that the '161 specification discloses water diverters that "extend outboard of a transom," "extend outboard a side strake" and that the water diverter is positioned "relative to a longitudinal axis of the watercraft." *Id.* at col. 2, ll. 12-23. Defendants cites to the specification that provides, "One will also appreciate that the pivot axis may be substantially vertical, substantially parallel to the side edge, some other angle there between, or some angle slightly inclined with respect to the side edge." *Id.* at col. 6, ll. 15-19. Defendant emphasizes that "the specification does not describe or illustrate a single embodiment in which flaps deploy by moving past a bottom edge of the transom to deflect water traveling underneath the hull." [Doc. 37 at 28].

Defendant also cites to the figures, several of which are depicted below. For instance, Figure 1 "illustrates a watercraft 30 equipped in a surf wake system 32 for modifying a wake formed by a watercraft travelling through water. . . The surf wake system of the present invention in general includes one or more water diverters 33, each water diverter is adjustably mounted relative to the watercraft for deflecting water travelling past a transom 35 of the watercraft. Broadly, the water diverters are movably mounted with respect to transom 35." '161 Patent, col. 5, ll. 17-19 and 23-28. Further, "[i]n the illustrated embodiment, the water diverters are in the form of flaps, 33, pivotally mounted on respective hinges 37, which have a pivot axis 39 extended

adjacent and along a side edge 40 of the transom." *Id.* at col. 5, ll. 29-32; *see also* Figure 2 ("an

enlarged perspective view of the flap assemblies"). *Id.* at col. 4, ll. 1-2.



With respect to Figure 5A, it illustrates the water diverters in their neutral positions, while

Figures 5B and 5C illustrate each respective flap in an "outward position" extending "beyond [each

respective] side strake. '161 Patent, col. 8, ll. 64-68 and col. 9, ll. 1-15.



At the hearing, Plaintiff stated that it did not object to the word "beyond" in Defendant's

proposed construction. [Doc. 45 at 52], Thus, central to this issue is whether the disputed term

should include the word "side." Plaintiff insists that the word "side" limits the ways flaps can be

42

deployed, [*Id.* at 54], while Defendant argues that the language in the '161 Patent teaches "deployment to the side edge and altering water rushing along the side." [*Id.* at 118].

The Court agrees with Defendant and recommends that "past the transom/at the edge of the transom" be construed as "beyond the side of the transom." The Court finds this construction more consistent with the claims and the specification in the '161 Patent. Again, the Court first looks to the language of the claims. *Phillips*, 415 F.3d at 1312 ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'") (quoting *Innova*, 381 F.3d at 115). Here, Claim 1 provides that when a flap is in the *retracted* position, no substantial portion of the respective flap extends past a port side edge, a starboard side edge, or a bottom edge of the transom. When the flap is in the *deployed* position, portions of the flap move past the transom to deflect water traveling along the hull of the water-sports boat and past the transom. Plaintiff asserts that the "claims clearly encompass deploying a portion of a flap beyond a port-side edge, a starboard-side edge, or a bottom edge of a transom." [Doc. 35 at 29]. The Court disagrees, as the language is clear in Claim 1 that the phrase "bottom edge of the transom" relates to the retracted position and not the deployed position of the flap.

Plaintiff asserts that Defendant's construction violates the doctrine of claim differentiation. Specifically, Plaintiff argues that Independent Claim 1 recites, in part, that when deployed "portions of a respective flap move past the transom to deflect water traveling along the hull of the water-sports boat and past the transom." Claim 1. Claim 2, however, which depends on Claim 1, recites that when deployed "the respective flap extends outboard beyond a side surface of the water-sports boat at the transom to deflect water traveling along side and past the transom." In addition, Independent Claim 29 recites, in part, "portions of a respective flap move past an edge of the transom to deflect water traveling along the hull of the water-sports boat and past the

43

transom." Claim 30, which depends on Claim 29, recites that "the port flap in the deployed position extends past a portside edge of the transom; and the starboard flap into deployed position extends past a starboard side edge of the transom."

In this case, the Court disagrees that claim differentiation disallows Defendant's proposed construction in this case. In making this recommendation, the Court finds that the Federal Circuit Court's decision in *Curtiss-Wright Flow Control* is instructive. There, the Court explained that "[i]n the most specific sense, 'claim differentiation' refers to the presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim.'" 438 F.3d at 1380 (citing *Nazomi Commc'ns, Inc. v Arm Holdings, PPLC*, 403 F.3d 1364, 1370 (Fed. Cir. 2005) ("[C]laim differentiation normally means that limitations stated in dependent claims are not to be read into the independent claim from which they depend.") (other quotations omitted). "Thus, the claim differentiation tool works best in the relationship between independent and dependent claims." *Id.*. The Court stated that "the statute stresses that a dependent claim must add a limitation to those recited in the independent claim." *Id.* (citing 35 U.S.C. § 114). The Court cautioned that "reading an additional limitation from a dependent claim into an independent claim would not only make that additional limitations superfluous, it might render the dependent claim invalid." *Id.* The Court further explained, "Beyond the independent/dependent claim scenario, this court has characterized claim differentiation more generally, i.e., as the "presumption that each claim in a patent has a different scope.'" *Id.* (quoting *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004)) (other quotations omitted). The Federal Circuit has also explained that the doctrine of claim differentiation "is not a rigid rule but rather is one of several claim construction tools." *ICU Med. Inc., v. Alaris Medical Systems, Inc.*, 558 F.3d 1338, 1376 (Fed. Cir. 2009).

44

In the present matter, the Court finds that the claims, coupled with the specification and the prosecution history, support Defendant's construction. Specifically, the '161 Patent specification discloses flaps that deploy by pivoting outwardly, flaps that deploy by extending laterally beyond a side strake, and flaps that deploy by extending parallel to the boat's longitudinal axis. '161 Patent col. 2, ll. 12-23. Further, the Patent specification discloses flaps that are "substantially vertical, substantially parallel to the side edge, some other angle there between, or some angle slightly inclined with respect to the side edge." *Id.* at col. 6, ll. 15-19. As Defendant emphasizes, the specification does not describe or illustrate a single embodiment in which flaps deploy by moving past a bottom edge of the transom to deflect water traveling underneath the hull. *See Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1137 (Fed. Cir. 2016) ("The district court's analysis does not involve importing limitations from embodiments described in the specification. Every embodiment described in the specification has inwardly extended short seals and every section of the specification indicates the importance of inwardly extended short seals. These two facts provide together a proper reason to limit the claims in this way.").

The Court is mindful that courts have "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1323 (citing *Gemstar-TV Guide Intern., Inc., v. Int'l Trade Com'n*, 383 F.3d 1352, 1366 (Fed. Cir. 2004)). This is because "section 112 of the Patent Act requires that the claims themselves set forth the limits of the patent grant, but also because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Id.*

The Court is also mindful that it should "avoid imposing limitations from the specification into the claims." *Phillips*, 415 F.3d at 1323; *see also Comark Commc'n, Inc., v. Harris Corp.*, 156

45

F.3d 1182, 1186-87 (Fed. Cir. 1998) (explaining that "there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification"). "The purposes of the specification are to teach and to enable those of skill in the art to make and use the invention and to provide a best mode for doing so." *Phillips*, 415 F.3d at 1323. As the Federal Circuit in *Phillips* reasoned:

> One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention of a particular case. Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive.

*Id.*

In this case, however, the language of the Patent as a whole supports Defendant's construction. Here, the specification describes as follows:

> Since the port side flap is an outward position and thus extends beyond the port side strake, waves on the port side are redirected, which facilitates constructive interference of converging waves to form a large starboard wake with a higher peak and smoother face that is suitable for starboard surfing, such as that shown in FIG. 6 B . . .

'161 Patent, col. 8, l. 67 and col. 9, ll. 1-5.

The specification further explains:

> Another aspect of the present invention is directed to a surf wake system including a flap for deflecting water traveling past a transom of the watercraft, a hinge for pivotally mounting the flap relative to the watercraft, the hinge having a pivot axis extending adjacent and along a side edge of the transom, and positioner operably connected to the flap for positioning the flap relative to a longitudinal axis of the watercraft between a neutral position and an outward position.

'161 Patent, col. 2, ll. 27-34.

46

The Patent further teaches that "the surf wake system of the present invention allows the enhancement of wake without significant pitching or leaning of the watercraft to one side or the other." '161 Patent, col. 7, ll. 44-53. The Court agrees with Defendant that this point is noted in the specification:

> By moving a flap of the present invention to an outward position, however, water is redirected which may lead to constructive interference to form a larger wake having a higher peak and a smoother face, which wake is conducive for surfing . . . Moreover, by placing the flaps along the side edges, the watercraft can generate a suitable surfing wake with less tilt or lean to one side, thus making the watercraft easier to control.

'161 Patent, col. 7, ll. 44-53. The above language is in contrast to the prior art referenced in the '161 patent, which creates a wake by "eadding weights of ballast to a rear corner of the watercraft make the watercraft tilt to one side." '161 Patent, col. 1, ll. 35-38. *See On Demand Mach. Corp. v. Ingram Indus., Inc.,* 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("the claims cannot be of broader scope than the invention that is set forth in the specification" and "when the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope").

Plaintiff maintains that the use of "outboard" in the specification does not mean merely to the side. Plaintiff cites as an example the Summary of the Invention, describing "a pair of upright water diverters including a port diverter and a starboard diverter, each independently movable from a neutral position to a deployed position in which a respective water diverter extends outboard of a transom of the watercraft to deflect water traveling along a hull of the watercraft and past the transom." '161 Patent, col. 2, ll. 1. 67 and col. 2, ll. 1-6. The Court agrees with Defendant that Plaintiff's contention assumes without support that "outboard" can include extension below the bottom of the boat. Further, as Defendant emphasizes, the specification references "outboard" as

being "beyond a side strake of the watercraft," as follows: "In the deployed position, the respective water diverter may extend outboard beyond a side strake of the watercraft to deflect water traveling along the side strake and past the transom." '161 Patent, col. 2, ll. 12-16. In addition, when referencing Figure 5A (depicted above), the specification explains "outboard" as "extending outward" as follows: "As shown in FIG. 5A, both flaps are retracted and positioned in their neutral positions behind transom, and not extending outward or outboard from their respective port and starboard side strakes." *Id.* at col. 8, ll. 51-54. The specification further provides, "For convenience in explanation and accurate definition in the appended claims, the terms "inward" and "outward," "inboard" and "outboard," and etc. are used to describe features of the exemplary embodiments with reference to the positions of such features as displayed in the features." *Id.* at col. 14, ll. 36-40.

The Court's recommendation is reinforced by the prosecution history. First, as Defendant emphasizes in its Response, claims noting flaps deploying a "port/starboard side edge" or "side edge" were not added to the '161 Patent claims until November 10, 2015, more than three years after the July 10, 2012 filing date, of the Patent. [Doc. 37 at 35]. Further, during prosecution of the '161 Patent, the Office found as follows:

> Claims 1-8, 11, 13, 16 and 18-22 are rejected under 35 U.S.C. [§] 102(b) as being anticipated by Castillo (US 60112408). Castillo disclosed the recited surf wake system, watercraft/boat[10], hull, transom [14], side strakes (hull sides), port and starboard upright water diverters (fins) [30] and controller (implicit in function of device). *See* Figs. 1-4. The water diverters [30] are considered capable of the recited functional limitations and the water diverters are mounted on the transom [14] adjacent (near) the each side of the hull. The pivot axis for hinge is adjacent (near) and along (beside) a side edge of the transom; applicant has not specified the pivot axis is parallel with a side edge of a transom.

[Doc. 36-8 at 7]. In response, Plaintiff stated as follows:

48

Castillo lacks the surf wake system of the present invention including upright diverters (claim 1) or upright flaps (claim 7) independently movable to generate distinct port and starboard surf wakes, and extend substantially parallel to an intersection of the transom and the respective port and starboard sides in both their neutral and deployed positions, as is called for by independent claims 1 and 7.

* * *

Nor does Castillo teach or suggest diverters or flaps that are substantially parallel to an intersection of the transom and the respective port and starboard sides.

[Doc. 36-9 at 3]. Accordingly, given the above, the Court recommends that "past the transom/past an edge of the transom" be construed as "beyond the side of the transom."

**4.      "first respective edge" and "second respective edge"**

The Court will address these claims together. With respect to "first respective edge," and "second respective edge," Plaintiff argues that the terms should carry their plain and ordinary meaning and that no construction is necessary.  Plaintiff argues that Defendant's proposed construction is contrary to Claim 34.

Defendant proposes that "first respective edge" be construed as "port side edge" and that "second respective edge" be construed as "starboard side edge."  Defendant states that these terms are set forth in Claims 15, 25, 34-39, and 45-50 and directly relate to the "past the transom" limitation.  Defendant asserts that the use of "first respective edge" and "second respective edge" in the claims buttresses this conclusion.  Defendant submits that the use of "respective" in the disputed terms clearly denotes the port and starboard side edges, as the port and starboard sides are referenced immediately prior to the claim terms and can be the only thing referenced by "respective."  Further, Defendant states that if each of these respective edges included a bottom

49

edge, the claims would describe both the port flap and starboard flap positioned relative to the same edge, not a first edge and a distinct second edge.

The parties agree that the Court's construction of "past the transom/past the edge of the transom" affects the construction of "first respective edge" and "second respective edge." Accordingly, similar to the reasoning above, the Court recommends that Defendant's construction of these terms be adopted. As mentioned above, Plaintiff maintains that Defendant's construction imports "port side edge" and "starboard side edge" as opposed to any other "edge of the transom." [Doc. 35 at 29]. The Court agrees with Defendant that the use of "respective" in the disputed terms denotes the port and starboard side edges, as the port and starboard sides are referenced immediately prior to the claim terms and can be the only thing referenced "respective." Further, as Defendant explains, if each of these respective edges included a bottom edge, the claims would describe both the port flap and starboard flap positioned relative to the same edge, not a first edge and a distinct edge. Accordingly, the Court recommends that "first respective edge" be construed as "port side edge" and that "second respective edge" be construed as "starboard side edge."

C.    '695 Patent

In the '695 Patent, the parties dispute the following terms: (1) "the wake surf system configurable by an operator purposefully selecting which of the port wave and the starboard wave to enhance to improve surfing thereon," (2) "pivotally coupled," and (3) "manual actuator."

The Court will address these terms separately.

1.    "the wake surf system configurable by an operator purposefully selecting which of the port wave and the starboard wave to enhance to improve surfing thereon"

Plaintiff states that the above term is a limitation on the claims and that no further construction is necessary. Plaintiff asserts that Defendant's proposed construction is not only

50

unnecessary but also completely changes the meaning of the term. Plaintiff argues that the preambles of Claims 12 and 29 provide antecedent basis to the body of the claims and that the '695 Patent is replete with references to the subject of these preambles. Plaintiff states that while these preambles serve as limitations of Claims 12 and 29, no further construction is necessary, and the term should be afforded its plain and ordinary meaning.

Defendant proposes the following construction: "the operator configuring the wake surf system to enhance the port wave or starboard wave to improve surfing thereon." Defendant argues that the claim itself ambiguously references a surf system that has an abstract potential "configurable," while at the same time referencing present action of an operator "selecting" either a port or starboard wave to enhance. Defendant asserts that the immediately preceding portion of the claim denotes the configuration as a present tense. Defendant states that how a configuration is performed reinforces this conclusion. Defendant concludes that the ambiguity of the term should be removed with a construction of the present tense configuration.

The preambles to Claims 12 and 29 provide as follows, with the disputed term in italics:

> A wake surf system for use with an inboard water-sports boat that is configured to produce a wake having eventually diverging port and starboard waves, *the wake surf system configurable by an operator purposefully selecting which of the port wave and the starboard wave to enhance to improve surfing thereon*, the wake surf system comprising . . .

"[A] claim preamble has the import that the claim as a whole suggests for it." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) (quoting *Bell Commc'n Research, Inc. v. Vitalink Commc'n Corp.*, 55 F.3d 615, 620, (Fed. Cir. 1995)). "If the claim preamble, when read in the context of the entire claim, recites limitations of the claim, or, if the claim preamble is necessary to give life, meaning, and vitality to the claim, then

51

the claim preamble should be construed as if in the balance of the claim." *Id.* (internal quotations omitted).

In the instant matter, Defendant does not appear to dispute that the preamble should be construed as limitations. Instead, Defendant contends that the ambiguity of the term should be removed with a construction of a present tense—that is, "configuring." The Court disagrees and recommends that no further construction is necessary given the "heavy presumption that a claim term carries its ordinary and customary meaning." *CCS Fitness,* 288 F.3d at 1366 (other quotations omitted). Defendant has not sufficiently rebutted this presumption. Accordingly, the Court recommends that no further construction is warranted for "the wake surf system configurable by an operator purposefully selecting which of the port wave and the starboard wave to enhance to improve surfing thereon."

### 2. "Pivotally coupled"

Plaintiff asserts that "pivotally coupled" is an easily understood phrase that should be afforded its plain and ordinary meaning. Plaintiff states that Defendant's proposed construction adds a limitation that is not found in the claim or the specification, and it is contrary to the specification. Further, Plaintiff argues that it is improper to attempt to limit "pivotally coupled" to a particular connection or orientation merely because the only embodiments, or all of the embodiments, contain a particular limitation.

Defendant proposes the following construction: "connected with a pivot axis oriented vertically with respect to the boat, allowing for slight deviation from vertical." Defendant argues that like the terms "flap" and "upright water diverter," the specification of the '695 Patent, which closely mirrors that of the '161 and '873 Patents, discloses a device that attaches to the transom of

52

a boat at a vertical orientation.  Defendant argues that "pivotally coupled" should be construed consistent with this disclosure.

Specifically, Claim 12 states, in relevant part, as follows:

> A wake surf system for use with an inboard watersports boat that is configured to produce a wake having eventually diverging port and starboard waves, the wake surf system configurable by an operator purposefully selecting which of the port wave and the starboard wave to enhance to improve surfing thereon, the wake surf system comprising:
>
> * * *
>
> a port-side deployable element configured to be *pivotally coupled* to an inboard water-sports boat hull proximate a transom, wherein the port-side deployable element is configured to pivot between an at least substantially retracted position and a deployed position, and wherein the port-side deployable element is configured such that at least a portion of the port-side deployable element redirects a flow of water along the port side of the hull proximate the transom when in the deployed position;
>
> a starboard-side deployable element configured to be *pivotally coupled* to an inboard water-sports boat hull proximate a transom, wherein the starboard-side deployable element is configured to pivot between an at least substantially retracted position and a deployed position, and wherein the starboard-side deployable element is configured such that at least a portion of the starboard-side deployable element redirects a flow of water along the starboard side of the hull proximate the transom when in the deployed position.

*See also* Claim 29.  Further, Dependent Claim 13 describes:

> wherein the port-side deployable element is *pivotally coupled* to the inboard water-sports boat hull proximate the transom such that at least the portion of the port-side deployable element extends at least laterally into the flow of water when in the deployed position, and wherein the starboard-side deployable element is *pivotally coupled* to the inboard water-sports boat hull proximate the transom such that at least the portion of the starboard-side deployable element extends at least laterally into the flow of water when in the deployed position.

*See also* Dependent Claim 31.

The Court has reviewed the claims and the specification and recommends that "pivotally coupled" be given its plain and ordinary meaning. The Court notes that Defendant string cites to the specification and figures but does not sufficiently explain why the Court should depart from the plain and ordinary meaning and adopt its proposed construction. The Court has noted throughout the Report and Recommendation that there is a "heavy presumption that a claim term carries its ordinary and customary meaning." *CCS Fitness,* 288 F.3d at 1366 (other quotations omitted). Accordingly, the Court finds Defendant's argument not well taken.

### 3. "Manual Actuator"

Plaintiff asserts that "manual actuator" is a readily understandable claim term in the context of the '695 Patent. Plaintiff argues that Defendant's proposed construction is particularly inappropriate here because it would render other language in the claims redundant.

Defendant proposes the following construction: "a mechanical device for putting the deployable element into action or motion that is operated by hand." Defendant argues that "manual actuator" should be construed consistently with its usage in the claims. Further, Defendant asserts that language relating to "manual actuator" was included by amendment in response to a June 9, 2015 rejection, based upon Castillo. Defendant submits that the Patent Office found the claimed invention patentable over Castillo with the amendment to the claims, "manual actuator positioned proximate the transom." Defendant states that while the reason for this conclusion is not set forth in the prosecution history, there can be no doubt that the amendment was done to establish patentability.

The Court will first look to the claims. Specifically, Claims 1 and 12 of the '695 Patent provide as follows:

> 1. An inboard water-sports boat comprising:

54

a first positioner configured to hold the port-side deployable element in the deployed position when the portside element is in the deployed position, wherein the first positioner comprises a *manual actuator* positioned rearward of the transom such that the *manual actuator* is manually adjustable by a user manually manipulating the *manual actuator* of the first positioner at a location rearward of the transom to position the port-side deployable element at the deployed position;

a second positioner configured to hold the starboard-side deployable element in the deployed position when the starboard-side element is in the deployed position, wherein the second positioner comprises a *manual actuator* positioned rearward of the transom such that the *manual actuator* is manually adjustable by a user manually manipulating the *manual actuator* of the second positioner at a location rearward of the transom to position the starboard-side deployable element at the deployed position.

12. A wake surf system for use with an inboard watersports boat that is configured to produce a wake having eventually diverging port and starboard waves, the wake surf system configurable by an operator purposefully selecting which of the port wave and the starboard wave to enhance to improve surfing thereon, the wake surf system comprising:

* * *

a first positioner comprising a *manual actuator* positioned proximate the transom that is configured to be manually adjustable by a user manually manipulating the *manual actuator* of the first positioner at a location proximate the transom to move the port-side deployable element between the at least substantially retracted position and the deployed position;

. . .

a second positioner comprising a *manual actuator* positioned proximate the transom that is configured to be manually adjustable by a user manually manipulating the *manual actuator* of the first positioner at a location proximate the transom to move the starboard-side deployable element between the at least substantially retracted position and the deployed position.

As an initial matter, the undersigned notes that courts are not required to construe a claim

simply because the parties disagree as to whether claim construction or the ordinary meaning of

55

the term is appropriate. *Viking Corp. v. Victaulic Co.,* No. 1:13-CV-1319, 2014 WL 11129036, at

*6 (W.D. Mich. Nov. 4, 2014) ("If it were the case that whenever parties disagreed whether claim

construction or ordinary meaning was appropriate, a court was compelled to engage in complex

construction rather than apply the terms' ordinary meaning it would gut the heavy presumption

that a claim term carries its ordinary and customary meaning."); *see also O2 Micro Intern., Ltd. v.

Beyond Innovation Tech. Co., Ltd.* 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise

an actual dispute regarding the proper scope of these claims, the court, not the jury must resolve

that dispute.").

   The Court agrees with Plaintiff that the claim language obviates any need to clarify that an

"actuator" is a device "for putting the deployment element into action or motion." Further, the

claim language already utilizes the term "manual."[13] The Court finds that Defendant's proposed

construction is unnecessary given the level of detail provided in the above claim language. Finally,

Defendant asserts that there is no doubt that "manual actuator positioned proximate the transom"

was added to establish patentability. At the hearing, Defendant elaborated that originally the claim

had a positioner that was configured to be manually adjustable, and that Plaintiff added "manual

actuator" language. [Doc. 45 at 129]. Defendant maintained that "manual actuator is different

than the positioner. [*Id.* at 130]. The claims already provide, however, that the first and second

positioners comprise a manual actuator. Accordingly, the Court recommends that "manual

actuator" be given its plain and ordinary meaning.

## V.    CONCLUSION

---

   [13] In Plaintiff's brief, it asserts that the phrase "by hand" is not in the claims language, but
at the hearing, the undersigned stated that "manual means operated by hand," and Plaintiff replied,
"Sure." [Doc. 45 at 67].

Accordingly, and for the reasons explained above, hereby **RECOMMENDS**[14] as follows:

1.  "Upright" be construed as "oriented generally vertically with respect to the boat, allowing for slight inclination";

2.  "Upright Water Diverter" be given its plain and ordinary meaning, except with respect to the term "upright," which should be construed as above;

3.  "Surf Wake" be construed as "a wake whose size, shape, or other characteristics have been enhanced for surfing";

4.  "wherein when said port side water diverter produces said starboard side surf wake for right-foot-forward wake surfing, a port side wake is substantially unsuitable for left-foot-forward wake surfing, and when said starboard side water diverter produces said port side surf wake for left-foot-forward wake surfing, a starboard side wake is substantially unsuitable for right-foot-forward wake surfing" be given its plain and ordinary meaning;

5.  "wake surf settings" be construed as "settings that can affect the resulting surf wake";

6.  "Flap" be given its plain and ordinary meaning;

7.  "the water-sports boat is configured to change from enhancing the starboard wave to enhancing the port wave when a surfer desires to change from surfing an enhanced starboard wave to surfing an enhanced port wave or to change from enhancing the port wave to enhancing the starboard wave when the surfer desires to change from surfing the enhance port wave to surfing the enhanced starboard wave" be given its plain and ordinary meaning;

---

[14] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Federal Rule of Civil Procedure 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 153-54 (1985). "[T]he district court need not provide *de novo* review where objections [to the Report and Recommendation] are '[f]rivolous, conclusive or general.'" *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir.1982)). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

8. "Past the transom/past an edge of the transom" be construed as "beyond the side of the transom";

9. "First respective edge" be construed as "port side edge";

10. "Second respective edge" be construed as "starboard side edge";

11. "the wake surf system configurable by an operator purposefully selecting which of the port wave and the starboard wave to enhance to improve surfing thereon" be given its plain and ordinary meaning;

12. "Pivotally coupled" be given its plain and ordinary meaning; and

13. "Manual Actuator" be given its plain and ordinary meaning.


Respectfully submitted,


United States Magistrate Judge