**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION**

| | | |
|---|---|---|
| MALIBU BOATS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 3:18-cv-15-JPM |
| | ) | |
| SKIER'S CHOICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**CLAIM CONSTRUCTION ORDER AS TO THE '777 PATENT**

**ORDER ADOPTING IN PART THE REPORT AND RECCOMENDATIONS AS TO
CLAIM CONSTRUCTIONS FOR THE '161, '873 AND '695 PATENTS**

**ORDER SETTING STATUS CONFERENCE**

Before the Court is the Parties' request for claim construction pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, (1996). The Court held a telephonic claim construction hearing as to the US Patent No. 10,322,777 on April 13, 2020. (ECF No. 93.)[1] Also before the Court is Magistrate Judge Guyton's Report and Recommendations as to Claim Constructions for the '161, '873 and '695 Patents ("R & R"). (ECF No. 58.) Both parties have filed objections to the R & R. (ECF Nos. 61, 62.) The Court hereby construes the relevant terms as to the '777 Patent and ADOPTS IN PART the R & R.

**I. BACKGROUND**

---

[1] The Court typically conducts claim construction hearing in-person. Due to the COVID-19 pandemic, this was not possible. (See ECF Nos. 89, 92)

1

This is a consolidated civil action for patent infringement, and corresponding counterclaims for noninfringement, invalidity, and unenforceability of the subject patents. Plaintiff Malibu Boats ("Malibu") seeks a judgment finding that U.S. Patent Nos. 9,260,161, 8,578,873, 9,199,695, and 10,322,777 ("asserted patents) have been infringed by Defendant Skier's Choice, Inc. ("Skier's Choice"). (3:18-cv-15 ECF No. 1 at PageID 39–40; 3:19-cv-225 at ECF No. 1.)[2] Plaintiff also seeks "[p]reliminary and permanent[]" injunctive relief enjoining Skier's Choice from infringing the subject patents, willful infringement damages, attorney's fees, and interest. (Id.) Defendant/Counterclaimant Skier's Choice denies Malibu's allegations, essentially asserting that "Malibu did not invent wake surfing or boats used for wake surfing," and counterclaiming for declaratory judgment that Patents '161, '873, '695, and '777 are not infringed by Skier's Choice, are invalid, and are unenforceable. (3:18-cv-15 ECF No. 19 at PageID 195–215; 3:19-cv-225 at ECF No. 18 at PageID 191–207.)

Factual Background

Plaintiff Malibu is a Delaware corporation with its principal place of business in Loudon, Tennessee. (ECF No. 1 at PageID 5.) Defendant Skier's Choice is an Oklahoma corporation with its principal place of business in Marysville, Tennessee. (Id.) Jurisdiction is not disputed. (ECF No. 19 at PageID 198.)

Malibu makes "inboard sport boat[s]." (ECF No. 1 at PageID 1.) Malibu has patented critical aspects of a technology that allows the driver of a boat to displace water in the wake of a boat "at the push of a button" in order to create a surf wake on either side of the boat, for the

---

[2] 3:18-cv-15 is the lead case post-consolidation. For pre-consolidation filings, both case numbers are listed. Where no case number is listed, the citation is to the lead case.

purposes of wake surfing.  (Id. at PageID 2.)  Malibu calls this technology "SURF GATE®."
(Id.)  Malibu alleges that Skier's Choice "Moomba" and "Supra"[3] lines of boats equipped with
surf systems infringe these patents.  (Id.)

On a normal boat, there are pneumatic devices that extend flaps into the water to prevent
a boat from tilting, or listing, to one side or another due to the position of the individuals or
materials within the boat.  These flaps are called trim tabs.  By extending downward from the
vessel, these trim tabs displace water.  This allows the boat to stay balanced regardless of the
arrangement of weight in the vessel.



*Figure 1: Second Drawing from the
'161 patent showing the wake creation
mechanisms.*

In one embodiment, Malibu's claimed invention
employs a mechanical device similar to traditional trim tabs.
Malibu sells boats that have additional pneumatic flaps on the
back, or stern, of the boat: one to the left, or port, one to the
right, or starboard, and one in the center, as depicted in the
patent drawing in Figure 1.  These flaps operate to displace
water in order to make the boat's wake suitable for wake
surfing.  Malibu asserts that, prior to the inventions protected
by patents '161, '873, and '695, in order to generate a suitable wake for wake surfing, the ballast,
or weight carried by the boat would need to be arranged in a certain way so that the boat would
displace enough water in a linear fashion.  (Id.)

---

[3] These appear to be categories of Skier's Choice boats, which include the sub-categories of
"Moomba Flow" and "Supra Swell" systems.  (ECF 1 at PageID 1.)

Malibu asserts four patents in the litigation.  (See supra; 3:18-cv-15 ECF No. 1 at PageID 1; 3:19-cv-225 at ECF No. 1 at PageID 1.)  These patents are all titled "Surf wake system for a watercraft." (Id.)

Malibu contends that the proprietary SURF GATE® system has given it a significant commercial advantage, and that Skier's Choice saw that advantage and copied Malibu's system.  (See, e.g. ECF No. 1 at PageID 12.)  For instance, Malibu maps the '161 Patent onto a specific model of 2017 Skier's Choice Supra Boat, featuring an image from the owner's manual.  (Id. at PageID 12-22.)

Skier's Choice contends that "Malibu did not invent wake surfing or boats used for wake surfing. Malibu did not invent the diversion of water."  (ECF No. 19 at PageID 195.)  Skier's Choice denies that its Moomba and Supra lines "were copied from or developed as result of systems or purported inventions of Malibu" and instead asserts that Skier's Choice is the owner of "numerous patents, patent applications and proprietary systems, methods and developments." (Id. at PageID 196.)  Skier's Choice denies that it needs a patent license from Malibu in order "to use trim tabs or surf tabs to divert water on one side of a boat."  (Id. at PageID 198.)

Procedural Background

On January 12, 2018, Plaintiff Malibu filed the Complaint as to patents US 9,260,161, US 8,578,873, and US 9,199,695.  (ECF No. 1.)  On March 9, 2018, Defendant filed its Answer and Counterclaims.  (ECF No. 19.)  In the Answer, Skier's Choice raised the following defenses: (1) the claims are invalid and/or unenforceable, (2) injunctive relief for Malibu is barred on the grounds that there has not been and will not be irreparable harm to Malibu, (3) failure to state a claim, (4) estoppel/laches/waiver, (5) recovery for speculative injury is impermissible, (6)

4

Malibu cannot show the requisite mental state for willful infringement, (6) Malibu cannot establish "but-for" causation for lost profits, (7) unclean hands due to inequitable conduct during patent prosecution,[4] (8) insufficient patent labelling, (9) inconsistent positions/judicial estoppel/collateral estoppel, and (10) more than one person is required to operate the ski boat under the claims at a time, and therefore Skier's Choice cannot directly infringe. (Id. at PageID 211-14.) Skier's Choice also asserts a counterclaim for declaratory judgment, seeking a judgment of "non-infringement, invalidity, and unenforceability" for the patents-in-suit. (Id. at PageID 214.)

On April 3, 2018, Malibu filed its Answer to Skier's Choice's Counterclaim. (ECF No. 25.) On October 5, 2018, Malibu filed its Opening Claim Construction Brief. (ECF No. 35.) On October 26, 2018, Skier's Choice filed its Responsive Claim Construction Brief. (ECF No. 36-37.) On November 9, Malibu filed its Reply Claim Construction Brief. (ECF No. 39.)

On November 30, 2018, these motions were referred to the Magistrate Judge. (ECF No. 41.) On February 11, 2019, a *Markman* hearing was held before the Magistrate Judge. (ECF No. 43.)

On June 19, 2019 Malibu filed the second case, asserting infringement of the newly issued '777 patent. (3:19-cv-225 ECF No. 33.) On June 27, 2019, Skier's Choice filed a Motion to Consolidate. (ECF No. 50.) On July 11, 2019, Malibu filed an Opposition to the Motion to Consolidate. (ECF No. 52.) Also on July 11, Skier's Choice filed its Answer and Counterclaim

---

[4] Skier's Choice describes a serious incident while the Application was pending at the PTO where prior art that may have invalidated some of the claims of the '161 patent was disclosed in a strategic manner. Additionally, Skier's Choice alleges that Malibu asserted positions during an IPR with the '873 patent that are "diametrically opposed" to positions that Malibu is taking in the current litigation. (ECF No. 19 at PageID 121-13.)

in the '777 case. (3:19-cv-225 ECF No. 18.) On July 18, 2019, Skier's Choice filed a Reply to

Malibu's Opposition to the Motion to Consolidate. (ECF No. 57.) On November 27, 2019, the

Court granted Skier's Choice's Motion to Consolidate the Cases. (3:18-cv-15 ECF No. 73; 3:19-

cv-225 ECF No. 33.)

On July 22, 2019, the Magistrate Judge issued his Report and Recommendation as to the

competing Motions for Claim Construction ("R & R"). (ECF No. 58.) On August 5, 2019, both

Malibu and Skier's Choice filed their objections to the Report and Recommendations regarding

Claim Construction. (ECF Nos. 61-62.) On August 19, 2019, both parties filed their responses

to the opposing parties' objections. (ECF Nos. 67-68.)

## II. Claim Construction for the '777

Overview

The Parties did not present any joint constructions. (ECF No. 84 at PageID 2841.)

Parties have identified two disputed terms not argued in the prior claim construction hearing for

the '161, '873, and '695 patents: (1) deployable element and (2) deployed position. (Id. at

PageID 2842.) The Parties raise three terms that also arise in the first three patents, which they

have already briefed and for which the magistrate judge has already proposed a construction: (3)

upright, (4) surf wake, and (5) "a surf system configurable by an operator purposefully selecting

which of the port-side wave and the starboard-side wave to enhance to improve surfing thereon."

(Id. at PageID 2843.)

Applicable Legal Standard

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to

which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312

(Fed. Cir. 2005) (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Courts, as a matter of law, must construe the claims of a patent in order to ascertain precisely what it is that is patented.  See id.; see also Markman v. Westview Instruments, Inc., 517 U.S. 370, 387 (1996).

In engaging in that exercise, the words in the claims are "generally given their ordinary and customary meaning," that is, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1312-13 (internal citations and quotation marks omitted).  This ordinary and customary meaning "may be readily apparent even to lay judges."  Id.  Where that is the case, claim construction involves "little more than the application of the widely accepted meaning of commonly understood words."  Id. at 1314 (citing Brown v. 3M, 265 F.3d 1349, 1352 (Fed. Cir. 2001)).

When the ordinary and customary meaning is not immediately apparent, courts must look to other sources of evidence—"the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." Id. (citing Innova, 381 F.3d at 1116).  In Phillips, the United States Court of Appeals for the Federal Circuit provided guidance on the relative weight given to evidence from these various sources.  Id.

First, "the claims themselves provide substantial guidance as to the meaning of particular claim terms," particularly the "context in which a term is used in the asserted claim."  Id. at 1314.  But because claims are also part of a "fully integrated written instrument," they must "be read in view of the specification, of which they are a part."  Markman, 52 F.3d at 978, 979 (citations omitted).  As the Federal Circuit has stressed, "[a] patent's specification provides necessary

7

context for understanding the claims and is always highly relevant to the claim construction analysis." Abbott Labs. v. Sandoz, Inc., 566 F.3d 1282, 1288 (Fed. Cir. 2009) (en banc in part) (quoting Phillips, 415 F.3d at 1315). Further, "sometimes the specification offers practically incontrovertible directions about claim meaning," as when inventors "act as their own lexicographers and give a specialized definition of claim terms," or "intentionally disclaim, or disavow, subject matter that would otherwise fall within the scope of the claim." Id. (internal citations and quotation marks omitted). But the Court must take care neither "to import limitations into the claims from the specification," nor to allow "the claims to enlarge what is patented beyond what the inventor has described as the invention." Id. at 1288 (internal citations and quotation marks omitted). In addition, "a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment." Resonate Inc. v. Alteon Websystems, Inc., 338 F.3d 1360, 1364-65 (Fed. Cir. 2003).

The prosecution history of the patent is the other type of "intrinsic evidence," along with the specification, courts consider when determining the meaning of disputed terms. Phillips, 415 F.3d at 1317.

Finally, courts may consider extrinsic evidence—that is, "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Id. (quoting Markman, 52 F.3d at 980). Such evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." Phillips, 415 F.3d at 1317 (internal quotations and citations omitted).

In engaging in a Markman analysis, a court is not required to "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." U.S. Surgical

Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." Id.

*New Terms at Issue*

**A. "deployable element"** (All of the claims of the '777 Patent.)

| Plaintiff's Proposal | Defendants' Proposal | Court's Determination |
|---|---|---|
| No construction necessary; plain and ordinary meaning. This term is not a means-plus-function limitation under 35 U.S.C. § 112(f). | Skier's Choice maintains that this term is a means-plus-function limitation governed by 35 U.S.C. § 112(f) that performs the following functions: (1) mov[ing] between a deployed position and an at least substantially retracted position; (2) redirect[ing] water to enhance the starboard-side/port side wave of the wake to have a face that is substantially smoother than a face of the port-side/starboard-side wave; (3) chang[ing] a surf wake from one side of the inboard water-sports boat to the other side of the inboard water-sports boat in response to the user command received by the user interface; the corresponding structure of which is that which deploys beyond the side of the transom and equivalents thereof. | No construction necessary; plain and ordinary meaning. This term is not a means-plus-function limitation under 35 U.S.C. § 112(f). |

The parties dispute whether the term "deployable element" was drafted in a means-plus-function format. Defendant contends that this claim term is written as a "means-plus-function" term. (ECF No. 87 at PageID 3148. Section 112 of the Patent Act provides that claim limitations may be expressed as "means-plus-function" limitations:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112(f).

The Federal Circuit established two guidelines for determining whether § 112(f) applies to a given claim limitation. First, "use of the word 'means' creates a rebuttable presumption that the drafter intended to invoke [§ 112(f)], while failure to use the word 'means' creates a rebuttable presumption that the drafter did not intend the claims to be governed by [§ 112(f)]." Flo Healthcare Solutions, LLC v. Kappos, 697 F.3d 1367, 1373 (Fed. Cir. 2012) (citing Personalized Media Commc'ns LLC v. Int'l Trade Comm'n, 161 F.3d 696, 703–04 (Fed. Cir. 1998)). "[This] presumption[] can be rebutted if the evidence intrinsic to the patent and any relevant extrinsic evidence so warrant." Personalized Media, 161 F.3d at 704.

Second, if the patentee omits the term "means" from the claim, there is a rebuttable presumption that § 112(f) does not apply. Id. at 703. The presumption that § 112(f) does not apply because of the failure to use the word "means" "may be overcome if the claim fails to recite 'sufficiently definite structure' or merely recites a 'function without reciting sufficient structure for performing that function.'" Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1297 (Fed. Cir. 2014) (quoting Linear Tech. Corp. v. Impala Linear Corp., 379 F.3d 1311, 1319 (Fed. Cir. 2004)). The Federal Circuit has "repeatedly characterized this presumption as 'strong' and 'not readily overcome' and, as such, [has] 'seldom' held that a limitation without recitation of 'means' is a means-plus-function limitation." Id. (citing Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1358, 1362 (Fed. Cir. 2004); Inventio AG v. ThyssenKrupp Elevator Ams. Corp., 649 F.3d 1350, 1356 (Fed. Cir. 2011)).

"The correct inquiry is 'whether skilled artisans, after reading the patent, would conclude that a claim limitation is so devoid of structure that the drafter constructively engaged in means-plus-function claiming.'" EnOcean GmbH v. Face Int'l Corp., 742 F.3d 955, 958 (Fed. Cir. 2014) (quoting Inventio, 649 F.3d at 1357 (Fed. Cir. 2011).

10

The overall means-plus-function analysis is a two-step process. Naturally, there is some analytical overlap between these two steps. In the first step, [the Court] must determine if the claim limitation is drafted in means-plus-function format. As part of this step, [the Court] must construe the claim limitation to determine if it connotes "sufficiently definite structure" to a person of ordinary skill in the art, which requires us to consider the specification (among other evidence). In the second step, if the limitation is in means-plus-function format, [the Court] must specifically review the specification for "corresponding structure." Thus, while these two "structure" inquiries are inherently related, they are distinct.

Apple, 757 F.3d at 1296.

The term at issue is "deployable element." This term appears 61 times within the '777 patent. The term appears in all claims. In independent claim 1, it appears as part of the claimed "surf system":

> a surf system configurable by an operator purposefully selecting which of the port-side wave and the starboard-side wave to enhance to improve surfing thereon, the surf system comprising:
>
> a port-side deployable element movable between a deployed position and an at least substantially retracted position, wherein at least a portion of the port-side deployable element when in the deployed position is configured to redirect water to enhance the starboard-side wave of the wake to have a face that is substantially smoother than a face of the port-side wave;
>
> a starboard-side deployable element movable between a deployed position and an at least substantially retracted position, wherein at least a portion of the starboard-side deployable element when in the deployed position is configured to redirect water to enhance the port-side wave of the wake to have a face that is substantially smoother than a face of the starboard-side wave;

'777 Patent at Col. 27 ln. 12-31.

In dependent claim 4, which is exemplary of its presence in the dependent claims, it appears as follows:

> The inboard water-sports boat of claim 1, wherein each of the port-side deployable element and the starboard-side deployable element comprises at least one of a water diverter, a wake modifier, a flap, and a plate.

Id. at Col. 28 ln. 1-4.

It also appears 16 times in the specification. The most description that the term receives in the specification is in the description of the illustrations of the relevant embodiments:

> The surf system can include a port-side deployable element (e.g., **water diverter or flap** 33 p) movable between a deployed position and an at least substantially retracted position, and at least a portion of the port-side deployable element when in the deployed position can be configured to redirect water to enhance the starboard-side wave of the wake to have a face that is substantially smoother than a face of the port-side wave. The surf system can include a starboard-side deployable element (e.g., water diverter or flap 33 s) movable between a deployed position and an at least substantially retracted position, and at least a portion of the starboard-side deployable element when in the deployed position can be configured to redirect water to enhance the port-side wave of the wake to have a face that is substantially smoother than a face of the starboard-side wave.

'777 Patent at Col. 4, ln. 22-37 (emphasis added).

The first step of the analysis is to determine whether this claim term is drafted in means-plus-function format. The Court looks to whether the claim term uses the word "means." Flo Healthcare Solutions, 697 F.3d at 1373. The instant claim term does not. There is a rebuttable presumption that, if the patentee omits the term "means" from the claim, then § 112(f) does not apply. Personalized Media, 161 F.3d at 703. This presumption "may be overcome if the claim fails to recite 'sufficiently definite structure' or merely recites a 'function without reciting sufficient structure for performing that function.'" Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1297 (Fed. Cir. 2014) (quoting Linear Tech. Corp. v. Impala Linear Corp., 379 F.3d 1311, 1319 (Fed. Cir. 2004)).

Defendant argues that the intrinsic record meets this high standard. Defendant notes that the word "element" is a placeholder word, not otherwise used in the art, and akin to "means." (ECF No. 87 at PageID 3148-49.) "Element" can represent a nonce word in patent litigation. Williamson v. Citrix Online, *LLC*, 792 F.3d 1339, 1350 (Fed. Circ. 2015) (en banc). The word "element" does not effectively identify the claimed invention.

12

Plaintiff argues that claim 1 provides five limitations on this claim term which demonstrate that "deployable element" was not drafted as a means-plus-function claim: (1) the structure of the element, (2) the number of elements, (3) the interconnections between the deployable elements and the rest of the claimed invention, (4) where they are located and (5) what they can do in their movement. ECF No. 94 (hereinafter Hearing Tr.) at PageID 3301 ln. 5-9 (summarizing Plaintiff's argument).

First, Plaintiff points to the dependent claims as evidence that the claims limit the structure. Id. at ln.10–25. Plaintiff indicates that dependent Claim 5 shows that the structure can pivot and Claim 6 shows that the structure can slide in. Id. In dependent claim 4, there are limitations placed directly on the form of the "deployable element." Under Federal Circuit precedent, if the dependent claims merely characterize examples from the specification (as here), it does not alter the fact that the term may be construed as a means-plus-function claim. See Mollhagen v. Witte, 18 Fed. Appx. 846, 849 (Fed. Cir. 2001) ("[T]he stringencies of a means-plus-function limitation cannot be avoided by merely adding a dependent claim that recites the corresponding structure disclosed in the specification."). Therefore, this clarification does not change the claim construction analysis for "deployable element."

Second, the claim provides that there are two deployable elements in the invention—one on the starboard side of the boat and one on the port side of the boat. '777 Patent at Col. 27 ln. 16–31. The parties do not dispute this fact.

Third, the claim describes the interconnections between the deployable elements and the rest of the claimed invention. Claim 1 recites:

a first actuator configured to move the port-side deployable element to the deployed position in response to the user command to change from enhancing the port-side wave to the starboard-side wave; and

a second actuator configured to move the starboard-side deployable element to the deployed position in response to the user command to change from enhancing the starboard-side wave to the port-side wave;

'777 Patent at Col. 27 ln. 40–49.

This language shows the connections between the relevant "deployable elements" and the other components of the claimed invention and end user input.

Fourth, the claim describes where the deployable elements are located—that is, the port and starboard sides of the vessel. Id. at Col. 27 ln. 15–39.

Fifth, dependent claims 5 and 6 describe what the "deployable elements" can do in their movement. As stated prior, these dependent claims do not alter the means-plus-function analysis.

The Court finds that the claim adequately characterizes the term "deployable element" so that it does not fall within Section 112(f). The claim language provides the location, number, and interconnections between the pieces. The "deployable element" has traits: there must be two, they function when they are moved by certain other pieces of the claimed invention, and they must be located on "the port-side" and "the starboard-side." '777 Patent at Col. 27 ln. 40–49. These features exceed those of claims where the term is drafted so that it intentionally can represent any means to complete a function. See, e.g., Fiber, Ltd. Liab. Co. v. Ciena Corp., 792 F. App'x 789, 795 (Fed. Cir. 2019) (finding "a generic box with no indication of any structure" to be a means-plus-function term.). As a matter of claim construction, this term is not so bare that it can be appropriately categorized as a means-plus-function term.

### B. **"deployed position"** ('777 all claims)

| Plaintiff's Proposal | Defendants' Proposal | Court's Determination |
|---|---|---|
| No construction necessary; plain and ordinary meaning. | "position beyond the side of the transom" | No construction necessary. |

Defendant argues that, like the term "deployable element," this position is not sufficiently characterized and should be limited to the text of the specification. Defendants argue that the specification discloses some positions where the trimtabs extend "beyond the side of the transom." (ECF No. 87 at PageID 3156-57.) For instance, Figure 1 of the '777 teaches a deployed position that does not extend beyond the side of the transom. Many of the other diagrams represent trimtabs to the side. The Defendants are correct that none of the positions appear to be downward tilted in '777.[5] Defendant also cites '777 at Col. 1 ln. 50-55. (ECF No. 87 at PageID 3159.) But this section does not support that proposition: it only refers to the moving of ballast that the patent improved upon.

"Deployed position" bears the plain and ordinary meaning in this case. Claim 1 recites, in relevant part:

> a port-side deployable element movable between a deployed position and an at least substantially retracted position, wherein at least a portion of the port-side deployable element when in the deployed position is configured to redirect water to enhance the starboard-side wave of the wake to have a face that is substantially smoother than a face of the port-side wave;
> a starboard-side deployable element movable between a deployed position and an at least substantially retracted position, wherein at least a portion of the starboard-side deployable element when in the deployed position is configured to redirect water to enhance the port-side wave of the wake to have a face that is substantially smoother than a face of the starboard-side wave;

'777 Patent at Col. 27 ln. 16–31.

---

[5] See supra Figure 1.

In the claim, "deployed position" describes the location of a "deployable element." From context, it is clear that it extends beyond the boundary of the boat. Defendant argues that this should be limited to "beyond the side of the transom." This is unnecessary. The claim language speaks for itself.

*Terms Previously Argued*

**C. "upright"** ('777 claims 13, 26)

| Plaintiff's Proposal | Defendants' Proposal | R&R Construction | Court's Determination |
|---|---|---|---|
| "oriented generally vertically with respect to the boat, allowing for slight inclination" | "oriented vertically with respect to the boat, allowing for slight deviation from vertical" | "oriented generally vertically with respect to the boat, allowing for slight inclination" | "oriented generally vertically with respect to the boat, allowing for slight inclination" |

In a prior litigation of some of the same patents, <u>Malibu Boats v. Nautique</u>, 122 F. Supp. 3d 722, 736 (E.D. Tenn. 2015), the district court construed this term to mean "orientated generally vertically with respect to the boat, allowing for slight inclination." <u>Id.</u> at 737. The district court reasoned that the '873 Patent shows "water diverters that are upright even though they are slightly inclined." <u>Id.</u> at 736. The district court further found that "[i]n addition to this already inclined orientation, the patent[] explain[s] that the pivot axis may incline even further, including by at least 15° more." <u>Id.</u> (citing '873 Patent, col. 6, ll. 55-56). The district court rejected defendant's proposed construction (i.e., "vertical") because such a construction would exclude the embodiments with slightly inclined diverters. The Magistrate Judge declined to deviate from this construction.

This Court is not bound by the definition, and the reasoning is at most persuasive. <u>See</u> <u>Powervip, Inc. v. Static Control Components, Inc.</u>, No. 1:08-CV-382, 2011 WL 2669059, at *3

16

(W.D. Mich. July 6, 2011) (finding that "while not entitled to preclusive effect," the previous Markman order "is instructive and may properly be considered by the Court in rendering its own construction of the claims at issue"); see also Texas Instruments, Inc. v. Linear Techs. Corp., 182 F. Supp. 2d 580 (E.D. Texas 2012) (the court may defer to a prior claim construction, though it is not necessarily bound by it). In this case, the district court's analysis is accurate. The Court adopts this construction for the '777 patent.

**D. "surf wake"** ('777 claim 14 and its dependent claims)

| Plaintiff's Proposal | Defendant's Proposal | R&R Construction | Court's Determination |
|---|---|---|---|
| "a wake whose size, shape, or other characteristics have been enhanced for surfing" | "an enhanced wake produced by the claimed wake surf system as a boat moves through water" | "a wake whose size, shape, or other characteristics have been enhanced for surfing" | "a wake whose size, shape, or other characteristics have been enhanced for surfing" |

Plaintiff proposed the above construction because it was adopted in prior litigation and is consistent with the language of the '873 Patent. (ECF No. 58 at PageID 2457.) Defendant proposed the above construction to remove indefiniteness. (Id. at PageID 2458.) Defendant argues that Plaintiff's proposal was indefinite because it relied on subjective variables. (Id.) The R & R adopted the Plaintiff's proposed language as it was adopted in prior litigation and it is less ambiguous than Defendant's proposed construction. (Id. at PageID 2458-62.) The language that the R & R adopted mirrors the language that the patent uses to describe the subject wave. '777 at Col. 7 l. 23-25.

Defendant objects to the R&R's construction. (ECF No. 61 at PageID 2573.) Defendant argues that the "constructions proposed by Malibu and adopted by Judge Guyton would improperly allow the jury to determine the scope of these patent terms and whether a wake created by the

accused devices is/was *substantially unsuitable* for surging and/or constitutes a *surf wake*." (Id. (emphasis in original).) Furthermore, Defendant argues that the specification of the '873 teaches that the surf wake is merely "enhanced," even though the claim language requires that the claimed upright water diverter produce the surf wake. (Id. at PageID 2574.)

This objection is overruled. First, the construction "a wake whose size, shape, or other characteristics have been enhanced for surfing" is not so subjective as to render the term indefinite or otherwise beyond the purview of the jury. See Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 910 (2014). In Nautilus, the Supreme Court announced that 35 U.S.C. §112, ¶2

> require[s] that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty. The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable. The standard we adopt accords with opinions of this Court stating that the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter.

Id. at 910 (internal quotations omitted).

The Court follows Federal Circuit precedent and considers indefiniteness to the extent that "[i]ndefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim language is subject to construction." Praxair, Inc. v. ATMI, Inc., 543 F.3d 1306, 1319 (Fed. Cir. 2008) (citing Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1348 (Fed. Cir. 2005)).

Federal Circuit precedent does not automatically require that claim language that looks subjective is necessarily so subjective that the resulting term is indefinite as a matter of law. When language is related to "aesthetic preferences" or other exclusively subjective language, it may be invalid. Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1350 (Fed. Cir. 2005) (abrogated on other grounds by Nautilus). In some contexts, these subjective terms are not indefinite because the term "requires foreknowledge and even intent on the part of the person

18

practicing the invention," and such intent is clear from the face of the patent, it is not indefinite, and no construction is necessary.  <u>Datamize</u>, 417 F.3d at 1355-56.

As an initial matter, Defendant's proposal does not remove the subjective content of the '777 claim language.  This proposal would not change whether or not the claim term was legally indefinite.

In this case, the POSITA practicing a patent for a "surf wake system for a watercraft" would know the characteristics of a wave that has been enhanced for surfing.  As noted in the '873 Patent at Figures 6A-6C and within the specification, a wave that is generated for the purpose of surfing has different characteristics from a wave created by the typical movement of a boat through water.  '873 Patent at Col. 1 ln. 33-35, 40-44.  The same information is provided in the '777 Patent. Col. 1 ln. 40-48.  The wake created by the passage of a boat through water "is generally small, choppy or too close to the watercraft to be suitable and safe for water sports, and particularly not suitable for wake boarding or surfing."  <u>Id.</u>  Given the adopted construction and the specification, the jury will be able to determine the meaning of the relevant claim term.

   E. **"a surf system configurable by an operator purposefully selecting which of the port-side wave and the starboard-side wave to enhance to improve surfing thereon."** ('777 claim 1 and its dependent claims)

| Plaintiff's Proposal | Defendants' Proposal | R&R Construction | Court's Determination |
|---|---|---|---|
| No construction; plain and ordinary meaning. | "the operator configuring the wake surf system to enhance the port wave or starboard wave to improve surfing thereon" | Plain and ordinary meaning | Plain and ordinary meaning. |

The R & R adopted the Plaintiff's proposal because the key difference between the claim language and the Defendant's proposal was the switch to present tense, and that this was not a suitable reason to construe the claim.  Defendant objects to the construction adopted in the R & R

on the grounds that the "language of this claim term is incongruent as it references both past and present tense." (ECF No. 61 at PageID 2575.) This is not a good enough reason to change the claim language. Defendant does not point to any specific way that the confused tenses in the claim language could give rise to juror confusion. The patentees are their own lexographers, and the Court should not intervene where it is not required. The Court adopts the construction from the R & R as to the '695 Patent. The Court therefore construes the "a surf system configurable by an operator purposefully selecting which of the port-side wave and the starboard-side wave to enhance to improve surfing thereon" as having its plain and ordinary meaning.

### III. Claim Construction for '161, '873, and '695 Patents.

The parties completed claim construction briefing for patents '161, '873, and '695, and Magistrate Judge Guyton filed a Report and Recommendation on the construction of terms for these three patents. (ECF No. 58.) The parties then filed objections and responses to each other's objections. (ECF Nos. 61, 62, 67, 68.) The Magistrate Judge's Report and Recommendation as to Claim Construction recommended constructions for 13 terms, some of which have been combined in the claim charts and analyses. (ECF No. 58.)

### 1. "Upright"

| Plaintiff's Proposal | Defendant's Proposal | R&R Construction | Court's Determination |
|---|---|---|---|
| "oriented generally vertically with respect to the boat, allowing for slight inclination." | "oriented vertically with respect to the boat, allowing for slight deviation from vertical." | "oriented generally vertically with respect to the boat, allowing for slight inclination" | "oriented generally vertically with respect to the boat, allowing for slight inclination". |

Defendant argues that the Magistrate Judge's determination should not have been confined to the word "upright." (ECF No. 61 at PageID 2572.) Instead, the Defendant argues that the

20

correct phrase to be construed is "upright water diverter." (Id.) The R & R notes that "upright" merely modifies "water diverter." (ECF No. 58 at PageID 2451.) The Court overrules Defendant's objection because the R & R is correct that Defendant's alternate construction would exclude embodiments with "slightly inclined diverters," which would conflict with some of the embodiments disclosed by the '873 patent.

For the same reasons listed above, "upright" should bear the same construction in patents '161, '873, and '695 as in the '777, and the Court ADOPTS the R & R's construction.

2. "wherein when said port side water diverter produces said starboard side surf wake for right-foot-forward wake surfing, a port side wake is substantially unsuitable for left-foot-forward wake surfing, and when said starboard side water diverter produces said port side surf wake for left-foot-forward wake surfing, a starboard side wake is substantially unsuitable for right-foot-forward wake surfing"

| Plaintiff's Proposal | Defendant's Proposal | R&R Construction | Court's Determination |
|---|---|---|---|
| Plain and ordinary meaning. | "an enhanced wake produced by an upright water diverter as a boat moves through water having characteristics which make it more suitable for right/left-foot forward surfing." | plain and ordinary meaning. | plain and ordinary meaning. |

The R & R adopted the plain and ordinary meaning of this term because "the term is readily apparent in light of the language in the claim." (ECF No. 58 at PageID 2463.) Defendant objects on the grounds that "the constructions proposed by Malibu and adopted by Judge Guyton would improperly allow the jury to determine the scope of these patent terms and whether a wake created by the accused devices is/was substantially unsuitable for surfing." (ECF No. 61 at PageID 2573.) Defendant does not further clarify exactly how the Defendant's alternate construction would limit the scope of the patent compared to the original text of the patent. (Id.) Defendant's proposed construction eliminates claim text that goes to the

21

mechanism by which the wake is produced. The Court ADOPTS the R & R's construction

because the R &R is correct that the term is readily apparent to the jury, and no construction is

necessary.

3. **"Past the transom"/"past an edge of the transom"**

| Plaintiff's Proposal | Defendant's Proposal | R&R Construction | Court's Determination |
|---|---|---|---|
| "beyond the side of the transom" | "beyond any edge of the transom" | **"beyond the side of the transom"** | Plain and ordinary meaning. |

"Past the transom" appears in the following claims of the '161 Patent:

> a pair of flaps including a port flap and a starboard flap, each independently movable from a retracted position wherein a respective flap is substantially entirely retracted behind the transom such that no substantial portion of the respective flap extends past a port-side edge, a starboard-side edge, or a bottom edge of the transom to a deployed position in which portions of a respective flap move *past the transom* to deflect water traveling along the hull of the water-sports boat and *past the transom*;

'161 Patent at Col. 14-15 ln. 66-8 (Claim 1) (emphasis added).

> The water-sports boat of claim 1, wherein in the deployed position, the respective flap extends outboard beyond a side surface of the water-sports boat at the transom to deflect water traveling along the side and past the transom.

Id. at Col. 15 ln. 32-35 (Claim 2).

> a pair of flaps including a port flap and a starboard flap, each independently movable from a retracted position to a deployed position in which portions of a respective flap deflect water traveling along the hull of the water-sports boat and past the transom;

Id. at Col. 16-17 ln. 66-3 (Claim 17).

> positioning a port flap in a deployed position while a starboard flap is in a retracted position, wherein when the starboard flap is in the retracted position the starboard flap is substantially entirely retracted behind a transom of the water-sports boat such that no substantial portion of the starboard flap extends past a port-side edge, a starboard-side edge, or a bottom edge of the transom, and wherein when the port flap is in the deployed position portions of the port flap move past the transom to deflect water traveling along a hull of the water-sports

boat to enhance the starboard wave by making the face of the starboard wave substantially smoother than the face of the port wave; and

moving the starboard flap to the deployed position and the port flap to the retracted position to change from enhancing the starboard wave to enhancing the port wave while the water-sports boat is moving through water at a speed suitable for surfing when a surfer desires to change from surfing an enhanced starboard wave to surfing an enhanced port wave, wherein when the port flap is in the retracted position the port flap is substantially entirely retracted behind the transom such that no substantial portion of the port flap extends past a port-side edge, a starboard-side edge, or a bottom edge of the transom, and wherein when the starboard flap is in the deployed position portions of the starboard flap move past the transom to deflect water traveling along a hull of the water-sports boat to enhance the port wave by making the face of the port wave substantially smoother than the face of the starboard wave.

Id. at Col. 17-18 ln. 47-9 (Claim 19).

a pair of flaps including a port flap and a starboard flap, each independently movable from a retracted position wherein at least portions of a respective flap are retracted behind the transom to a deployed position in which portions of a respective flap move past an edge of the transom to deflect water traveling along the hull of the water-sports boat and past the transom;

Id. at Col. 19 ln. 50-57 (Claim 29).

a pair of flaps including a port flap and a starboard flap, each independently movable from a retracted position wherein at least portions of a respective flap are retracted behind the transom to a deployed position in which portions of a respective flap move past an edge of the transom to deflect water traveling along the hull of the water-sports boat and past the transom;

Id. at Col. 21 at ln. 12-19 (Claim 34).

"Past an edge of the transom" appears in the following claims of the '161 Patent:

a pair of flaps including a port flap and a starboard flap, each independently movable from a retracted position wherein at least portions of a respective flap are retracted behind the transom to a deployed position in which portions of a respective flap move past an edge of the transom to deflect water traveling along the hull of the water-sports boat and past the transom;

Id. at Col. 19 ln. 50-57 (Claim 29).

a pair of flaps including a port flap and a starboard flap, each independently movable from a retracted position wherein at least portions of a respective flap are retracted behind the transom to a deployed position in which portions of a

respective flap move past an edge of the transom to deflect water traveling along the hull of the water-sports boat and past the transom;

Id. at Col. 21 ln. 13-19 (Claim 34).

positioning a port flap in a deployed position while a starboard flap is in a retracted position, wherein when the starboard flap is in the retracted position at least portions of the starboard flap are retracted behind a transom of the water-sports boat, and wherein when the port flap is in the deployed position portions of the port flap move past an edge of the transom to deflect water traveling along a hull of the water-sports boat to enhance the starboard wave by making the face of the starboard wave substantially smoother than the face of the port wave; and

moving the starboard flap to the deployed position and the port flap to the retracted position to change from enhancing the starboard wave to enhancing the port wave while the water-sports boat is moving through water at a speed suitable for surfing when a surfer desires to change from surfing an enhanced starboard wave to surfing an enhanced port wave, wherein when the port flap is in the retracted position at least portions of the port flap are retracted behind the transom, and wherein when the starboard flap is in the deployed position portions of the starboard flap move past an edge of the transom to deflect water traveling along a hull of the water-sports boat to enhance the port wave by making the face of the port wave substantially smoother than the face of the starboard wave;

Id. at Col. 22-23 ln. 62-18 (Claim 44).

positioning a port flap in a deployed position while a starboard flap is in a retracted position, wherein when the starboard flap is in the retracted position at least portions of the starboard flap are retracted behind a transom of the water-sports boat, and wherein when the port flap is in the deployed position portions of the port flap move past an edge of the transom to deflect water traveling along a hull of the water-sports boat to enhance the starboard wave by making the face of the starboard wave substantially smoother than the face of the port wave; and

moving the starboard flap to the deployed position and the port flap to the retracted position to change from enhancing the starboard wave to enhancing the port wave while the water-sports boat is moving through water at a speed suitable for surfing when a surfer desires to change from surfing an enhanced starboard wave to surfing an enhanced port wave, wherein when the port flap is in the retracted position at least portions of the port flap are retracted behind the transom, and wherein when the starboard flap is in the deployed position portions of the starboard flap move past an edge of the transom to deflect water traveling along a hull of the water-sports boat to enhance the port wave by making the face of the port wave substantially smoother than the face of the starboard wave;

Id. at Col. Claim 45

24

The R &R provides support for its construction of "beyond the side of the transom" on four grounds: (1) because of the language in Claim 1, (2) the inapplicability of the doctrine of claim differentiation, (3) language in the specification and (4) the prosecution history.

First, the R & R states that "the language is clear in Claim 1 that the phrase 'bottom edge of the transom' related to the retracted position and not the deployed position of the flap." (ECF No. 58 at PageID 2483.) While it is true that the bottom edge of the transom language is related to the retracted position, it does not follow that the "past the transom" refers only to the side edges of the transom and excludes the bottom of the transom. The transom refers to the boundary of the back of the hull of the boat. This language does not bolster the R & R's adoption of the narrower claim language.

Second, the R & R determined that it is unnecessary to find that the language must include the bottom edge of the transom due to the doctrine of claim differentiation. The Court agrees.

Third, the language in the specification does not govern claim construction. The R &R purports not to be importing limitations from the specification to the claim terms. (Id. at PageID 2485-86.) Although a lack of disclosure in the specification can give rise to claims that the patent does not meet the enablement requirement such that the patent is enforceable against the accused products, the claim terms are only restricted by the specification to the extent that the specification helps determine the meaning of the terms as drafted.

The R & R states that the terms "outward" and "outboard" in the patent, which would provide the grounds for a claim scope that includes below the bottom of the boat, are consistently modified by phrases like "port and starboard side strakes," to the extent that the claimed

25

invention is limited in this way.  (Id. at PageID 2488.)  This is not uniformly accurate.  For instance, in col. 2 ln. 46-49, where the patent summarizes characteristics of the system, the terms inboard and outboard are not directionally modified.  While downward extending flaps do not appear in the embodiments presented, the specification does not disclaim this scope.

Here, the terms "past the transom" and "past the edge of the transom" are not modified in the specification.  The specification does not alter the meaning of the word transom.  Indeed, it uses transom to refer to the stern or back of the boat.  The R & R errs in determining that because that the embodiments and diagrams present in the specification show only side-deploying water-diverters, the patent can only protect side-deploying water diverters.  The claim language contradicts the R & R's construction.

Fourth and finally, the R & R determines that the prosecution history shows an affirmative disclaimer of downward-deploying port and starboard water diverters.  The R &R bases this argument on one office action and response where the "port/starboard side edge" language was incorporated following a rejection from the USPTO due to the Castillo art.  (ECF No. 58 at PageID 2488-89.)  First, the Castillo art teaches "port and starboard upright water diverters," which invalidated the Plaintiff's then claimed "pair of upright flaps."  (Id. at PageID 2488, ECF No. 36-8 at PageID 954, ECF No. 62 at PageID 2597.)  Flaps descending below the transom would be unaffected by the Castillo art.  The record fails to show an affirmative disclaimer of claim scope as to the deployment of flaps on the bottom of the transom.

In conclusion, construction for this claim term is unnecessary.  The R & R's construction changes the scope of the patent claim impermissibly, and the Court declines to adopt the construction.  A person having ordinary skill in the art can understand that "past the transom" or

26

Case 3:18-cv-00015-JPM-HBG   Document 132   Filed 08/25/20   Page 26 of 33   PageID #: 4909

"past the edge of the transom" refers to any side of the transom—which is the plain and ordinary meaning.

4. "Flap"

| Plaintiff's Proposal | Defendant's Proposal | R&R Construction | Court's Determination |
|---|---|---|---|
| No construction needed. | "a water diverting structure having a pivot axis oriented vertically with respect to the boat, allowing for slight deviation from vertical." | No construction needed. | No construction needed. |

The R & R adopted the plain and ordinary meaning because the term "flap" is not uses synonymously with "upright water diverter" in the patent. (ECF No. 58 at PageID 2471.) Defendant objects on two grounds. (ECF No. 61 at PageID 2574-75.) First, Defendant argues that the Plaintiff "has failed to show that *flap* has a specific meaning to a person of ordinary skill in the art." (Id. at PageID 2574.) Second, Defendant argues that "neither the '161 patent specification nor Malibu's prosecution . . . distinguish between a *flap* and an *upright water diverter*." (Id. at PageID 2575.)

The rule is that "words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." Phillips, 415 F.3d at 1313. "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." Thorner v. Sony Comput. Entm't Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1580 (Fed. Cir. 1996).).

The Court adopts the R & R's construction because the term "flap" is *not* defined within the patent as an upright water diverter, although it may act as one. Defendant concedes that one

27

of the embodiments in the patent discloses as least one embodiment where the flap is not an

upright water diverter.  (ECF No. 61 at PageID 2545, Defendant notes "that said sliding

embodiment does not disclose a device that deploys on a horizontal axis and need not be covered

in the claims asserted here.")  Additionally, although Defendant avers that the "'161 patent

specification [and] prosecution [history]" fail to distinguish between a flap and an upright water

diverter, the Defendant does not point to any evidence from the prosecution history or

specification that shows a disavowal of the broader scope of the word "flap."  The Court

ADOPTS the R & R's construction.

### 5. "First respective edge" be construed as "port side edge" and Second respective edge" be construed as "starboard side edge"

| Plaintiff's Proposal | Defendants' Proposal | R&R Construction | Court's Determination |
|---|---|---|---|
| Plain and ordinary meaning. | "First respective edge" be construed as "port side edge" and Second respective edge" be construed as "starboard side edge" | "First respective edge" be construed as "port side edge" and Second respective edge" be construed as "starboard side edge" | Plain and ordinary meaning. |

The R & R found that "First respective edge" be construed as "port side edge"

and second respective edge" be construed as "starboard side edge."  (ECF No. 58 at

PageID 2489-90.)  The R & R adopted this language because it was consistent with its

reading of the "beyond the transom" claim term.  (Id. at PageID 2490.)  The R & R found

> that the use of "respective" in the disputed terms denotes the port and starboard
> side edges, as the port and starboard sides are referenced immediately prior to the
> claim terms and can be the only thing referenced "respective."  Further, . . . if
> each of these respective edges included a bottom edge, the claims would describe
> both the port flap and starboard flap positioned relative to the same edge, not a
> first edge and a distinct edge.

Id.

> Plaintiff objects on the grounds that this reinforces the "beyond the transom"

construction recommended by the R & R.  (ECF No. 62 at PageID 2600-01.)

28

The Court declines to adopt the R & R's construction. The patent claims certain flaps and certain edges as being port, starboard, or the bottom edge on the transom. For instance, Claim 1 recites:

> a pair of flaps including a port flap and a starboard flap, each independently movable from a retracted position wherein a respective flap is substantially entirely retracted behind the transom such that no substantial portion of the respective flap extends past a *port-side edge, a starboard-side edge, or a bottom edge of the transom* to a deployed position in which portions of a *respective flap* move past the transom to deflect water traveling along the hull of the water-sports boat and past the transom;

'161 Patent at Col. 14-15 ln. 66-8 (Claim 1).

The term "first respective edge" appears 18 times in the '161 patent. The term "second respective edge" appears 18 times in the '161 Patent. The language appears in the patent in an interesting way: specifically, these claim terms appear almost exclusively in mirroring dependent claims. For example, consider dependent claims 14 and 15 of the '161 Patent:

> 14. The water-sports boat of claim 1, wherein:
>
> the *port flap* pivots between the retracted position and the deployed position about a pivot axis, wherein the port flap has a substantially planar portion that is substantially parallel to the pivot axis and an angled end portion that is offset from the substantially planar portion in a direction away from a centerline of the hull, wherein the angled end portion is configured to redirect water away from the hull when the *port flap* is in the deployed position, and wherein the substantially planar portion is between the pivot axis and the angled end portion; and
>
> the *starboard flap* pivots between the retracted position and the deployed position about a pivot axis, wherein the starboard flap has a substantially planar portion that is substantially parallel to the pivot axis and an angled end portion that is offset from the substantially planar portion in a direction away from a centerline of the hull, wherein the angled end portion is configured to redirect water away from the hull when the *starboard flap* is in the deployed position, and wherein the substantially planar portion is between the pivot axis and the angled end portion.
>
> 15. The water-sports boat of claim 1, wherein:

29

> the *port flap* pivots between the retracted position and the deployed position about a port hinge having a pivot axis, wherein the pivot axis at the port hinge is positioned less than 10 inches from *a first respective edge* of the transom, and wherein the pivot axis of the port hinge is angled less than about 15 degrees from the first respective edge of the transom; and
>
> the *starboard flap* pivots between the retracted position and the deployed position about a starboard hinge having a pivot axis, wherein the pivot axis at the starboard hinge is positioned less than 10 inches from *a second respective edge* of the transom, and wherein the pivot axis of the starboard hinge is angled less than about 15 degrees from the second respective edge of the transom.

Id. at col. 16 ln. 12-48.

The Court need not rewrite the claim language to require uniformity. Clearly, the "first respective edge" and the "second respective edge" align with the port or starboard flaps. This is not a sufficient reason to rewrite the claim term. Where the claim does not list a port or starboard edge, the court does not need to preclude the jury from inferring that the respective edge may refer to a port or starboard side of the bottom edge of the transom. As their own lexicographers, the patentees demonstrate through other claim language that they can articulate when they refer to the port-side or starboard-side edges. There is no need to reinterpret first and second respective edges in order to conform to an interpretation that the R & R deems obvious. The Court therefore determines that no construction is necessary, and that this term should be given its plain and ordinary meaning.

**6.** **"the wake surf system configurable by an operator purposefully selecting which of the port wave and the starboard wave to enhance to improve surfing thereon" be given its plain and ordinary meaning;**

| Plaintiff's Proposal | Defendant's Proposal | R&R Construction | Court's Determination |
|---|---|---|---|
| plain and ordinary meaning | "the operator configuring the wake surf system to enhance the port wave or starboard wave to improve surfing thereon" | plain and ordinary meaning | plain and ordinary meaning |

The R & R adopted the plain and ordinary meaning the primary change is to the tense of the claim, and the claim language surrounding the term is not ambiguous. (ECF No. 58 at PageID 2492.) The Defendant objects on the grounds that "The language of this claim term is incongruent as it references both past and present tense." (ECF No. 61 at PageID 2575.) Defendant does not further clarify exactly how the Defendant's alternate construction would limit the scope of the patent compared to the original text of the patent. (Id.) The Court adopts the R & R's construction because the R &R is correct that the term is readily apparent to the jury, no construction is necessary, and the superficial improvement in the grammar of the claim term is not a sufficient justification for rewriting the term.

**7.** **"Pivotally coupled"**

| Plaintiff's Proposal | Defendant's Proposal | R&R Construction | Court's Determination |
|---|---|---|---|
| Plain and ordinary meaning. | "Connected with a pivot axis oriented vertically with respect to the boat, allowing for slight deviation from vertical." | Plain and ordinary meaning. | Plain and ordinary meaning. |

The R & R adopted the plain and ordinary meaning for "pivotally coupled" because the Defendant failed to sufficiently explain why the Court should depart from the plain and ordinary meaning. (ECF No. 58 at PageID 2494.) The Defendant objects on the grounds that the patent

31

"fails to describe or depict an embodiment that has a horizontal axis of movement relevant to the boat." (ECF No. 61 at PageID 2576.)

The rule is that "words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." Phillips, 415 F.3d at 1313. "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." Thorner v. Sony Comput. Entm't Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1580 (Fed. Cir. 1996).).

The Defendant does not point to any evidence that the patent or prosecution history affirmatively defined "pivotally coupled" in this way or expressly disavowed all claim scope. If Defendant contends that the patent does not teach any horizontal "pivot coupl[ings]," such arguments are appropriate for claim construction. The Court adopts the R & R's construction.

### 8. "Manual Actuator"

| Plaintiff's Proposal | Defendant's Proposal | R&R Construction | Court's Determination |
|---|---|---|---|
| Plain and ordinary meaning. | "A mechanical device of putting the deployable element into action or motion that is operated by hand." | Plain and ordinary meaning. | Plain and ordinary meaning. |

The R & R adopted the plain and ordinary meaning because "the claim language obviates any need to clarify that an 'actuator' is a device 'for putting the deployable element into action or motion." (ECF No. 57 at PageID 2496.)    The Defendant objects on the grounds that, during the

patent prosecution the manual actuator language was added to overcome a prior art reference where the relevant component was "adjustable by hand." (ECF No.61 at PageID 2576.) The Court adopts the R & R's construction because the definition introduced does little more than synthesize the dictionary definitions of both words in the claim term with the surrounding claim language. As a result, it only marginally clarifies the language of the patent. The term does not need to be rewritten merely to incorporate the dictionary definition of the relevant words. The objection is overruled and the Court ADOPTS the R & R's construction.

## IV. CONCLUSION

The R & R is hereby ADOPTED IN PART. The Court SETS a status conference in this matter for Thursday, August 27, 2020 at 2 p.m. Eastern / 1 p.m. Central for the limited purpose of resetting the pretrial calendar and trial dates.

**SO ORDERED**, this 25th day of August, 2020.

/s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE