**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

| | | |
|---|---|---|
| MALIBU BOATS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:18-cv-00015 |
| vs. | ) | Consolidated with 3:19-cv-00225 |
| | ) | |
| | ) | |
| SKIER'S CHOICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT**

Before the Court are Defendant's Motion for Partial Summary Judgment, filed on July 15, 2020 ("First Motion," ECF No. 95) and Defendant's Second Motion for Partial Summary Judgment, filed on September 8, 2020 ("Second Motion," ECF No. 143) (collectively, "Summary Judgment Motions"). For the reasons stated below, Defendant's Summary Judgment Motions are **GRANTED-IN-PART** and **DENIED-IN-PART**.

## I.    BACKGROUND

This is a consolidated civil action for patent infringement and corresponding counterclaims for noninfringement and invalidity of the subject patents. Plaintiff Malibu Boats ("Malibu Boats") seeks a judgment finding that U.S. Patent Nos. 9,260,161 (the "'161 Patent"), 8,578,873 (the "'873 Patent"), and 10,322,777 (the "'777 Patent") (collectively, "Asserted Patents")[1] have been infringed by Defendant Skier's Choice, Inc. ("Skier's Choice"). (ECF No. 1 at PageID 39–40.)[2]

---

[1] U.S. Patent 9,199,695 was originally asserted but voluntarily dismissed by Plaintiff. (ECF No. 108.)
[2] Unless otherwise indicated, all docket entry citations refer to Civil Action No. 3:18-cv-00015.

Malibu Boats also seeks injunctive relief enjoining Skier's Choice from infringing the Asserted Patents, along with willful infringement damages, attorney's fees, and interest. (Id.) Specifically, Malibu Boats asserts the following claims from each Asserted Patent:

'161 Patent: Claims 1, 7, 10, 12–15, 19, 20, 22–25, 29, 31–35, and 41–45

'777 Patent: Claims 1–5, 8, 10–11, 13–17, 19–23, and 25–27

'873 Patent: Claims 1, 2, 17, and 20.

(Collectively, "Asserted Claims," ECF No. 96-2 at PageID 3402.)

### A.  Factual Background

Plaintiff Malibu Boats is a Delaware corporation with its principal place of business in Loudon, Tennessee. (Id. at PageID 5.) Defendant Skier's Choice is an Oklahoma corporation with its principal place of business in Marysville, Tennessee. (Id.) Malibu Boats makes "inboard sport boat[s]." (Id. at PageID 1.) Malibu Boats has patented critical aspects of a technology that allows the driver of a boat to displace water in the wake of a boat at a "push of a button" in order to create a surf wake on either side of the boat for the purpose of wake surfing. (Id. at PageID 2.) Malibu Boats brands this technology as "SURF GATE®." (Id.)

Skier's Choice has its own line of surf systems on its Moomba and Supra lines of boats, including the Moomba Flow and Supra Swell systems. (Id. at PageID 4.) Malibu Boats alleges that the Moomba Flow and Supra Swell systems infringe the Asserted Patents, specifically the "innovative and entirely revolutionary redirection of at least water on one side to modify and improve the wake on the opposite side." (Id. at PageID 5.)

On a normal boat, there are pneumatic devices that extend flaps into the water to prevent a boat from tilting, or listing, to one side or another due to the positions of the individuals or materials within the boat. These flaps are called "trim tabs." By extending downward from the vessel, trim

2

tabs displace water, which enables the boat to stay balanced regardless of the arrangement of weight in the vessel. Additional weight is also typically required in order to tilt the boat from one side to another and displace more water, and must be moved from one side of the boat to the other in order to generate a wake on the other side of the boat. '873 Patent col. 1, l. 61–64.

The Asserted Patents, all entitled "Surf Wake System for a Watercraft," purport to "enhance[] a wake formed by a watercraft travelling through water." See, e.g., '873 Patent at Abstract. This is achieved through a system that "may include a flap for deflecting water traveling past the stern of the watercraft, and/or a positioner operably connected to the flap for positioning the flap relative to a longitudinal axis of the watercraft between a neutral position and an outward position." (Id.) Furthermore, "[p]ositioning a port flap in its extended position enhances a



starboard surf wake, and positioning the starboard flap in its extended position enhances a port surf wake." (Id.) '873 Patent at Fig. 1.

In the illustrated embodiment, "the surf wake system may enhance surf wakes with or without supplemental ballast[.]" '873 Patent, col. 5, l. 65–66. The embodiment in Figure 1 of the Asserted Patents utilizes "water diverters [] in the form of flaps" that can be "moveably mounted directly or indirectly on the transom." '873 Patent, col. 6, l. 1–12. The surf wake system includes "one or more positioners or actuators" that are "configured to pivot the flaps about their respective pivot axis and position the flaps in different positions[.]" '873 Patent, col. 7, l. 6–10. Generally, as a boat travels through water, it "displaces water and generates waves including bow waves and diverging stern waves," but those waves tend to be "small, choppy or too close to the watercraft to be suitable and safe for water sports, and particularly not suitable for wake surfing." '873 Patent col. 8, l. 10–20. The Asserted Patents purport to solve this by "moving a flap of the present invention to an outward position," which redirects water and "may lead to constructive interference to form a larger wake having a higher peak and a smoother face, which wake is conducive for surfing." '873 Patent col. 8, l. 21–25.

Malibu Boats claims that its "SURF GATE®" product "allows users to more easily configure a boat for surfing on a desired side and readily and straightforwardly switch to configuring the boat for surfing on the other side, even doing so without stopping." (ECF No. 1 at PageID 3.) It claims that "[s]uch configurations vastly improve the usability of the boats for wake surfing and allows surfers to perform previously impossible moves." (Id.) Malibu Boats contends that boats with the Supra Swell, Swell 2.0, Swell 3.0, as well as boats with the Moomba Flow 2.0 and Flow 3.0 (collectively, "Accused Products") infringe the Asserted Patents because

they utilize surf wake systems that "modify the wake to enhance the starboard wave to have a face substantially smoother than a face of the port wave and/or to enhance the port wave to have a face substantially smoother than a face of the starboard wave." (Id. at PageID 14.) Skier's Choice contends that "Malibu did not invent wake surfing or boats used for wake surfing," nor did it "invent the diversion of water." (ECF No. 19 at PageID 195.) It further denies that the Accused Products "were copied from or developed as a result of systems or purported inventions of Malibu" and instead asserts that Skier's Choice is the owner of "numerous patents, patent applications, and proprietary systems, methods and developments." (Id. at PageID 196.)

## B. Procedural Background

On January 12, 2018, Malibu Boats filed the Complaint as to the '161, '873, and '695 Patents. (ECF No. 1.) On March, 9, 2018, Defendant filed its Answer and Counterclaims. (ECF No. 19.) Skier's Choice asserts a counterclaim for declaratory judgment, seeking a judgment of "non-infringement, invalidity, and unenforceability" for the Asserted Patents. (Id. at PageID 214.) On April 3, 2018, Malibu Boats filed its Answer to Skier's Choice's Counterclaim. (ECF No. 25.) On June 19, 2019, Malibu Boats filed the second case, asserting infringement of the newly issued '777 Patent. (Case No. 3:19-cv-225, ECF No. 33.) The Court granted Skier's Choice's Motion to Consolidate the Cases on November 27, 2019. (ECF No. 73.)

Malibu Boats filed its First Motion for Summary Judgment on July 15, 2020. (ECF No. 95.) Skier's Choice filed a Response in Opposition to Malibu Boats' First Motion on August 5, 2020. (ECF No. 122.) Malibu Boats filed its Reply to Skier's Choice's Response on August 12, 2020. (ECF No. 125.) The Court issued its Claim Construction Order as to the Asserted Patents on August 25, 2020. ("Markman Order," ECF No. 132.) In light of the Court's Markman Order, the Court allowed the parties to file another round of summary judgment briefing. (Transcript of

Video Conference Proceedings on August 27, 2020.)  Malibu Boats then filed its Second Motion for Partial Summary Judgment on September 8, 2020.  (ECF No. 143.)  Skier's Choice filed a Response in Opposition to Malibu Boats' Second Motion on September 22, 2020.  (ECF No. 151.)  On September 29, 2020, Malibu Boats filed a Reply to Skier's Choice's Response.  (ECF No. 152.)

## II.    LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense."  Bruederle v. Louisville Metro Gov't, 687 F.3d 771, 776 (6th Cir. 2012).

"In considering a motion for summary judgment, [the] court construes all reasonable inferences in favor of the non-moving party."  Robertson v. Lucas, 753 F.3d 606, 614 (6th Cir. 2014) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  "The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact."  Mosholder v. Barnhardt, 679 F.3d 443, 448 (6th Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact."  Mosholder, 679 F.3d at 448-49; see also Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.  "When the non-moving party fails to make a sufficient showing of an essential element of his case on which he bears the burden of proof, the moving parties are entitled to judgment as a matter of law and summary judgment is proper."  Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d 911, 914 (6th Cir. 2013) (quoting Chapman v. UAW Local 1005, 670 F.3d 677, 680 (6th Cir. 2012) (en banc)) (internal quotation marks omitted).

6

In order to "show that a fact is, or is not, genuinely disputed," a party must do so by "citing to particular parts of materials in the record," "showing that the materials cited do not establish the absence or presence of a genuine dispute," or showing "that an adverse party cannot produce admissible evidence to support the fact." L.R. 56.1(b)(3); Bruederle, 687 F.3d at 776 (alterations in original) (quoting Fed. R. Civ. P. 56(c)(1)); see also Mosholder, 679 F.3d at 448 ("To support its motion, the moving party may show 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting Celotex, 477 U.S. at 325)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" Martinez, 703 F.3d at 914 (alteration in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "[T]he district court has no 'duty to search the entire record to establish that it is bereft of a genuine issue of material fact.'" Pharos Capital Partners, L.P. v. Deloitte & Touche, 535 Fed. Appx. 522, 523 (6th Cir. 2013) (per curiam) (quoting Tucker v. Tennessee, 539 F.3d 526, 531 (6th Cir. 2008), abrogation recognized by Anderson v. City of Blue Ash, 798 F.3d 338 (6th Cir. 2015)).

The decisive "question is whether 'the evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law.'" Johnson v. Memphis Light Gas & Water Div., 777 F.3d 838, 843 (6th Cir. 2015) (quoting Liberty Lobby, 477 U.S. at 251-52). Summary judgment "'shall be entered' against the non-moving party unless affidavits or other evidence 'set forth specific facts showing that there is a genuine issue for trial.'" Rachells v. Cingular Wireless Employee Servs., LLC, No. 1:08CV02815, 2012 WL 3648835, at *2 (N.D. Ohio Aug. 23, 2012) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 884 (1990)). "[A] mere 'scintilla' of evidence in support of the non-

moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in her favor." Tingle v. Arbors at Hilliard, 692 F.3d 523, 529 (6th Cir. 2012) (quoting Liberty Lobby, 477 U.S. at 251). "[I]n order to withstand a motion for summary judgment, the party opposing the motion must present "affirmative evidence" to support his/her position." Mitchell v. Toledo Hosp., 964 F.2d 577, 584 (6th Cir. 1992) (citing Liberty Lobby, 477 U.S. at 247-254; Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)). "[C]onclusory assertions, unsupported by specific facts made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a motion for summary judgment." Rachells, 2012 WL 3648835, at *2 (quoting Thomas v. Christ Hosp. and Med. Ctr., 328 F.3d 890, 894 (7th Cir. 2003)). Statements contained in an affidavit that are "nothing more than rumors, conclusory allegations and subjective beliefs" are insufficient. See Mitchell, 964 F.2d at 584-85.

## III.    ANALYSIS

Skier's Choice seeks summary judgment on the following issues: 1) Non-infringement of the Asserted Claims of the '161 Patent; 2) Non-infringement of the Asserted Claims of the '777 Patent; 3) Non-infringement of the Asserted Claims of the '873 Patent; 4) Not inducing infringement of Asserted Method Claims; 5) Invalidity of Asserted Claims under § 112; and 6) Invalidity based on anticipation of the Asserted Claims of the '161 and '777 Patents. The Court addresses the non-infringement, § 112 indefiniteness, and § 102(a) anticipation arguments below.

### A.  Summary Judgment on issues of Non-Infringement is DENIED

"Evaluation of summary judgment of noninfringement is a two-part inquiry: first, a court construes the scope and meaning of the asserted patent claims, and then compares the construed claims to the accused product or process." Medgraph, Inc. v. Medtronic, Inc., 843 F.3d 942, 949

(Fed. Cir. 2016) (citing Abbott Labs. v. Sandoz, Inc., 566 F.3d 1282, 1288 (Fed. Cir. 2009)). "Because the determination of infringement is a question of fact, summary judgment of infringement is improper if a reasonable jury could find that not every limitation of the claim in question would be met by the [accused product]." Abbott Labs., 300 F.3d at 1373 (internal citation omitted).

### 1) The Court's construction of *Past the Transom* Precludes Summary Judgment of Non-Infringement of the Asserted Claims of the '161 Patent

Skier's Choice's arguments for non-infringement of the '161 Patent are predicated on a construction of "past the transom" as "beyond the side of the transom." (ECF No. 96 t PageID 3377.) Skier's Choice asserts that "should the Court construe *past the transom* as requested by Skier's Choice[], or in another matter that does not include downward deployment, the accused boats and surf systems would fail to meet at least one limitation of each of the asserted claims." (Id.) The Court's Markman Order clearly stated however, that "[w]hile downward extending flaps do not appear in the embodiments presented, the specification does not disclaim this scope." (ECF No. 132 at PageID 4909.) Accordingly, the Court concluded that "[a] person having ordinary skill in the art can understand that 'past the transom' or 'past the edge of the transom' refers to any side of the transom—which is the plain and ordinary meaning." (Id. at 4910.) Because the Court did not adopt the construction upon which Skier's Choice non-infringement is based, summary judgment is **DENIED AS MOOT** on this point.

### 2) The Court's construction of *Deployed Element* and *Deployed Position* Precludes Summary Judgment of Non-Infringement of the Asserted Claims of the '777 Patent

Skier's Choice also argues that it "would be entitled to summary judgment as to the '777 patent claims if the Court adopts Skier's Choice's constructions of either *deployable element* or *deployed position*." (ECF No. 96 at PageID 3378.) Skier's Choice argues that "deployable

element" is a "means-plus-function limitation that should be limited to structures that perform the claimed functions, namely those that deploy beyond the side of the transom" and "deployed position" "should be construed as 'a position beyond the side of the transom.'" (Id.) If the Court construed these terms in line with Skier's Choices arguments, or "in another manner that limits the scope of either term to exclude devices that deploy downwardly below the bottom of the transom, Skier's Choice would be entitled to summary judgment of non-infringement as to all [of] Malibu's infringement claims under the '777 patent." (Id. at 3378–79.)

In its Markman Order, the Court rejected both of Skier's Choice's proposed constructions. First, it found that the term "deployable element" was adequately characterized by the claims so as not to fall under § 112(f). (ECF No. 132 at PageID 4897.) In particular, the Court found that "[t]he claim language provides the location, number, and interconnections between the pieces," along with traits of the deployable elements such that the term "is not so bare that it can be appropriately characterized as a means-plus-function term." (Id. at PageID 4897.) Similarly, the Court rejected Skier's Choices' argument that "deployed position" should be limited to "beyond the side of the transom." (Id. at PageID 4899.) Instead, the Court found that "deployed position" describes the location of a "deployable element" and "extends beyond the boundary of the boat." (Id.) The term was afforded its plain and ordinary meaning. Because Skier's Choice's arguments for non-infringement of the '777 Patent are based on constructions that were rejected by the Court, Skier's Choice's motion is **DENIED AS MOOT** on non-infringement of the '777 Patent.

### 3) Summary Judgment of Non-infringement of the '873 Patent is Improper Because a Reasonable Jury Could Find that the '873 Patent is Infringed by the Accused Products

Skier's Choice asserts that even under Malibu's proposed construction of "upright," "there is no genuine dispute of material fact that the accused devices lack at least one limitation of those

10

claims — namely, an *upright water diverter* that is 'movable between a first and second position'…because it is undisputed that, even under Malibu's requested constructions, the 'secondary' or 'yaw' tab of the Flow 3.0 system is *upright* in only one position.  (ECF No. 125 at PageID 4797.)

Skier's Choice argument fails because it attempts to insert a requirement into the Court's construction of "upright."  In its <u>Markman</u> Order, the Court construed "upright" to mean "oriented generally vertically with respect to the boat, allowing for slight inclination."  (ECF No. 132 at PageID 4899.)  With this construction applied, Skier's Choice contends that "the language of the claims requires a *water diverter* that is 'oriented generally vertically with respect to the boat, allowing for slight inclination' (or *upright*) ***and*** moveable 'between a first and second position,' as opposed to a *water diverter* that ***becomes*** *upright* when moved 'between a first and second position.'"  (ECF No. 125 at PageID 4799 (emphasis in original).)  Summary judgment of non-infringement is premised on the requirement that "the *upright water diverter* be *upright* in both the 'first' and 'second' positions."  (ECF No. 96 at PageID 3381.)  According to Skier's Choice, "the '873 patent requires that the accused devices employ a *water diverter* that is *upright* in at least two positions: a 'first position' and a 'second position.'"  (<u>Id.</u>)

In response, Malibu Boats argues that "[t]he language of the asserted claims of the '873 Patent does not have any such requirement" and that "[t]he claims recite that the upright water diverters are moveable between two positions, ***not*** that the upright water diverters remain upright in both positions."  (ECF No. 122 at PageID 4657 (emphasis in original).)  The time for claim construction has passed, and the Federal Circuit "gives broad deference to the trial court's application of local procedural rules in view of the trial court's need to control the parties and flow of litigation before it."  <u>SanDisk Corp. v. Memorex Prods., Inc.</u>, 415 F.3d 1278, 1292 (Fed. Cir.

2005). Here, Skier's Choice did not request a construction of "first position," "second position," or "operably connected." It further adds that it is not requesting a new construction, and instead argues that summary judgment should be granted based on Malibu Boats' proposed construction, along with the plain and ordinary meaning of these terms. Skier's Choice contends that "[w]hen [Malibu Boats'] proposed constructions are applied and the asserted claim language compared to the accused devices, it is undisputed that Skier's Choice is entitled to summary judgment of non-infringement on the '873 patent." (ECF No. 125 at PageID 4802.)

The Court disagrees. Adopting the plain and ordinary meaning of any unconstrued claim terms results in the following relevant portion of claim 1 of the '873 Patent:

a port side **upright water diverter** movable between a **first and second position**, wherein one of said first and second positions produces said starboard side surf wake;

a starboard side **upright water diverter** movable between a **first and second position**, wherein one of said first and second positions produces said port side surf wake[.]

'873 Patent, col. 25, l. 4–9 (emphasis added).

Using the plain and ordinary meaning of "first and second position," there is no such requirement that the water diverters be upright at either or both positions. In fact, Magistrate Judge Guyton ruled on this exact issue in <u>Malibu Boats, LLC v. Mastercraft Boat Company, LLC</u>, Case No. 3:15-cv-276 (E.D. Tenn. Feb. 24, 2017). There, Defendant argued that an "upright water diverter" was "one that is upright in both its first and second positions." (C.A. 3:15-cv-276, ECF No. 135 at PageID 7366.) The Magistrate Judge found Defendant's proposed construction to be inconsistent with the specification and claim language, adding that Defendant "ha[d] not specifically cited language in the specification that would support abandoning the plain and ordinary meaning of the term." (<u>Id.</u> at PageID 7377.) Skier's Choice's arguments, while veiled as a non-infringement theory, in fact require rewriting the claim term to define the first and second

12

positions. The time for claim construction has passed, and both "first position" and "second position" are afforded their ordinary meaning. Skier's Choice's request for summary judgment of non-infringement of the '873 Patent is therefore **DENIED**.

4) **Summary Judgement of Non-Induced Infringement of Asserted Method Claims is Denied Because a Reasonable Fact-Finder Could Find That Skier's Choice Induced Infringement**

Skier's Choice seeks summary judgment of non-infringement of Malibu Boat's induced infringement claims. 35 U.S.C. § 271(b) states: "Whoever actively induces infringement of a patent shall be liable as an infringer." The Federal Circuit has provided further guidance on induced infringement:

> Importantly, liability for induced infringement under § 271(b) must be predicated on direct infringement. The patentee must also show that the alleged infringer possessed the requisite intent to induce infringement, which we have held requires that the alleged infringer knew or should have known his actions would induce actual infringements.

Eli Lilly & Co. v. Teva Parenteral Medicines, Inc., 845 F.3d 1357, 1363–64 (Fed. Cir. 2017) (internal citations and quotation marks omitted).

"Mere 'knowledge of the acts alleged to constitute infringement' is not sufficient." Id. at 1368 (quoting DSU Med. Corp. v. JMS Co., 471 F.3d 1293, 1305 (Fed. Cir. 2006)). A patentee may prove infringement by direct or circumstantial evidence" and "is not required to present direct evidence of infringement." 02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd., 449 Fed. Appx 923, 928 (Fed. Cir. 2011) (internal citations and quotations omitted). A party may present "circumstantial evidence that some party committed direct infringement of the asserted method claims by using the accused product." Id. (citing Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1317–19 (Fed. Cir. 2009)); Symantec Corp. v. Computer Assocs. Int'l, Inc., 522 F.3d 1279, 1293 (Fed. Cir. 2008)). For example, "use of instruction manuals [may be used] to demonstrate direct infringement by customers in the context of induced infringement." Tinnus Enterprises,

13

LLC v. Telebrands Corp., 846 F.3d 1190, 1204 (Fed. Cir. 2017) (citing Golden Blount, Inc. v. Robert H. Peterson Co., 438 F.3d 1354, 1362–63 (Fed. Cir. 2006)).

Skier's Choice argues that [w]here an accused device is capable of non-infringing use, and the patentee fails to provide evidence of third-party direct infringement, summary judgment in favor of the accused infringer as to induced infringement is proper." (ECF No. 125 at PageID 4802.) "In order to prove direct infringement, a patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit." ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd., 501 F.3d 1307, 1313 (Fed. Cir. 2007) (citing Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263 (Fed. Cir. 2004)). Relying on the Federal Circuit's holdings in ACCO and Dynacore, Skier's Choice argues that "the accused devices do not 'necessarily infringe'" and that "Malibu provides no evidence [as] to a third-party customer or dealer, let alone evidence that any one customer or dealer practiced any step of the asserted methods." (ECF No. 125 at PageID 4804.) It adds that "Malibu has provided the Court with Skier's Choice's publications and Malibu's expert's conclusory opinions that third parties would perform the specific methods of the '161 patent claims as a result," but that "such evidence does not suffice because it requires the inferential leap that third parties necessarily infringed the patented methods even though the accused devices do not necessarily infringe." (Id. at PageID 4806.)

Here, Malibu Boats presents circumstantial evidence for a jury to find direct infringement including the "number of boats sold and the methods in which the defendant instructed its users to perform the recited methods[.]" (ECF No. 122 at PageID 4661.) It further provides expert testimony in the expert report of Kevin Breen "identifying evidence supporting direct infringement by 'dealers and customers using each of the accused Supra boats equipped with a Swell 1.0, 2.0,

14

and 3.0 surf system' or 'dealers and customers using each of the accused Moomba boats equipped with a Flow 2.0 or Flow 3.0 surf system.'" (Id. at PageID 4662.) Malibu Boats also points to Skier's Choice's materials and published videos that show Supra boats with Swell surf systems purportedly practicing the methods of the '161 Patent. (Id.) Finally, Malibu Boats highlights testimony from Skier's Choice's Head of Product Development and Engineering, Robert Loucks, as well as its Product Development Manager, Matt Brown, regarding factory default settings on boats sold by Skier's Choice. (Id.) Skier's Choice argues that "[s]uch evidence does not suffice because it requires the inferential leap that third parties necessarily infringed the patented methods even though the accused devices do not necessarily infringe." (ECF No. 125 at PageID 4806.) Whether or not there is direct infringement by a third-party is a question for the jury, and the Court is unconvinced by Skier's Choice's arguments to take this question out of the hands of the fact-finder. Because a reasonable fact-finder could conclude that Skier's Choice's customers practice claims 19, 20, 22–25, and 44 of the '161 Patent, summary judgment is **DENIED** on the issue of induced infringement.

### B. Summary Judgment on Issues of § 112 Indefiniteness is GRANTED-IN-PART and DENIED-IN-PART

Skier's Choice asks this Court to grant summary judgment in its favor on the issue of § 112 indefiniteness because 1) the Asserted Apparatus Claims Improperly Claim Both an Apparatus and Method of Using Said Apparatus; and 2) Certain of Malibu's Asserted Claims are Invalid as Indefinite.

35 U.S.C. § 112(b) requires patent claims to "particularly point[] out and distinctly claim[] the subject matter which the inventor or a joint inventor regards as the invention." In Nautilus, the Supreme Court announced that 35 U.S.C. §112, ¶2:

require[s] that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty. The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable. The standard we adopt accords with opinions of this Court stating that the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject matter.

Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 910 (2014) (internal citations and quotations omitted).

"[U]nder controlling precedent, the ultimate question of indefiniteness is one of law." Dow Chem. Co. v. NOVA Chems. Corp. (Can.), 809 F.3d 1223, 1224–25 (Fed. Cir. 2015). The party asserting indefiniteness has the burden of proving it with clear and convincing evidence. Microsoft Corp. v. I4I Ltd. P'ship, 564 U.S. 91, 97 (2011). In Teva, the Supreme Court acknowledged that subsidiary factual determinations are made in the course of claim construction. Teva Pharm. USA, Inc. v. Sandoz, Inc., 135 S. Ct. 831, 832 (2015). To the extent that a definiteness analysis relies on factual issues as to the knowledge of the person having ordinary skill in the art, it is an inquiry that "is amenable to resolution by the jury.… " BJ Servs. Co. v. Halliburton Energy Servs., Inc., 338 F.3d 1368, 1372 (Fed. Cir. 2003) ("[D]efiniteness … is amenable to resolution by the jury where the issues are factual in nature.) Furthermore, the analysis of indefiniteness can be assessed both at the claim term level during Markman briefing, as well as at a claim level during summary judgment briefing. See, e.g., Cox Comm's, Inc. v. Spring Comm'n Co., 838 F.3d 1224, 1228 ("[T]he district court decided, among other things, that the term 'processing system' was not indefinite, but did not warrant a construction.…[T]he district court granted Cox's motion [for partial summary judgment], finding that the claims were indefinite."). The Cox Court also shed light on the ultimate question of indefiniteness under 35 U.S.C. § 112, ¶ 2:

"To be sure, we have generally acknowledged that an indefiniteness analysis under 35 U.S.C. § 112, ¶ 3 is 'inextricably intertwined with claim construction.'" Atmel Corp v. Info. Storage Devices, Inc., 198 F.3d 1374, 1379 (Fed. Cir. 1999.)

16

Accordingly, the common practice of training questions of indefiniteness on individual claim terms is a helpful tool. Indeed, if a person of ordinary skill in the art cannot discern the scope of a claim with reasonable certainty, it may be because one of several claim terms cannot be reasonably construed. See, e.g., Interval Licensing LLC v. AOL, Inc., 766 F.3d 1364, 1374 (Fed. Cir. 2014) (finding the phrase 'unobtrusive manner' rendered claims indefinite because, even after consulting the claims, specification, and prosecution history, a skilled artisan would be left 'to consult the unpredictable vagaries of any one person's opinion') (citations and internal quotation marks omitted).

Nevertheless, indefiniteness under § 112, ¶ 2 must ultimately turn on the question set forth by Nautilus: whether the 'claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.' Id. at 2129 (emphasis added).

Cox Comm's, Inc. v. Sprint Comm'n Co., 838 F.3d 1224, 1231–32 (Fed. Cir. 2016).

### 1) The Asserted Patents Do Not Improperly Claim Both an Apparatus and Method of Using Said Apparatus

Skier's Choice posits that the Asserted Claims "are all directed to a structure — whether an *upright water diverter, flap* or *deployable element* — as well as use of that structure to produce or create a specific type of wake" and are therefore indefinite. (ECF No. 125 at PageID 4806.) The Federal Circuit has held that "'a single claim covering both an apparatus and a method of use of that apparatus' fails to meet the requirements of § 112 because 'it is unclear whether infringement … occurs when one creates a[n infringing] system, or whether infringement occurs when the user actually uses [the system in an infringing manner.]'" UltimatePointer, L.L.C. v. Nintendo Co., 816 F.3d 816, 826 (Fed. Cir. 2016) (alteration in original) (citing IPXL Holdings, LLC v. Amazon.com, Inc., 430 F.3d 1377, 1384 (Fed. Cir. 2005)). "[A]pparatus claims are not necessarily indefinite for using functional language." Microprocessor Enhancement Corp. v. Texas Instruments Inc., 520 F.3d 1367, 1375 (Fed. Cir. 2008). For example, in UltimatePointer, Plaintiff argued that claims were not invalid as indefinite because "they simply claim[ed] a

handheld device with an image sensor **capable** of generating data, and recite[d] sufficient structure for that capability." Id. at 826. Conversely, Nintendo argued that the "claims [did] not clearly tie the functional language to the device's capability." Id. at 827. The Federal Circuit found that the claims were not invalid as indefinite, because they "reflect[ed] the capability of the claimed apparatus." Id. "Unlike IPXL and similar cases, the claims at issue here make clear that the 'generating data' limitation reflects the capability of that structure rather than the activities of the user." Id.

Thus, the question before the Court is whether the claims require an apparatus and a specific use of that apparatus, or merely recite a structure capable of performing recited functions. "If an apparatus claim 'is clearly limited to a[n apparatus] possessing the recited structure and **capable** of performing the recited functions,' then the claim is not invalid as indefinite." UltimatePointer, 816 F.3d at 826 (citing Microprocessor, 520 F.3d at 1375) (emphasis in original).

Malibu Boats argues that the Asserted Claims "are undisputedly directed to a boat possessing the recited structures—including 'upright water diverters,' 'flaps,' and 'deployable elements' — and **capable** of performing recited functions." (ECF No. 122 at PageID 4664 (emphasis in original).) Malibu Boats points to claim 1 of each of the Asserted Patents to assert that the Asserted Claims "recite an apparatus including specific structures that are **capable** of performing the recited functions, not any activity that must be performed by a user to meet the limitations of the claims." (Id. at PageID 4665 (emphasis in original).)

Skier's Choice argues that the claims of the '873 Patent "recite a boat with a particular structure that, when used, creates a wake on the side of the deployed *upright water diverter* that is different than the opposite side." (ECF No. 125 at PageID 4807.) Similarly, it asserts that the claims of the '161 and '777 Patents "recite a boat with a particular structure that, when used,

creates a wake on the opposite side of *flap* or *deployable element* deployment that is 'substantially smoother' than the wake of the side of deployment." (Id.) The crux of Skier's Choice's argument is that "[d]etermining whether such wake is created in a way that meets the claim limitations requires a comparison of one side wake with another that necessarily requires use of the claimed structure" and that such "wake comparison limitations also come from isolated 'wherein' clauses that are not tied to any particular structure but use of the apparatus generally." (Id.) Skier's Choice argument appears to predicated on the premise that "[w]hether or not these limitations are met cannot be determined until the claimed surf systems are in ***use***." (ECF No. 96 at PageID 3388.) That is not the operative legal question. In IPXL Holdings, the Federal Circuit found the following claim 25 of the patent at issue to be indefinite for the following reason:

> Thus, it is unclear whether infringement of claim 25 occurs when one creates a system that allows the user to change the predicted transaction information or accept the displayed transaction, **or** whether infringement occurs when the user actually uses the input means to change transaction information or uses the input means to accept a displayed transaction.

IPXL Holdings, 430 F.3d at 1384 (emphasis added).

The Federal Circuit has provided further guidance on the issue. In In re Katz Interactive Call Processing Patent Litigation, the Federal Circuit held Katz's claims indefinite for "creat[ing] confusion as to when direct infringement occurs because they are directed both to systems and to actions performed by 'individual callers.'" 639 F.3d 1303, 1318 (Fed. Cir. 2011). In HTC Corp v. IPCom GmbH & Co., KG, the Federal Circuit held apparatus claims not invalid for indefiniteness despite using functional language. 667 F.3d 1270 (Fed. Cir. 2012). Specifically, the court found that the claim at issue did not "recite a mobile station and then have the mobile station perform the six enumerated functions," but instead "merely establish[ed] those functions as the underlying work environment in which the mobile station operates." Id. at 1277. Despite

the "unconventional format" of the claim, the claim was not indefinite because it made clear that "infringement occurs when one makes, uses, offers to sell, or sells the claimed apparatus: the mobile station—which must be used in a particular network environment.." Id. Most recently, in MasterMine Software, Inc. v. Microsoft Corp., the court evaluated the following claim in relevant portion:

> [a] system comprising…
>
> a reporting module installed within the CRM software application…
>
> wherein the reporting module installed within the CRM software application *presents* a set of user-selectable database fields as a function of the selected report template, *receives from the user a selection* of one or more of the user-selectable database fields, and *generates* a database query as a function of the user selected database fields[.]

874 F.3d 1307, 1315 (Fed. Cir. 2017) (emphasis in original) (internal citation omitted).

"Though claim 8 includes active verbs—presents, receives, and generates—these verbs represent permissible functional language used to describe capabilities of the 'reporting module.' Like the claims in MEC, HTC, and UltimatePointer, the claims at issue here merely claim that the system 'possess[es] the recited structure [which is] capable of perming the recited functions.'" MasterMine, 874 F.3d at 1315–16. The court further noted that the claims "do not claim activities performed by the user" and that while they "make reference to user selection, they do not explicitly claim the user's act of selection, but rather claim the system's capability to receive and respond to user selection." Id. at 1316. The Federal Circuit distinguished the limitations of "receiving" and "generating" in MasterMine as "focus[ing] on the capabilities of the system" from the claims in IPXL Holdings ("the user uses the input means") and Katz ("said individual callers digitally enter data"), which it said "focus[ed] on specific actions performed by the user." Id.

Here, the Court agrees with Malibu Boats' contention that "nothing in the claims of the asserted patents require certain 'activities of the user,' as opposed to reflecting the claimed structures' capabilities." (ECF No. 122 at PageID 4666.) Because the claims "merely use permissible functional language to describe the capabilities of the claimed system, it is clear that infringement occurs when one makes, uses, offers to sell, or sells the claimed system." MasterMine, 874 F.3d at 1316. Accordingly, Skier's Choice has not met the burden of demonstrating that the Asserted Claims are indefinite and summary judgment is **DENIED** on this point.

### 2) The Term "Significant Leaning" is Indefinite, but the Terms "Substantially Smoother" and "Surf Wake" Are Not

Section 112 requires that a patent specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 ¶ 2. "The Supreme Court has read this provision to require that 'a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty.'" Sonix Tech. Co., Ltd. v. Pubs. Int'l, Ltd., 844 F.3d 1370, 1377 (Fed. Cir. 2017) (citing Nautilus, 572 U.S. at 909). "Indefiniteness must be proven by clear and convincing evidence." Sonix, 844 F.3d at 1377. Section 112 strikes a "delicate balance" because it "must be precise enough to afford a clear notice of what is claimed," but also "must take into account the inherent limitations of language" such that there be "[s]ome modicum of uncertainty[.]" Nautilus, 572 U.S. at 909. "Because language is limited, [the Federal Circuit] [has] rejected the proposition that claims involving terms of degree are inherently indefinite." Sonix, 844 F.3d at 1377 (citing Interval Licensing LLC v. AOL, Inc., 766 F.3d 1364, 1370 (Fed. Cir. 2014)). "Claim language employing terms of degree has long

been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention." <u>Interval Licensing</u>, 766 F.3d at 1370 (internal citations omitted).

a. *Significant Leaning*

Claims 12, 22, 32, and 42 of the '161 Patent, as well as claims 3 and 21 of the '777 Patent refer to enhancement of port or starboard side wave by a claimed boat "without significant leaning." <u>See, e.g.</u>, '161 Patent, cl. 12. Skier's Choice argues that claims using the term "significant leaning" are invalid as indefinite because neither the claims, nor the specification or prosecution histories, "provide an objective criteria by which to determine when lean becomes 'significant.'" (ECF No. 96 at PageID 3389–90.) Malibu Boats contends that this is merely a "question of what can be seen by the normal human eye" and that "[t]he specification of the '161 and '777 Patents further provides an objective baseline for determining whether this claim is met." (ECF NO. 122 at PageID 4668.) Malibu Boats refers to the patent specifications disclosure regarding the downside of using ballast on boats:

> Using such additional weight to produce larger wakes, however, poses several disadvantages. For example, such additional weight may take up significant space and capacity that may otherwise reduce the passenger capacity of the watercraft. Also, such additional weight may unbalance the watercraft creating difficulties in control. Moreover, the additional weight generally must be moved from one side of the watercraft to the other in order to generate a wake on the other side of the watercraft. Shifting such additional weight may require significant time and effort. For example, filling and emptying ballast tanks to switch from one side to the other may require 20 minutes or more.

'161 Patent, col. 1, l. 42–54. It contrasts this with the benefit of the patented invention:

> Moreover, by placing the flaps along the side edges, the watercraft can generate a suitable surfing wake with *less tilt or lean* to one side, thus making the ***watercraft easier to control***. One will appreciate that the flaps may enhance wake shape and size with or without the use of significant additional weight or ballast located toward the rear corners of the watercraft.

'161 Patent, col. 7, l. 50–56.

Malibu Boats puts forth the above disclosure, combined with its expert testimony and internal documents to argue that that a person having ordinary skill in the art ("PHOSITA") would understand the scope of the claimed invention. To support this contention, Malibu Boats points to Sonix for the distinction between terms that are "subjective in the sense that they turn[] on a person's tastes or opinion" versus "what can be seen by the normal human eye." (ECF No. 122 at PageID 4668.) The Sonix Court ruled that the latter provided an "objective baseline through which to interpret the claims." Sonix, 844 F.3d at 1378. What Malibu Boats fails to recite from Sonix and other Federal Circuit opinions however, is the importance of objective boundaries for those of skill in the art. See, e.g., Liberty Ammunition, Inc. v. United States, 835 F.3d 1388, 1396 (Fed. Cir. 2016); see also Sonix, 844 F.3d at 1377 (Comparing terms of degree to be found not invalid as indefinite in Enzo with terms of degree found to be indefinite in Datamize due to a lack of guidance that rendered the claim interpretation "completely dependent on a person's subjective opinion") (internal citations and quotations omitted).

Here, the specification and prosecution history provide little to no guidance as to what constitutes a "significant" lean, as opposed to an insignificant lean. Without more guidance, two PHOSITAs looking at the same exact lean of a boat can have diverging opinions. As summarized by Skier's Choice, "the specifications of the '161 and '777 patent generally describe enhancement of wake with less tilt or lean than the prior art, but fail to 'place any limit on the scope of what was invented beyond the prior art' by omitting any objective boundary for when a boat leans significantly and is prior art or enhances wake 'without significant leaning' and is within the scope of the patented claims." (ECF No. 125 at PageID 4810 (citing Halliburton Energy Servs. v. MI, LLC, 514 F.3d 1244, 1253 (Fed. Cir. 2008)).)

The Court further agrees with Skier's Choice that Malibu Boats' "expert testimony fails to create a genuine dispute of material fact to the contrary." (ECF No. 125 at PageID 4810.) Malibu Boats points to Skier's Choice documents that discuss the advantages of running the boat "relatively flat," but this does not inform the PHOSITA or provide a relevant standard or objective boundary regarding the "significance" of the lean in the '161 and '777 Patents. Skier's Choice also highlights the testimony of Malibu Boats' expert, Kevin Breen, whose deposition testimony concedes that two PHOSITA may look at the same degree of lean and have diverging opinions regarding its significance. (ECF No. 125-1 at 278:14–280:9.) Skier's Choice has met its burden of clear and convincing evidence to show that claims 12, 22, 32, and 42 of the '161 Patent, as well as claims 3 and 21 of the '777 Patent should be found invalid due to the indefiniteness of the term "significant lean." Summary judgment is **GRANTED** on this point.

b. *Substantially Smoother*

The Federal Circuit "has repeatedly confirmed that relative terms such as 'substantially' do not render patent claims so unclear as to prevent a person of skill in the art from ascertaining the scope of the claim." Deere & Co v. Bush Hog, LLC, 703 F.3d 1349, 1359 (Fed. Cir. 2012). The parties take similar positions to those that they did for "significantly leaning." Skier's Choice argues that "[t]he record evidence similarly provides no objective boundary for when the face of one side's wave is 'substantially smoother' than the face of the other side, rendering the asserted '161 and '777 patent claims indefinite." Skier's Choice asserts that "Malibu provides nothing from the specification, prosecution history or record evidence that would show a P[H]OSITA understood when and whether a wave is '***substantially*** smoother' than the wave of the opposite side." (ECF No. 125 at PageID 4813 (emphasis in original).)

Conversely, Malibu Boats states that the "[t]he specification is replete with evidence by which one of skill in the art would understood whether one side of the wake was 'substantially smoother' than the other side." (ECF No. 122 at PageID 4669.) It points first and foremost to a holding by this Court contrasting a "conventional wake" that "lack[ed] a smooth face and a high peak" against an enhanced wake in which the "side of the wake opposite the deployed diverter [was] noticeably smoother" and had "a higher peak than the conventional wake." Malibu Boats, LLC v. Nautique Boat Co., 122 F.3d 722, 738 (E.D. Tenn. 2015). Furthermore, unlike the disclosure for "significant leaning," the '161 and '777 Patents do provide sufficient disclosure with respect to "substantially smoother." For example, figures 6A, 6B, and 6C provide visuals of difference in smoothness and the accompanying disclosure explains:

> Comparing to the non-enhanced wake of FIG. 6A with the starboard wake shown in FIG. 6B, it is evident that surf wake system 32 modified and/or enhanced the wake with a ***smooth face*** and a relatively high peak. As can be seen in FIG. 6B, waist-high peaks of three or four feet are attainable, thus providing a reproducible wake that is suitable for surfing. Turning to FIG. 5C, when a port side surf wake is desired, starboard side flap 33,s [*sic*] is positioned in an outward position while the port side flap 33,p [*sic*] remains in a neutral position. Now that the starboard side flap is an outward position, the surf wake system, a port side wake, such as that shown in FIG. 6C is produced in a manner similar to that described above. Such configuration produces a left side surf wake. Comparing to the non-enhanced wake of FIG. 6A with the port side wake shown in FIG. 6C, it is evident that surf wake system 32 modified and/or enhanced the port side wake with a ***smooth face*** and a relatively high peak.

'161 Patent, col. 9, l. 5–22.

Here, as was the case in Enzo, "the intrinsic evidence provide[s] guidance as to the scope of the claims," along with examples of varying degrees of smoothness. Enzo Biochem, Inc. v. Applera Corp., 599 F.3d 1325, 1334–36 (Fed. Cir. 2010). Consequently, the claims are not indefinite despite not "refer[ring] to a precise numerical measurement." Id. at 1335. A PHOSITA has sufficient guidance to compare a potentially infringing product with the examples in the

25

specification to determine whether a wake is "substantially smoother." Accordingly, summary judgment is **DENIED** on this ground, and the Asserted Claims are not invalid for indefiniteness.

c. *Surf Wake*

Skier's Choice also asserts that the Asserted Claims of the '873 and '777 Patents are "indefinite for use of the term *surf wake*." (ECF No. 96 at PageID 3391.) In its <u>Markman</u> Order, this Court construed "surf wake" as a "a wake whose size, shape, or other characteristics have been enhanced for surfing." (ECF No. 132 at PageID 4900.) Skier's Choice argues that "[t]his construction is indefinite because there are no objective boundaries as to what size, shape or 'other characteristics' make a wake a *surf wake*." (ECF No. 125 at PageID 4814.) The Court addressed these arguments in its <u>Markman</u> Order and reiterates its ruling here:

> In this case the P[H]OSITA practicing a patent for a 'surf wake system for a watercraft' would know the characteristics of a wave that has been enhanced for surfing. As noted in the '873 Patent at Figures 6A–6C and within the specification, a wave that is generated for the purpose of surfing has different characteristics from a wave crated by the typical movement of a boat through water. ['873 Patent, col. 1, l. 33–35, 40–44.] The same information is provided in the '777 Patent. ['777 Patent, col. 1, l. 40–48.] The wake created by the passage of a boat through water 'is generally small, choppy or too close to the watercraft to be suitable and safe for water sports, and particularly not suitable for wake boarding or surfing.' <u>Id.</u> Given the adopted construction and the specification, the jury will be able to determine the meaning of the relevant claim term.

(ECF No. 132 at PageID 4901.)

Malibu Boats further points to disclosures made in the specifications of the Asserted Patents, which "explain that '[t]o facilitate surfing, a wake should be formed away from the stern of the watercraft, for example, about ten feet away, and with a waist-high peak, for example, about three feet or higher.'" (ECF No. 122 at PageID 4671 (citing '873 Patent, col. 1, l. 45–47).) Additionally, the specifications' disclosed embodiments purport to "create an asymmetrical wake suitable for wake surfing" ('873 Patent, col. 3, l. 59–60) such as a "larger starboard wake with a

26

higher peak and smoother face" (id., col. 8, l. 23–25). Malibu Boats posits that "one of skill in the art would understand that the characteristics described as being enhanced by the disclosed embodiments—the length, size, shape, smoothness of the face, or height of the peak—are all characteristics of a 'surf wake.'" (ECF No. 122 at PageID 4671.) The Court agrees. Accordingly, summary judgment is **DENIED** on this issue. The Asserted Claims are not invalid for indefiniteness based on the "surf wake" term.

### C. Summary Judgment on Issues of Damages' Calculations is DENIED

#### a. Factual Questions on <u>Panduit</u> Factor 2 Preclude Summary Judgment on Lost Profits

Skier's Choice asks the Court to "grant summary judgment in Skier's Choice's favor that Malibu cannot seek damages based on the entire market value of its boats under any theory, whether by reasonable royalty, lost profits or otherwise." (ECF No. 96 at PageID 3394.) Malibu Boats contends that it applies a lost profits analysis, and not the entire market value rule under a reasonable royalty analysis. (ECF No. 122 at PageID 4673.) The Court begins by clarifying confusion about the applicable standard on the issue of lost profits.

"When a patentee seeks damages on unpatented components sold with a patented apparatus, courts have applied a formulation known as the 'entire market value rule' to determine whether such components should be included in the damage computation, whether for reasonable royalty purposes, or for lost profits purposes." <u>Rite-Hite Corp v. Kelley Co., Inc.</u>, 56 F.3d 1538, 1549 (Fed. Cir. 1995) (en banc) (internal citations omitted). "The entire market value rule has typically been applied to include in the compensation base unpatented components of a device when the unpatented and patented components are physically part of the same machine." <u>Id.</u> In <u>Rite-Hite</u>, the Federal Circuit noted that <u>Panduit</u> "articulated a four-factor test that has since been accepted as a useful, but non-exclusive, way for a patentee to prove entitlement to lost profits

damages." Id. at 1545 (citing Panduit Corp v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152 (6th Cir. 1978)). The Panduit factors include: "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) [] manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit [that] would have [been] made." Panduit, 575 F.2d at 1156. "A showing under Panduit permits a court to reasonably infer that the lost profits claimed were in fact caused by the infringing sales, thus establishing a patentee's *prima facie* case with respect to 'but for' causation." Rite-Hite, 56 F.3d at 1545. "A patentee need not negate every possibility that the purchaser might not have purchased a product other than its own, absent the infringement." Id. (internal citation omitted).

Recently, the Federal Circuit in Mentor Graphics further clarified the first two Panduit factors:

> We have explained the relationship between the first two Panduit factors. The first factor—demand for the patented product—considers demand for the product as a whole. The second factor—the absence of non-infringing alternatives—considers demand for particular limitations or features of the claimed invention. Together, requiring patentees to prove demand for the product as a whole and the absence of non-infringing alternatives ties lost profit damages to specific claim limitations and ensures that damages are commensurate with the value of the patented features.

Mentor Graphics Corp. v. EVE-USA, Inc., 851 F.3d 1275, 1285 (Fed. Cir. 2017).

The second factor is the focus of the dispute between the parties. Malibu Boats contends that "Skier's Choice does not contest the evidence cited by Mr. Green in Panduit factor 2[,] [n]or does [it] contest Mr. Green's conclusion that the record evidence shows 'the importance of the above-described benefits enabled by practice of the Asserted Patents in generating sales to compete against other performance sport boat manufacturers.'" (ECF No. 122 at PageID 4673 (internal citation omitted).) In response, Skier's Choice states that "[t]here is also no dispute that surf systems are ***not*** the only basis of consumer demand for the accused boats and that the accused

28

Case 3:18-cv-00015-JPM-HBG   Document 176   Filed 04/20/21   Page 28 of 41   PageID #: 6308

boats incorporate non-patented features." (ECF No. 125 at PageID 4816.) Skier's Choice further argues that it *does* dispute Malibu Boats' application of Panduit factor 2 because "Malibu has incorrectly applied the second Panduit factor by basing its lost profit market reconstructions on the assumption that Skier's Choice's manual Flow 1.0 product was the only non-infringing alternative available to Skier's Choice." (ECF No. 125 at PageID 4817.) Skier's Choice "contends that Malibu has failed to properly consider the ***second*** Panduit factor by relying on an imaginary world where Flow 1.0 is a non-infringing alterative." (Id. at PageID 4818–19 (emphasis in original).)

The Court finds that Skier's Choice's arguments conflate "but for" causation with the Panduit factors. In Mentor Graphics, the Federal Circuit explicitly stated that "[t]here is no particular required method to prove but for causation," but that "[o]ne 'useful, but non-exclusive' method to establish the patentee's entitlement to lost profits is the Panduit test first articulated by the Sixth Circuit." 851 F.3d at 1284. As stated previously, "requiring patentees to prove demand for the product as a whole and the absence of non-infringing alternatives ties lost profit damages to specific claim limitations and ensures that damages are commensurate with the value of the patented features." Id. at 1285. In other words, the Panduit factors are one avenue through which Malibu Boats can show that it is entitled to lost profits. Whether it has done so relies inherently on a factual question—specifically, whether it has met its burden of showing the absence of an acceptable non-infringing alternative. In situations where the patentee "can prove all the Panduit factors," it may "obtain its lost profits on [those] sales." Id. at 1286; see also id. at 1288 ("In this case, apportionment was properly incorporated into the lost profits analysis and in particular through the Panduit factors.…We hold today that on the undisputed facts of this record, satisfaction of the Panduit factors satisfies principles of apportionment: Mentor's damages are tied to the worth of its patented features.").

"Patentee's may prove lose profits through presenting a hypothetical, 'but for' world where infringement has been 'factored out of the economic picture.'" Versata Software, Inc. v. SAP America, Inc., 717 F.3d 1255, 1265 (Fed. Cir. 2013) (quoting Grain Processing Corp. v. Am. Maize-Prods Co., 185 F.3d 1341, 1350 (Fed. Cir. 1999)). "While the hypothetical, but-for world must be supported with sound economic proof, '[t]his court has affirmed lost profit awards based on a wide variety of reconstruction theories.'" Id. (citing Crystal Semiconductor Corp v. TriTech Microelectronics Int'l, Inc., 246 F.3d 1336, 1355 (Fed. Cir. 2001)). The Federal Circuit in Mentor Graphics also highlighted that "[t]he second factor, absence of acceptable non-infringing alternatives, often proves the most difficult obstacle for patent holders." 851 F.3d at 1286. This is because "if there is a noninfringing alternative which any given purchaser would have found acceptable and bought, then the patentee cannot obtain lost profits for that particular sale." Id.

The Court does not reach a conclusion on whether Malibu Boats is entitled to lost profits, because a factual inquiry remains for the jury on whether there are acceptable non-infringing alternatives. As was the case in Mentor Graphics, the jury will be instructed "that if there were any other acceptable non-infringing [boats] or if there were prototypes that may have been acceptable or if there was any acceptable non-infringing alternative that could have been made available (even if they did not already exist)," then Malibu Boats cannot receive lost profits on those particular sales. 851 F.3d at 1288. Accordingly, summary judgment is **DENIED** on the issue of lost profits because material factual questions must be resolved by the jury.

### b. Malibu Boats May Seek Reasonable Royalties Based on its Calculations

Skier's Choice contends that "the damages Malibu seeks must be apportioned because the accused surf systems are not the basis for consumer demand of the accused boats" and that "Malibu provides no argument or evidence to the contrary and essentially concedes that the entire market

rule prohibits royalties based on the sales of boats." (ECF No. 125 at PageID 4820.) Malibu Boats contends that its expert's "reasonable royalty is based on the number of accused surf systems sold by Skier's Choice." (ECF No. 122 at PageID 4674.) Further, the reasonable royalty is "not structured as a percentage of the value of any entire boat." (Id.)

"The entire market value rule is a narrow exception to the general rule that royalties are awarded based on the smallest salable patent-practicing unit." Versata, 717 F.3d at 1268 (citing LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 67 (Fed. Cir. 2012)). "A patentee may assess damages based on the entire market value of the accused product only where the patented feature creates the basis for customer demand or substantially creates the value of the component parts." Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1318 (Fed. Cir. 2011). In Versata, the Federal Circuit rejected similar arguments to those made here by Skier's Choice:

> The expert did not apply his 40 percent royalty rate to the entire value of SAP's infringing products. The royalty rate was applied to the value of Khimetrics' sales. Rather, the expert merely accounted for all infringing sales. Thus, the entire market value exception was never triggered, and Versata was not required to show that the demand for hierarchical pricing drove demand for SAP's product as [a] whole.

Versata, 717 F.3d at 1268.

Here, Malibu Boats' expert, Phillip Green ("Green"), provides in-depth background on various royalty negotiations, along with a draft license agreement sent to Skier's Choice in August 2017 for "Licensed Water-Diverter Product[s]." (ECF No. 101-1 at PageID 3986.) The entire market value exception is not triggered because Malibu Boats has based its reasonable royalty analysis on accused surf systems, not the value of entire boats. (See, e.g., Id. at PageID 4001–06.) Accordingly, summary judgment is **DENIED** on Skier's Choice's motion to preclude Malibu Boats from seeking reasonable royalties based on the sales of boats.

31

**D. Summary Judgment on Issues of Invalidity due to Anticipation is DENIED**

Skier's Choice asserts that it is entitled to summary judgment of invalidity due to anticipation because "[e]ach limitation of the Asserted Claims is met by MasterCraft's Gen 1 boats and surf system[3]" ("MasterCraft Gen 1").  (ECF No. 144 at PageID 4936.)

Anticipation is a factual question that may be resolved on summary judgment if no genuine issue of material fact exists.  Ormco Corp v. Align Tech., Inc., 498 F.3d 1307 1319 (Fed. Cir. 2007).  "Invalidity for anticipation requires that all of the elements and limitations of the claim are found within a single prior art reference."  Carella v. Starlight Archery and Pro Line Co., 804 F.2d 135, 138 (Fed. Cir. 1986).  "There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention."  Scripps Clinic & Research Foundation v. Genetech, Inc., 927 F.2d 1565, 1576 (Fed. Cir. 1991).

An anticipation inquiry involves two steps.  First, the court must construe the claims of the patent in suit as a matter of law.  Second, the finder of fact must compare the construed claims against the prior art.  In re Montgomery, 677 F.3d 1375, 1379 (Fed. Cir. 2012).  "To anticipate a claim, a single prior art reference must expressly or inherently disclose each claim limitation."  Finisar Corp. v. DirecTV Grp. Inc., 523 F.3d 1323, 1334–35 (Fed. Cir. 2008) (quoting Celeritas Techs., Ltd. v. Rockwell Int'l Corp., 150 F.3d 1354, 1361 (Fed. Cir. 1998)).  Anticipation requires that the reference not only describe the elements of the claimed invention but also mirror the elements' arrangement or combination in the claim.  Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1343 (Fed. Cir. 2016) (internal quotations omitted); Net MoneyIN, Inc. v. VeriSign, Inc., 545 F.3d 1359, 1370 (Fed. Cir. 2008).  The court's anticipation analysis must also consider the

---

[3] Note that Malibu Boats also refers to the MasterCraft X2.  For purposes of this motion, the MasterCraft Gen 1 includes the X2.

claim limitations and the patent specification context in which the claims arise. In re Schreiber, 128 F.3d 1473, 1481 (Fed. Cir. 1997); Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc., 45 F.3d 1550, 1554 (Fed. Cir. 1995). Importantly, the prior art need not use identical words as those recited in the claims to be anticipating. Structural Rubber Prods. Co. v. Park Rubber Co., 749 F.2d 707, 716 (Fed. Cir. 1984).

### a. Prior Art and Relevant Patents

#### i. *MasterCraft Gen 1 is 102(a) Prior Art*

35 U.S.C. 102 provides:

A person shall be entitled to a patent unless—

(1) the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the filing date of the claimed invention.

35 U.S.C. § 102(a)(1).

Skier's Choice asserts that "[t]here is no genuine dispute of fact that MasterCraft Gen 1 boats were publicly sold and offered for sale at least one year prior to the earliest critical date at issue here, November 12, 2011." (ECF No. 144 at PageID 4936.) The parties do not dispute that "[i]n 2009 and 2010, and at least one year prior to November 12, 2011, MasterCraft made, publicly offered for sale, and sold inboard watersports boats equipped with a surf system now known as the Gen 1 surf system." (ECF No. 150-1 at PageID 5431.) Accordingly, the MasterCraft Gen 1 is § 102(a) prior art for purposes of this Order. Skier's Choice argues that the MasterCraft Gen 1 anticipates each of the Asserted Claims. In response, Malibu Boats argues that Skier's choice has "fail[ed] to present any evidence that the 'Surf Tabs' of the MasterCraft X2 boat enhanced the opposite side wave by making its face 'substantially smoother,' as required by every asserted claim of the '161 Patent, or that they are 'configured to redirect water to enhance the [opposite]-side

wave of the wake to have a face that is substantially smoother,' as required by every asserted claim of the '777 Patent." (ECF No. 150 at PageID 5409.)

### ii. '161 Patent and '777 Patents

Malibu Boats contends that "[t]he background of the '161 and '777 Patents expressly distinguishe[d] [the] previous approach of creating a surf wake by leaning the boat" and "replace[s] that approach with a new one: creating a surf wake by delaying the convergence of water through the use of deployable elements (such as flaps or water diverters)." (ECF No. 150 at PageID 5412.)

Both patents include the following disclosure:

> [T]he surf wake system of the watercraft allows diversion of water passing along one side of the stern away from the usual converging area immediately behind the transom of the watercraft, so that the diverging water will enhance the resulting wake on the opposing side of the watercraft. In doing so, the surf wake system of the present invention allows the enhancement of wake without significant pitching or leaning of the watercraft to one side or the other.

'161 Patent, col. 5, l. 6–15; '777 Patent, col. 7, l. 24–33.

Malibu Boats asserts that the Asserted Claims "require (along with numerous other elements) that the 'flaps' or 'deployable elements' enhance the surf wake and/or the ability to change from enhancing a port-side surf wake to a starboard-side surf wake on the fly" and that "[n]one of these limitations can be met by a boat that creates an enhanced wake merely through leaning of the hull, as was done in the prior art." (ECF No. 150 at PageID 5414.)

### b. Material Factual Disputes Preclude Summary Judgment on Issues of Anticipation

"Anticipation is a question of fact." Scripps Clinic & Research Found. v. Genetch, Inc., 927 F.2d 1565, 1576 (Fed. Cir. 1991) (*overruled on other grounds* by Abbott Labs. v. Sandoz, Inc., 566 F.3d 1282 (Fed. Cir. 2009). Additionally, "[w]hat the prior art shows is a question of fact." Uniloc, 632 F.3d at 1323. To succeed on anticipation, Skier's Choice "must submit such

34

clear and convincing evidence of facts underlying invalidity that no reasonable jury could find otherwise." TriMed, Inc. v. Stryker Corp., 608 F.3d 1333, 1340 (Fed. Cir. 2010) (internal citations and quotations omitted). Furthermore, "[t]o anticipate a patent claim, a prior art reference must describe 'each and every claim limitation and enable one of skill in the art to practice an embodiment of the claimed invention without undue experimentation.'" ActiveVideo Networks, Inc. v. Verizon Comm's, Inc., 693 F.3d 1312, 1327 (Fed. Cir. 2012) (internal citations omitted).

Here, Skier's choice asserts that the MasterCraft Gen 1 anticipates Claims 1, 7, 10, 13, 14, 15, 19, 20, 23, 24, 25, 29, 31, 33, 34, 35, 41, 43, 44 and 45 of the '161 Patent, as well as Claims 1, 2, 4, 5, 8, 10, 11, 14–17, 19, 20, 22, 23, 25, and 27 of the '777 Patent (collectively, "Allegedly Anticipated Claims"). (ECF No. 144 at PageID 4933.) Specifically, Skier's Choice argues that the MasterCraft Gen 1: 1) meets the generic boat limitations of the Allegedly Anticipated Claims; 2) employs port and starboard *flaps* and *deployable elements* that meet the limitations of the Asserted Claims; 3) employs a user interface that is configured to change a port and starboard-side wake while a boat is moving at a speed suitable for surfing; 4) meets the functional limitations of the Allegedly Anticipated Claims; 5) are capable of enhancing wake without moving ballast from side to side; and 6) meets all of the limitations of the relevant method claims. (ECF No. 144 at PageID 4931.) Factual disputes on the following issues preclude grant of summary judgment.

### i. Whether the "Surf Tabs" of the MasterCraft Gen 1 Meet the "Flap" and "Deployable Element" Limitations is a Factual Dispute

Skier's Choice asserts that the "Gen 1 boats also employ the *flaps* and *deployable elements* of the Asserted Claims. An exemplary portion of the '161 Patent claim 1 recites the following:

> A pair of flaps including a port flap and a starboard flap, each independently movable from a retracted position wherein a respective flap is substantially entirely retracted behind the transom such that no substantial portion of the respective flap extends past a port-side edge, a starboard-side edge, or a bottom edge of the transom

to a deployed position in which portions of a respective flap move past the transom to deflect water traveling along the hull of the water-sports boat and past the transom[.]

'161 Patent, col. 14–15, l. 66–8.

Similarly, an exemplary portion of claim 1 of the '777 Patent recites the following structure for both the port and starboard sides:

a [port/starboard]-side deployable element movable between a deployed position and at least substantially retracted position, wherein at least a portion of the [port/starboard]-side deployable element when in the deployed position is configured to redirect water to enhance the [port/starboard]-side wave of the wake to have a face that is substantially smoother than a face of the [port/starboard]-side wave[.]

'777 Patent, col. 27, l. 16–31.

Skier's Choice contends that the MasterCraft Gen 1 "utilizes, 'surf tabs,' one on each of the port and starboard sides," and that "[t]hese surf tabs are attached to the rear of the boat at the transom by means of a hinge and actuator which is controlled by a user interface in the console of the boat and are capable of being moved independent of one another." (ECF No. 144 at PageID 4939.) According to Skier's Choice, "the surf tab pivots downward 'past the transom' and below the bottom of the boat to modify wake." (Id.) It adds that "Gen 1 surf tabs also 'pivot' and are capable of moving to interim positions between fully retracted and fully deployed." (Id. at PageID 4940.)

Relying on its expert, Mr. Kevin Breen ("Breen"), Malibu Berts raises a "genuine dispute as to whether the Surf Tabs 'deflect water traveling along the hull of the water-sports boat and past the transom' to 'enhance[] the [opposite-side] wave by making the face of the [opposite side] wave substantially smoother,' as required by the claims of the '161 Patent[.]" (ECF No. 150 at PageID 5421–22.) Furthermore, it disputes that the Surf Tabs are "'configured to redirect water to enhance the [opposite]-side wave of the wake to have a face that is substantially smoother' or 'change a surf wake from one side of the inboard water-sports boat to the other side of the inboard water-

sports boat,' as required by the claims of the '777 Patent." (Id. at PageID 5422.)  As discussed previously, the Court finds that the term "substantially smoother" is not indefinite.  See supra II.B.2.b.  Malibu Boats points to sections of Breen's expert report in which he tests MasterCraft Gen 1 and provides images and analysis suggesting that "the port-side Surf Tab [of the MasterCraft Gen 1] does not deflect or redirect water to enhance the starboard-side wave by making the face of the starboard-side wave smoother than the port-side wave." (ECF No. 151-6 at PageID 5559.)

Breen includes the following photograph as evidence that "[w]hen equally weighted and with either port or star-board side Surf Tabs deployed, the wake produced behind the 2010 MY MasterCraft X2 featured significant amounts of white water on the lip without a clean face or a height that is suitable for surfing as shown in the screenshot below."  (Id. at PageID 5560.)



*2010 MY MasterCraft X2, Port and Starboard Ballast Full, Starboard-side Surf Tab Deployed*

Breen contrasted photos similar to the one above with the figures from the '161 Patent, in which "the flaps or water diverters of Malibu and Skier's Choice's boats deflect, divert, or redirect water to enhance an opposite side of the wake by making the opposite side wake substantially

smoother with little or no white water, thereby creating a large surfable area."



*FIG. 6C*

*U.S. 9,260,161, FIG. 6C*



*FIG. 6B*

*U.S. 9,260,161, FIG. 6B*

"Where there is a material dispute as to the credibility and weight that should be afforded to conflicting expert reports, summary judgment is usually inappropriate." Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp., 635 F.3d 1373, 1384 (Fed. Cir. 2011). Here, the parties have proffered relevant and competing expert testimony on whether the Surf Tabs of the MasterCraft Gen 1 suffice to meet the functional limitations — particularly the "substantially smoother" requirement — of the Allegedly Anticipated Claims. Accordingly, summary judgment is **DENIED** because a reasonable jury could find that the MasterCraft Gen 1 does not anticipate.

> ii. *There is a Factual Dispute Regarding the Capability of the MasterCraft Gen 1 to Change Between Sides of Waves While Moving at a Speed Suitable for Surfing*

The relevant portion of exemplary claim 1 of the '161 Patent recites the following:

wherein the water-sports boat is configured to change from enhancing the starboard wave to enhancing the port wave when a surfer desires to change from surfing an enhanced starboard wave to surfing an enhanced port wave or to change from enhancing the port wave to enhancing the starboard wave when the surfer desires to change from surfing the enhance port wave to surfing the enhanced starboard wave, and wherein the water-sports boat is configured to change from enhancing

38

the starboard wave to enhancing the port wave or to change from enhancing the port wave to enhancing the starboard wave while moving through water at a speed suitable for surfing.

'161 Patent, col. 15, l. 19–31.

Skier's Choice argues that the MasterCraft Gen 1 is capable of meeting this limitation because its "user interface utilizes a 'surf left' and 'surf right' button that a user may use to change from modifying the port side wave for wake surfing to modifying the starboard-side wave for wake surfing." (ECF No. 144 at PageID 4934.)

A prior art reference may anticipate an apparatus claim "if the reference discloses an apparatus that is reasonably capable of operating so as to meet the claim limitations, even if it does not the meet the claim limitations in all modes of operation." ParkerVision, Inc. v. Qualcomm Inc., 903 F.3d 1354, 1361 (Fed. Cir. 2018) (internal citation omitted). The Federal Circuit has however distinguished between "claims with language that recite[] capability, and those that recite configuration[.]" Id. "The language used in the claims is critical to deciding on which side of this line the claims fall." Id. In Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc., the Federal Circuit concluded that claims reciting a configuration in which protrusions needed to be "resting upon" was one directed to a "configuration" such that "infringement occur[ed] only if the accused product [was] configured with the cover being used as a base underneath a candle holder with feet." 555 F.3d 984, 994–95 (Fed. Cir. 2009). On the other hand, claim language directed to "capability, as opposed to actual operation" can rely on an apparatus "reasonably capable" of performing claimed functions for infringement purposes. Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1217 (Fed. Cir. 2014).

Here, the operative question is whether the MasterCraft Gen 1 is *capable* of changing between enhancing the port-side and starboard-side waves while moving through water at a speed

suitable for surfing. Skier's Choice's position is that the "Gen 1 surf system surf tabs may be deployed independent of one another via [a user interface] when a surfer so desires and when the boat is moving at a speed suitable for surfing." (ECF No. 144 at PageID 4942.) Skier's Choice also presents video evidence showing a "'Gen 1 boat 'transferring' enhanced wake from one side to another ___*without shifting ballast*___." (ECF No. 152 at PageID 5628 (emphasis in original).) Malibu Boats rebuts this video evidence by pointing out that the surfer behind the boat in Skier's Choie's video "was Parker Payne, the world's former top-ranked professional wake surfer" and that his "ability to switch sides of the wake is not evidence that either side is enhanced." (ECF No. 150 at PageID 5425.) Malibu Boats also presents testimony from Breen to argue that there is a factual dispute regarding the ability to switch between enhancing the port-side wave to enhancing the starboard-side wave because "[s]uch a transition instead requires the time-consuming task of emptying ballast on one side of the boat while filling ballast on the other." (Id.) Skier's Choice argues that the need to empty ballast while filling it on the other is "immaterial because none of the Asserted Claims require that a wake be modified from one side to another ___*in any particular time frame*___. (ECF No. 152 at PageID 5626 (emphasis in original).) While a timeframe is not required, the claims do require that this switch between enhancing port-side and starboard-side waves is done *while moving through the water at a speed suitable for surfing*. Here, there is a material factual dispute as to whether the MasterCraft Gen 1 is *capable* of accomplishing this functional limitation. Both parties have proffered factual and expert testimony, and it is the jury's province to determine what the facts are and to make determinations as to credibility. Accordingly, summary judgment is **DENIED**.

## IV.    CONCLUSION

For the reasons stated above, Skier's Choice's motion for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**.  Skier's Choice's motion is **GRANTED** on the issue of indefiniteness of claims with the term "significant leaning."  Claims 12, 22, 32, and 42 of the '161 Patent, and claims 3 and 21 of the '777 Patent are therefore **INVALID** as **INDEFINITE**. Skier's Choice's motion is **DENIED** on the remaining issues of Indefiniteness, Non-Infringement, and Anticipation.

The following Asserted Claims from the Asserted Patents remain in the case:

'161 Patent: Claims 1, 7, 10, 13–15, 19, 20, 23–25, 29, 31, 33–35, 41, and 43–45

'777 Patent: Claims 1, 2, 4, 5, 8, 10–11, 13–17, 19, 20, 22, 23, and 25–27

'873 Patent: Claims 1, 2, 17, and 20.

**SO ORDERED**, this 20th day of April, 2021.

/s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE