# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

MALIBU BOATS, LLC,

      Plaintiff,

v.

SKIER'S CHOICE, INC.,

      Defendant.

Case No. 3:18-CV-015
[Consolidated with 3:19-CV-225]

---

## SKIER'S CHOICE, INC.'S BRIEF IN SUPPORT OF
## MOTION FOR ATTORNEYS' FEES AND COSTS UNDER 35 U.S.C. § 285

---

R. Bradford Brittian (007130)
John T. Winemiller (021084)
Ian G. McFarland (030549)
Merchant & Gould, P.C.
800 S. Gay Street, Suite 2150
Knoxville, TN 37929
Telephone: (865) 380-5960
Fax: (612) 332-9081
jwinemiller@merchantgould.com
bbrittian@merchantgould.com
imcfarland@merchantgould.com
    -and-
Lindsay Jones
Merchant & Gould, P.C.
150 S. Fifth Street, Suite 2200
Minneapolis, MN 55402
(612) 332-5300
ljones@merchantgould.com
*Admitted Pro Hac Vice*

Michael J. LaBrie, OBA #16253
Spencer F. Smith, OBA #20430
Zachary A.P. Oubre, OBA #30666
McAfee & Taft A Professional Corporation
Tenth Floor, Two Leadership Square
211 N. Robinson
Oklahoma City, OK 73102
mike.labrie@mcafeetaft.com
spencer.smith@mcafeetaft.com
zach.oubre@mcafeetaft.com
*Admitted Pro Hac Vice*

*Attorneys for Skier's Choice, Inc.*

June 4, 2021

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................................1

II. SKIER'S CHOICE IS THE PREVAILING PARTY ..............................................5

III. THE "EXCEPTIONAL CASE" STANDARD UNDER *OCTANE FITNESS* .........................5

IV. THE COURT SHOULD FIND THIS AN "EXCEPTIONAL CASE" ...................................6

    A. Malibu's Position was Substantively Weak and Unsupported by Credible Evidence at Trial ................................................................................................................6

        1. *Malibu's Baseless Position that Secondary Tabs of Flow 3.0 are "Upright"* ...............6

        2. *Malibu's Unsupported Position that Skier's Choice's Tabs Divert Water* ....................8

        3. *Malibu's Flawed Position as to Anticipation and Obviousness of Gen 1* ...................12

        4. *Malibu's Baseless Position as to Enablement and the Adequacy of its Written Description* ................................................................................................................14

    B. Malibu's Inconsistent Positions before the Patent Office and in Litigation Make this an "Exceptional" Case ........................................................................................18

V. THE COURT SHOULD DEFER ITS RULING ON THE AMOUNT DUE UNLESS AND UNTIL IT DETERMINES THIS CASE IS "EXCEPTIONAL." .........................................23

VI. CONCLUSION ..................................................................................................24

Case 3:18-cv-00015-JPM-HBG   Document 261   Filed 06/04/21   Page 2 of 29   PageID #: 11477

## TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Agilent Techs., Inc. v. Affymetrix, Inc.*
567 F.3d 1366 (Fed. Cir. 2009) ......................................................................17

*Brooks Furniture Mfg., Inc. v. Dutailer Int'l, Inc.*
393 F.3d 1378 (Fed. Cir. 2005) .......................................................................5

*Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs.*
394 F.3d 1348 (Fed. Cir. 2005) .......................................................................5

*Cosmo Techs. Ltd. v. Actavis Lab. FL, Inc.*
No. 15-164, 2019 WL 147459 (D. Del. March 28, 2019) .....................11, 12

*Fogerty v. Fantasy, Inc.*
510 U.S. 517 (1994).........................................................................................6

*Inventor Holdings v. Bed Bath & Beyond*
876 F.3d 1372 (Fed. Cir. 2017) .......................................................................7

*Kilopass Tech. Inc. v. Sidense Corp.*
No. C 10-02066, 2014 WL 3956703 (N.D. Cal. Aug. 12, 2014) ...............22

*Magnetar Techs. Corp. v. Six Flags Theme Park, Inc.*
No. 07-127-LPS-MPT, 2017 WL 962760 (D. Del. Mar. 13, 2017) ...........8

*Marctec, LLC v. Johnson & Johnson*
664 F.3d 907 (Fed. Cir. 2012) ..................................................................21, 22

*Mathis v. Spears,*
857 F.2d 749 (Fed. Cir. 1988) .........................................................................1

*Microstrategy, Inc. v. Crystal Decisions Inc.*
555 F.Supp.2d 475 (D. Del. 2008)..............................................................14, 22

*Octane Fitness v. ICON Health & Fitness*
572 U.S. 545 (2014) ...............................................................................passim

*Phillips v. AWH Corp.*
415 F.3d 1303 (Fed. Cir. 2005) .....................................................................17

*Ranier v. Microsoft Corp.*
887 F.3d 1298 (Fed. Cir. 2018) .......................................................................5

*RFR Indus., Inc. v. Century Steps, Inc.*
477 F.3d. 1348 (Fed. Cir. 2007) ............................................................5

*Schriber-Schroth Co. v. Cleveland Trust Co., Chrysler Corp.*
305 U.S. 47 (1938)....................................................................22

*Straight Path IP Grp, Inc. v. Cisco Systems, Inc.*
411 F.Supp.3d 1026 (N.D. Cal. Nov. 20, 2019) ............................18, 22

*Vas-Cath Inc. v. Mahurka*r
935 F.2d 1555 (Fed. Cir. 1991) ............................................17

**Statutes**
35 U.S.C. § 112......................................................................16
35 U.S.C. § 285......................................................................passim

**Rules**
Fed. R. Civ. P. 54(d)................................................................23

Malibu's overreaching and unsuccessful litigation strategy makes this an "exceptional case" under 35 U.S.C. § 285. Considering both the breadth of Malibu's allegations and the jury's unambiguous verdict in favor of Skier's Choice, this case "stands out from others with respect to the substantive strength of a party's litigating position" and "the unreasonable manner in which the case was litigated." *Octane Fitness v. ICON Health & Fitness*, 572 U.S. 545, 554 (2014). As such, the Court should find that Skier's Choice is entitled to an award of its reasonable attorneys' fees and recoverable expenses[1] incurred in defending against Malibu's claims in an amount to be determined.

## I.      INTRODUCTION

For over three years, Skier's Choice was forced to defend against Malibu's claims that technology Malibu did not invent infringes its patents. From the onset of this litigation Malibu asserted U.S. Patent Nos. 8,578,873 ("the '873 patent"), U.S. Patent No. 9,260,161 ("the '161 patent") and U.S. Patent No. 10,322,777 ("the '777 patent") cover downwardly deploying trim tabs even though Malibu did not describe a downwardly deploying device in applying for these patents, knew downwardly deploying trim tabs preexisted its claimed invention, and previously distinguished trim tabs from its invention in statements made to the U.S. Patent and Trademark Office ("PTO") and in prior litigation involving the patents-in-suit.  Malibu knew or should have known that the accused Swell and Flow systems use trim tabs that do not practice Malibu's invention. Malibu knew or should have known the broad claim scope it advocated against Skier's Choice would render its patent claims invalid.  Malibu nevertheless pursued that scope through trial, relying on unsupported expert opinion and mischaracterizations of record evidence to rebut Skier's Choice's claims of non-infringement and invalidity.

---

[1] Section 285 has been interpreted to include certain costs and expenses.  *See, e.g., Mathis v. Spears,* 857 F.2d 749, 757-759 (Fed. Cir. 1988).

On November 12, 2011, Malibu filed the first provisional application for what would become the Surf Gate patent family. Consistent with Malibu's commercial embodiment, that application and its later filed continuations disclose devices and methods of using devices that deploy outwardly or rearwardly (as shown by common FIG. 3 depicted below on the left) in order to divert water traveling along one side of a boat and cause that water to be redirected to create a surf wake on the opposite side. This outward and rearward deployment is what Malibu consistently described as its invention and is in contrast to prior art trim tab systems that deploy downwardly like those depicted below in the images in the center and on the right, which were raised in prior litigation and during the prosecution of the asserted patents.



*See* '873, '161, '777 patents at

FIG. 3; [Doc. 46/47] at PageID1599; [Doc. 36/37] at PageID 693.

In pursuit of infringement suits against its competitors, the claims of each continuation of the Surf Gate patent family have departed further and further from their common description so as to try and encompass downwardly deploying tabs that Malibu did not invent. For example, the first patent to issue claimed "upright water diverters...laterally extending beyond [a] side strake at the transom." Claim 1, U.S. Patent No. 8,539,897. The second to issue, the '873 patent, claims "upright water diverter[s] movable between a first and second position." Claim 1, '873 patent. Both were asserted against Nautique in litigation that ended in February 2015 and concerned an upright sliding device shown below on the left. *See Malibu v. Nautique,* [Doc 56],

at 7-8.[2] Malibu then asserted the '873 patent against MasterCraft contending that the upturned surfaces of its downwardly deploying tab, depicted below on the right, infringed the '873 patent. *See MasterCraft I,* [Doc. 117] at 16.




The third patent to issue was U.S. Patent No. 9,199,695 ("'695 patent"), which claims "deployable element[s]…configured to redirect flowing along a [] side of the hull." The fourth patent to issue was the '161 patent, which claims "a pair of flaps… movable…to a deployed position in which portions of a respective flap move past the transom to deflect water traveling…past the transom." Malibu asserted the '161 patent against MasterCraft in *MasterCraft II*, which was filed the same day as the '161 patent issued, *see MasterCraft II,* ECF. 1, and litigated concurrently with *MasterCraft I* until both cases were dismissed on May 10, 2017. *See MasterCraft I,* [Doc. 153]; *MasterCraft II,* [Doc. 86].

*Skier's Choice I* was filed in January 2018 and initially involved the '873, '161 and '695 patents. [Doc. 1.] Following claim construction in *Skier's Choice I,* Malibu filed *Skier's Choice II*, in which it asserted the '777 patent. *Skier's Choice II* was consolidated with *Skier's Choice I* over Malibu's objection. [Doc. 73.]   The '777 patent claims "deployable element[s] movable between a deployed position and an at least substantially retracted position…." Since launching both *Skier's Choice I* and *Skier's Choice II*, Malibu has contended that Skier's Choice's

---

[2] The related cases in the Eastern District of Tennessee are referred to as follows: *Malibu v. Nautique*: No. 3:16-cv-00656; *MasterCraft I*: No. 3:15-cv-00276; *MasterCraft II*: No. 3:16-cv-00082; *Skier's Choice I*: No. 3:18-cv-015; and *Skier's Choice II*: No. 3:19-cv-00225. Unless noted otherwise, Doc. references for filings in this litigation refer to filings in *Skier's Choice I.*

downwardly deploying tabs, like those found in the prior art, are *upright water diverters*, *flaps*, or *deployable elements* that infringe asserted claims of the '777, '161 and '873 patents, as shown by the images below taken from Malibu's two complaints in this suit:



*See Skier's Choice I*, [Doc. 1] at PageID 16, 26; *Skier Choice II*, [Doc. 1] at PageID 15.

Malibu's pleading strategy in this case was as aggressively expansive as its prosecution strategy. Malibu alleged literal infringement, infringement under the doctrine of equivalents, indirect infringement, and contributory infringement of 56 claims in four patents during the pendency of this suit. By the time of trial, however, Malibu withdrew all its allegations except five claims of direct literal infringement: claim 1 of the '873 patent, claims 1 and 34 of the '161 patent, and claims 1 and 14 of the '777 patent. The Court directed a verdict of noninfringement as to claim 1 of the '873 patent. [Doc. 233.] The jury then found each of remaining four claims in suit invalid and that three of them were not infringed by Skier's Choice. [Doc. 252.]

The jury's verdict confirmed that Malibu overreached throughout the entire litigation. Although Malibu distinguished prior art trim tabs in arguing the validity of its patents, it knew that the accused Skier's Choice's systems are just trim tabs. In early 2014, Malibu's CEO, Jack Springer, received Malibu's analysis of the Swell 1.0 system that acknowledged the system uses "trim tabs" that shape waves "through lift" like the prior art rather than diverting water like Malibu's invention. Malibu nevertheless filed two suits against Skier's Choice in which it advocated claim scope unsupported by what is described and enabled in its patent disclosures and which reads on prior art trim tabs it had disparaged, making this case exceptional.

## II. SKIER'S CHOICE IS THE PREVAILING PARTY

Section 285 allows for an award of attorneys' fees to the prevailing party. A party "prevails" if the Court's judgment "effect[s] a material alteration in the legal relationship between the parties." *Ranier v. Microsoft Corp.*, 887 F.3d 1298, 1306 (Fed. Cir. 2018) (citations omitted). All patent claims tried in this case were found invalid, not infringed, or both. *See* [Docs. 233 & 259.] These findings of non-infringement and invalidity changed the legal relationship between the parties, rendering Skier's Choice the "prevailing party." *See, e.g., id.*; *see also Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs.*, 394 F.3d 1348, 1350 (Fed. Cir. 2005) (affirming fees to party prevailing on summary judgment of invalidity).[3]

## III. THE "EXCEPTIONAL CASE" STANDARD UNDER *OCTANE FITNESS*

For a finding of exceptionality under *Octane Fitness*, a movant need only show, by a preponderance of the evidence, that a case "stands out from others" with respect to either (1) "the substantive strength of a party's litigating position (considering both the governing law and the facts of the case)" or (2) "the unreasonable manner in which the case was litigated." *Id*. at 554. Determining exceptionality is committed to the discretion of the Court on a "case-by-case" basis considering the "totality of the circumstances." *Id*. at 554.

Unlike the pre-*Octane Fitness* standard under *Brooks Furniture Mfg., Inc. v. Dutailer Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005), "sanctionable conduct is not the appropriate benchmark." *Id*. at 555. Rather, "a district court may award fees in the rare case in which a party's unreasonable conduct – while not necessarily independently sanctionable – is nonetheless so 'exceptional' as to justify an award of fees." *Id*. There is no precise formula for making this

---

[3] Skier's Choice acknowledges that, due to the Court granting Malibu's request to voluntarily dismiss its allegations under the '695 patent, Skier's Choice is not a prevailing party with respect to that patent, *see RFR Indus., Inc. v. Century Steps, Inc.*, 477 F.3d 1348, 1353 (Fed. Cir. 2007).

determination, and the Court may consider "among other factors, 'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Id.* at 554 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994)).

## IV. THE COURT SHOULD FIND THIS AN "EXCEPTIONAL CASE"

### A. Malibu's Position was Substantively Weak and Unsupported by Credible Evidence at Trial.

Although Malibu's positions in this case involved factual disputes ultimately necessitating trial, the lack of credible evidence to support Malibu's unsubstantiated claims renders this case exceptional.

#### 1. *Malibu's Baseless Position that Secondary Tabs of Flow 3.0 are "Upright"*

In asserting infringement of the '873 patent, Malibu claimed that the secondary or "yaw" tab of Skier's Choice's Flow 3.0 system is an *upright water diverter*, as shown by the above image from Malibu's initial complaint. Years prior to this case, Malibu asserted the '873 patent against Nautique. In that litigation, Judge Varlan construed *upright* to mean "oriented generally vertically with respect to the boat, allowing for slight inclination." *Malibu v. Nautique,* [Doc. 221], at 22. Malibu sought the same construction of *upright* here, which was recommended by Judge Guyton and adopted by the Court. [Doc. 35 at PageID 509; Doc. 132 at PageID 4899.]

Despite receiving the construction it sought, Malibu's sole evidence at trial to show the Flow 3.0 secondary tabs are *upright* was the opinion of Malibu's technical opinion witness, Kevin Breen, who evaluated the system for his report in this case. As Mr. Breen acknowledged at trial, the secondary tab is generally horizontal and the furthest it deploys from its horizontal orientation is an angle of 60 degrees, or 30 degrees from vertical. *See* Ex. A, Breen Trial Testimony, at 217:21-220:10. Without other support, and despite acknowledging that 30 degrees

from vertical makes the secondary tab's deployed position mathematically closer to not vertical than vertical, Mr. Breen nevertheless opined that the secondary tabs are *upright* under the Court's construction. *See, e.g., id.* at 220:8-221:9.

The allegation was baseless, and the Court directed a verdict as to the claim after Malibu rested its case-in-chief because no reasonable fact finder could believe secondary tabs are *upright*. [Doc. 233.] As Malibu recognized in its claim construction arguments in this case, and as Judge Varlan noted in construing the term *upright*, the '873 patent describes "upright water diverters" in an orientation that "may be substantially vertical, substantially parallel to the side edge, some other angle therebetween, or some angle slightly inclined with respect to the side edge." [Doc. 35 at PageID 510]; *Malibu v. Nautique*, [Doc. 221], at 22. The secondary tabs of the Flow 3.0 system are, however, generally ***horizontal*** and deploy at an angle relative to their ***horizontal*** orientation in a manner far from *upright.*

The Flow 3.0 secondary tabs are not *upright* when retracted and never deploy to a degree that would cause them to become *upright*. As a result, Malibu – having full knowledge of the prior construction of *upright* and knowing it would seek the same construction here – should have known that its theory of infringement under the '873 patent was baseless. This was certainly uncovered by Mr. Breen's evaluation of the Flow 3.0 devices for his May 20, 2020 infringement report, which should have – at the least – caused Malibu to reevaluate the viability of its claims against Flow 3.0, as the secondary tabs of that system are never within a "slight deviation" from generally vertical. *See, e.g.,* [Doc. 233.]

Malibu's continued assertion of the '873 patent despite these facts, relying solely on the unsupported opinion of Mr. Breen, makes this case exceptional. *See Octane Fitness*, at 554; *see also Inventor Holdings v. Bed Bath & Beyond*, 876 F.3d 1372, 1377-78 (Fed. Cir. 2017)

(affirming fee award and finding it warranted "based on the weakness of [the patentee's] arguments and the need to deter similarly weak arguments in the future"); *Magnetar Techs. Corp. v. Six Flags Theme Park, Inc.*, No. 07-127-LPS-MPT, 2017 WL 962760, at *7-9 (D. Del. Mar. 13, 2017), *report and recommendation adopted*, No. 07-127-LPS-MPT (D. Del. Sept. 1, 2017) (finding case exceptional where plaintiffs acted in an objectively unreasonable manner by ignoring case-dispositive evidence of inventorship and basing their infringement position on a "completely inadequate" expert report).

2.    *Malibu's Unsupported Position that Skier's Choice's Tabs Divert Water*

Malibu's position that Skier's Choice's tabs perform key functional limitations of the asserted claims also make this an "exceptional case." There is no question that wake surfing preexisted the Malibu Surf Gate patents. *See, e.g.,* Ex. A at 124:4-126:1. Likewise, there is no question that prior to Malibu's first application for the patents-in-suit surf wakes were created by leaning and tilting a boat. As Dan Gasper, Malibu's lead inventor, admitted, leaning a boat causes the wakes on the port and starboard sides to converge differently behind the boat creating an asymmetrical wake for surfing. *See* Ex. B, Gasper Trial Testimony, at 103:12-103:20; 185:17-186:2. Mr. Gasper conceived of a different way to cause this asymmetry: diversion of water by deployment of a structure later called an *upright water diverter, flap* or *deployable element* in the claims of the '873, '161 and '777 patents. *See, e.g., id.* at 137:14-138:11.

Malibu was well-aware that there were at least two different ways to create an asymmetrical wake for surfing, as shown by its patent disclosures describing the prior art method of leaning with offset ballast. *See, e.g.,* '161 patent at 1:32-54; '873 patent at 1:45-67; and '777 patent at 1:49-2:4. Prior to initiating this suit, Malibu was also aware that prior art trim tabs were used to lean a boat from one side to another to cause an asymmetrical wake for surfing. Mr.

8

Gasper admitted to having pre-conception knowledge of the MasterCraft Gen 1 surf system and knowing that deployment of a trim tab downward causes a boat to roll to one side or another to create a surf wake. *See, e.g.,* Ex. B at 193:22-194:22 (discussing trim tabs); 200:25-201:25 (discussing Gen 1); 207:5-25 (same). Malibu also had knowledge of such prior art systems through its litigation with MasterCraft beginning in 2015, as Gen 1 was raised as invalidating prior art in those suits. *See, e.g.,* [Doc. 46/47] at PageID 1599-1601.

Despite this knowledge, Malibu contended that any system that creates a surf wake through "delayed convergence" infringes its patent claims. This false contention was rebuked by Malibu's own witnesses, including Mr. Gasper, who admitted that delaying the convergence of wakes behind a boat may be accomplished by both leaning a boat – which does not infringe – as well as by diversion of water by *diverter, flap* or *deployable element. See* Ex. B at 185:17-186:2. Mr. Breen made similar admissions and acknowledged that causing delayed convergence to create a surfable wake does not infringe Malibu's patent claims if the wake is created by lean and not diversion of water:

> Q    And you would agree with me delaying the convergence of the wake, Mr. Gasper testified yesterday that that can be done both with leaning and rolling a boat and with his own invention, correct?
> A    Yes.
>                                    …
> Q    Okay. So the concept of delayed convergence is not automatically mean infringement of the '161 or '777 or '873 patents, correct?
> A    It's how that delayed convergence created by using in this case flaps or water diverters.
> Q    But it can also be created through lean and roll of the boat. That wouldn't infringe any of the asserted patents, right?
> A    That's possible.
>                                    …
> Q    But the patent claims also require that the flap or the deployable element of the diverter itself be the thing that diverts water, and leaning or rolling a boat and causing a wake in that manner would not infringe?
> A    Correct.
>                                    …

> Q     But you would agree with me that if [the tabs of the accused systems] merely lift the boat to create a roll moment and cause a surf wake with that roll, that they're not going to infringe claims 1 and 34 of the '161, claim 1 of the '777 and claim 20 of the '873 patent?
>
> A     Correct. The flaps or the deployable devices have to redirect the water to create the surfable area.

Ex. A at 240:4-8; 246:14-22; 249:14-18; 254:7-12. Malibu noted the same in response to Skier's Choice's motion for partial summary judgment for anticipation, in which Malibu referred to the functional limitations of the '161 and '777 patents and admitted that "[n]one of these limitations can be met by a boat that creates an enhanced wake merely through leaning of the hull, as was done in the prior art." [Doc. 151] at PageID 5484-86.

Despite the critical distinction between diversion and leaning, Mr. Breen admitted that during his single day of testing of Skier's Choice boats he did not attempt to document with underwater instrumentation or cameras whether water was actually being diverted by Skier's Choice's tabs. *See* Ex. A at 214:21-23; 217:11-20; 230:2-14; 253:17-254:1. In addition, Mr. Breen admitted that he performed no testing to account for whether surf wakes created by Skier's Choice tabs were the result of diversion of water by those tabs or the displacement of water by a boat hull as Skier's Choice's boats lean from one side to another. *Id.* at 249:25-250:22. Mr. Breen also admitted that asymmetric deployment of the tabs of the accused Skier's Choice systems cause a boat to be lifted on one side and roll toward the opposite side of deployment. *Id.* at 225:1-226:11. Nevertheless, after observing that a surf wake could result after one of the tabs of the Skier's Choice systems is deployed, Mr. Breen made the inferential leap – couched as an expert opinion – that every such surf wake is the result of water diversion that infringes, rather than leaning a boat through roll which would not. *See, e.g., id.* at 249:8-18; 253:4-254:12.

Malibu relied on this unsupported conclusion as its principal evidence of infringement at trial. Malibu's remaining evidence amounted to misconstruing cherry-picked statements from

Skier's Choice emails and brochures, none of which provide that Skier's Choice tabs divert water on one side of the boat to create a surf wake on the opposite side. *Id.* at 134:14-138:1; 166:14-172:2; 175:15-181:8. Indeed, Malibu's reliance on many of these documents was based on mere reference to "delayed convergence," which Malibu argued to be an admission by Skier's Choice despite its own witnesses' admissions that delayed convergence may be caused by non-infringing leaning. *Id.* at 177:7-181:8; 245:21-246:22. Malibu also characterized documents referencing the no-longer-used "barrel" mode of Swell 1.0 as somehow evidencing infringement, although there is and can be no dispute that "barrel mode" did not infringe Malibu's claims as it involved contemporaneous deployment of both the port-side and starboard-side tabs. *Id.* at 240:18-245:40; 246:23-249:18.

Before initiating its suit, Malibu was aware of prior art leaning to cause surf wakes and that downwardly deploying tabs – such as those used by Skier's Choice – could be used to cause such leaning that would not and could not constitute infringement of the asserted claims. As a result, whether or not Skier's Choice tabs divert water or create lean to cause a surfable wake was a critical distinction in determining infringement. Malibu nevertheless failed to have its own expert test for this diversion. The weakness of the evidence presented at trial on this issue, coupled with Mr. Breen's lack of testing as to the same, inexorably leads to the conclusion that Malibu knew or should have known that it had no real infringement case.

A similar scenario supported an exceptional case finding in *Cosmo Techs. Ltd. v. Actavis Lab. FL, Inc.,* No. 15-164, 2019 WL 147459 (D. Del. March 28, 2019). In *Cosmo*, the patentee's failure to have its expert test the accused product in accordance with the claim construction the patentee sought was "objectively unreasonable and confirm[ed] the substantive weakness" of the plaintiff/patentee's claims. *Id.* at * 2. Similarly, Malibu never tested ***how*** a surf wake is created

by the accused systems and whether it is by diversion of water or leaning despite knowing that the tabs of the accused systems could modify wake by leaning and in doing so they would not infringe. Malibu's failure to test to determine whether Skier's Choice's tabs divert water shows this case to be "exceptional" as it did in *Cosmo.*

### 3. <u>*Malibu's Flawed Position as to Anticipation and Obviousness of Gen 1*</u>

Malibu's position as to anticipation and obviousness were so flawed that they cause this case to be "exceptional." A key prior art reference in this litigation is the MasterCraft Gen 1 surf system. There is no dispute that Gen 1 constitutes prior art. *See* [Doc. 218] at PageID 7037. Skier's Choice raised Gen 1 as invalidating art since its initial invalidity contentions, and it was also the subject of a motion for summary judgment prior to trial. [Doc. 143 & 144.] In responding to that motion, Malibu argued for the validity of its claims over Gen 1 by contending that a boat equipped with Gen 1 could not create a surfable wake or change from creating a surfable wake on one side of a boat to creating a surfable wake on the opposite side while a boat moves through water. *See* [Doc. 151] at PageID 5493-98. Yet, as noted in the record evidence of that summary judgment dispute, Mr. Breen admitted during his deposition that the surf tabs of the Gen 1 surf system make the face of a wake "cleaner" or smoother for purposes of surfing. *See* [Doc. 144] at PageID 4947-48. Moreover, videos of testing of a Gen 1 boat provided by Skier's Choice in June of 2020 showed that Gen 1 systems are at least capable of performing changing a surf wake from one side of a boat to another as a boat moves through water. *Id.* at PageID 4950-52; [Doc. 152] at PageID 5636-37.

Malibu nevertheless clung to its baseless infringement assertions and disputed Gen 1 as being anticipatory or a non-infringing alternative by relying on the flawed premises that Gen 1 boats could not shift ballast while a boat was moving, that Gen 1 is patented, and that Gen 1

cannot create a surfable wake – all of which was refuted by MasterCraft's corporate representative, Dave Ekern, during deposition and at trial and by testing performed by Dr. Eric Winkel on behalf of Skier's Choice. *Id. See also* Ex. C, Ekern Trial Testimony, at 51:15-52:12; 54:8-23; 55:15-20; 56:15-17; 88:14-89:2. Malibu's continued assertions of patent validity in contradiction to this evidence resulted in Mr. Breen taking the non-sensical positions that a switch could be a user interface while a toggle switch could not, *see* Ex. D, Breen Rebuttal Testimony, at 149:10-156:12, and that images of smoother wakes created by a Gen 1 system with even ballast were not surf wakes despite being strikingly similar to exemplary images of surf wakes from the patents in suit, as shown below. *Id.* at 133:24-138:18; 142:14-143:25.[4]

 

 

---

[4] As of the filing of the present motion, only the rough version of Mr. Breen's rebuttal trial testimony is available; however, should the Court wish, Skier's Choice can supplement with an official transcript of the same once it is made available.

Ultimately, the jury disagreed with Malibu and held the asserted claims invalid as anticipated or obvious. *See* [Doc. 254]. Malibu's validity arguments and continued assertion of this suit in contravention of the above-mentioned evidence cause Malibu's claims to "stand[] out from others" and make this case exceptional under § 285. *Octane Fitness,* at 554. Such a holding was made in *Microstrategy, Inc. v. Crystal Decisions Inc.,* 555 F.Supp.2d 475 (D. Del. 2008), where the district court found a case to be "exceptional" because, *inter alia*, the patentee's continued pursuit of infringement claims despite anticipatory prior art "substantially identical to the accused products." *Id.* at 480. Malibu likewise maintained infringement theories against Skier's Choice's downwardly deploying trim tabs despite knowledge of Gen 1 which also uses downwardly deploying trim tabs. Malibu knew or should have known the capability of Gen 1 and the substantive weakness of its validity arguments concerning Gen 1 in view of its broadly encompassing infringement theories against "substantially identical [] accused products." Its pursuit of those theories relying on false contentions concerning Gen 1 make Malibu's claims "exceptional" warranting an award of fees pursuant to § 285.

4.   *Malibu's Baseless Position as to Enablement and the Adequacy of its Written Description*

Malibu's overreaching claim scope also caused its asserted claims not to be enabled or adequately supported by its written disclosures, all in an attempt to contend it has a patent monopoly on what it did not invent. This, too, causes Malibu's case to "stand[] out from others" because the litigation was meritless from the outset.

As set forth in Skier's Choice's claim construction briefs, the patents-in-suit teach a structure that deploys outwardly or rearwardly, not downwardly. Each of the patents-in-suit describe "the present invention" as "a surf wake system…concerned with flow management of water passing the stern as the water craft [*sic*] is moving forward through a body of water, so that

water is directed in such a manner to enhance size, shape and/or other characteristics of the resulting wake of the watercraft." [Doc. 36] at PageID 691 & 702; [Doc. 87] at PageID 3155. The claimed system "allows diversion of water passing along one *side* of the stern away from the usual converging area immediately behind the transom of the watercraft, so that the diverging water will enhance the resulting wake on the opposing *side* of the watercraft." *Id.* (emp. added). "In doing so, the surf wake system of the present invention allows the enhancement of wake without significant pitching or leaning of the watercraft to one side or the other." *Id.*

The patent specifications teach that "deploying a flap will disrupt the flow of water *along the side of the hull* past the transom such that the flow of water is redirected outwardly and/or rearwardly" so as to create a surf wake, with structures that deploy outwardly or rearwardly. *See, e.g.,* [Doc. 36] at PageID 703-705; [Doc. 87] at PageID 3156 (emp. added). This type of deployment is consistently depicted in ***every*** figure of the patents in suit, none of which disclose any embodiment where the claimed flaps deploy downwardly. *See* '873, '161 and '777 patents at common FIGs. 1-5, 10-13,16-17; 19-27 (outward); FIG. 18 (rearward).

Each of the patents describe outward or rearward deployment as what interferes with water to produce a wake more suitable for surfing on the opposite side, and each of the patents teach this to be an improvement over the prior art method of leaning a boat:

> By moving a flap of the present invention to *an outward position*, however, water is redirected, which may lead to constructive interference to form a larger wake having a higher peak and a smoother face, which wake is conducive for surfing...

> Moreover, by placing the flaps *along the side edges*, the watercraft can generate a suitable surfing wake with less tilt or lean to one side…

> Since the port side flap is in an *outward position and thus extends beyond the port side strake*, waves on the port side are redirected…to form a larger starboard wake with a higher peak and smoother face ….

[Doc. 36] at PageID 703-704; [Doc. 87] at PageID 3156-57 (emp. added).

In no place in the specifications of any of the issued patents or the written descriptions of their respective applications is downward deployment described or depicted. The complete lack of any disclosure of downward deployment is not coincidental as the prior art method of leaning or tilting a boat to one side was known to be accomplished with downwardly deploying trim tabs which were not invented by the sole inventor of the initial provisional patent application to which Malibu claims priority, Mr. Gasper, as Mr. Gasper admitted at trial. *See* Ex. B at 199:10-14; 200:25-201:19; 207:5-25. Mr. Gasper's admissions in this regard were not a surprise at trial and were made by at least as early as his September 20, 2018 deposition in this case. *See, e.g.,* [Doc. 36] at PageID 707. Indeed, the specifications of the '873 and '777 patents explicitly differentiate prior art trim tabs with the claimed *diverters* described to be the invention of the patents in suit. *See* '873 patent at 19:60-65; '777 patent at 10:51-56 ("Example wake shaping features include, by way of example, water diverters 102 (which can be configured to control which side of the wake is adapted for surfing and/or other surf wake properties)…[and] one or more trim tabs (not shown in FIG. 26), etc….").

Malibu nevertheless advocated for a claim construction that would include downwardly deploying trim tabs because it was the only way to maintain its infringement action against Skier's Choice. In doing so, Malibu wholly ignored its own patent disclosures and sought claim scope that was not adequately supported or enabled by the written descriptions of its patent applications or issued patents. Malibu knew this would result in Skier's Choice taking the position the asserted claims are invalid under 35 U.S.C. § 112, as noted in its first claim construction brief in this case. *See* [Doc. 35] at PageID 522-523.

Despite this knowledge, the sole evidence that Malibu presented at trial to support disclosure of downward deployment was a sentence in the provisional application of the Surf Gate patent family that uses the term "outboard," and Mr. Breen's opinion that "outboard" can mean any direction, including downward. *See* Ex. D at 123:23-127:17. Yet, Mr. Breen provided no support for such a meaning other than his conclusory opinion, an opinion that contradicts use of "outboard" in the patents themselves which, *inter alia,* explicitly note that "outboard…[is] used to describe features of the exemplary embodiments ***with reference to the positions of such features as displayed in the figures,***" none of which depict a structure deploying downwardly. *See* '873 patent at 24:46-50; '161 patent at 14:36-40; '777 patent at 26:49-53 (emp. added). *See also* Ex. D at 165:20-167:15.

Malibu's overreach in this regard is precisely what the written description is designed to protect against: "Adequate description of the invention guards against the inventor's overreaching by insisting that he recount his invention in such detail that his future claims can be determined to be encompassed within his original creation." *Vas-Cath Inc. v. Mahurka*r, 935 F.2d 1555, 1561 (Fed. Cir. 1991) (citation omitted). Indeed, "'[t]he purpose of the written description requirement is to prevent an applicant from later asserting that he invented that which he did not; the applicant for a patent is therefore required to recount his invention in such detail that his future claims can be determined to be encompassed within his original creation." *Agilent Techs., Inc. v. Affymetrix, Inc*., 567 F.3d 1366, 1383 (Fed. Cir. 2009) (citation omitted). *Accord Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) ("'[N]othing can be more just and fair, both to the patentee and the public, than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent.'") (citation omitted).

Nevertheless, in order to assert allegations of infringement against Skier's Choice, Malibu claimed patent rights to something its own inventors admitted they did not invent. It is therefore unsurprising that the claim scope Malibu asserted was found to be invalid. Considering the lack of any credible evidence of an adequate written description or enablement, Malibu should have never pursued claims of infringement against Skier's Choice relying on such scope. Malibu maintaining this suit despite its limited disclosures, and its principal inventor disclaiming inventorship of flat, downwardly deploying trim tabs like those used by Skier's Choice, cause Malibu's claims to "stand[] out from others" because Malibu knew from the outset that it could claim infringement against Skier's Choice only by asserting its patents so broadly that they would be rendered invalid. *Octane Fitness,* at 554. As such, the Court should find Skier's Choice is entitled to an award of its attorneys' fees and expenses under § 285.

**B.**     **Malibu's Inconsistent Positions before the Patent Office and in Litigation Make this an "Exceptional" Case.**

Malibu's contradictory positions of infringement and validity also establish its claims were baseless, rendering this case exceptional. *Straight Path IP Grp, Inc. v. Cisco Systems, Inc.*, 411 F.Supp.3d 1026, 1031 (N.D. Cal. Nov. 20, 2019) ("telling the Federal Circuit one thing and telling this Court the opposite on a critical point make this an 'exceptional case.'"). At no point during prosecution of the '873, '161 and '777 patents did Malibu ever describe its claimed invention as deploying downwardly. Rather, Malibu described its invention as deploying outwardly and rearwardly and distinguished its claimed invention from downwardly deploying devices in its arguments before the PTO and in district court. Its contradictory position in this regard are another reason this case is "exceptional."

During prosecution of the '161 patent, the PTO found every claim of the '161 patent as anticipated and/or rendered obvious by U.S. Patent No. 6,012,408 ("Castillo"). *See* [Doc. 36] at

PageID 695. In arguing to overcome Castillo, Malibu described the invention of the '161 patent as follows: "the surf wake system of the present invention include[es] upright diverters (*claim 1) or upright flaps (claim 7) independently movable to generate distinct port and starboard surf wakes, and extend substantially parallel to an intersection of the transom and respective port and starboard side in both their neutral and deployed positions" and distinguished Castillo by asserting that "Castillo [does not] teach or suggest diverters or flaps that are substantially parallel to an intersection of the transom and the respective port and starboard sides." *Id.* at 695-96.

During prosecution of the '777 patent, Malibu appealed a final rejection in a proceeding before the Board of Patent Appeals and Interferences ("BPAI") in which Malibu described the "present application" as disclosing a surf system utilizing structures that extend outwardly: "The present application discloses…two water diverting structures at the stem of the boat, one for water flowing along the port **side** of the boat and one for water flowing along the starboard **side…**The extended water diverter **delays water on its side**…resulting in constructive wave interference that produces a wake having a higher peak and a smoother face suitable for surfing." [Doc. 87] at PageID 3160 (quoting [Doc. 86-8] at 5) (emp. added). In so arguing, Malibu relied on the depictions below which show outwardly deploying structures to redirect water flowing along the side of the transom to create *surf wake*:



FIG. 6A    Conventional Wake      FIG. 6B    Starboard-Side Surf Wake

*Id*. Malibu also asserted its claimed invention was sufficiently disclosed in its original application based on the following from its application: "***In the deployed position***, the respective ***water diverter may extend outboard beyond a side strake*** of the watercraft to deflect water traveling along the side strake and past the transom." *Id.* at PageID 3160-61 (emp. added).

These statements are in addition to statements made by Malibu distinguishing its Surf Gate invention from downwardly deploying trim tabs. On July 10, 2013, approximately four months prior to the public release of Skier's Choice's Swell 1.0 system, the PTO rejected what would become claims 1 and 20 of the '873 patent as unpatentable over U.S. Patent No. 7,707,956 ("Moore"), *see* [Doc. 36-5] at PageID 831-815, which teaches "plates" that deploy downwardly. *See* [Doc. 36-6] at PageID 831 *and* [Doc. 36] at PageID 692-93. In response to that rejection, Malibu distinguished Moore's "front hinged trim tabs or plates" from its claimed invention. *Id.*

Malibu's expert in a subsequent *inter partes* review concerning the '873 patent again distinguished trim tabs from Malibu's invention by likening trim tabs to prior art leaning of a boat that is different from the diversion of water. *See, e.g.,* [Doc. 36] at PageID 694. *See also* [Doc. 36-7] at PageID 895-899. In his August 22, 2016 declaration, Malibu's expert in that proceeding noted, "Trim tabs and other trim devices act to control the trim of the boat" and "do not disrupt the flow of water along the deployed side and delay its convergence with the surf side flow, thereby facilitating constructive interference of converging waves to form a larger surf side wake," because they "work in the same way as the prior art, making the watercraft tilt to one side, which causes the boat to displace more water on that side, thereby generating a larger wake on that side." [Doc. 36-7] at PageID 895-899.

Likewise, in responding to an interrogatory during litigation with MasterCraft under the '161 patent, Malibu distinguished the invention of the '161 patent over the trim tabs of MasterCraft's Gen 1 system by noting that trim tabs cause a boat to list from side to side to create a surfable wake as opposed to diverting water in an manner required by the patents in suit. *See* [Doc. 46] at PageID 1599-1601.

Malibu cannot deny that downwardly deploying trim tabs are prior art to its patent claims. Although Malibu's technical opinion witness admitted at trial that Skier's Choice's tabs are, in fact, trim tabs, *see* Ex. A at 254:2-6, Malibu nevertheless maintained its infringement claims against the Skier's Choice Swell and Flow systems contending that Skier's Choice trim tabs somehow infringe while prior art trim tabs do not invalidate, all in contradiction of the written disclosure of its invention that in no way describes downwardly deploying trim tabs. Moreover, as noted above, approximately four years before authorizing the present suit, Malibu's CEO, Jack Springer, exchange correspondence with Malibu's Vice President of Sales that attached a Malibu-created analysis of competing surf systems that described the Swell 1.0 system as "just trim tabs" that shape waves "through lift" like traditional, prior art trim tabs. *See* Ex. E, pages 1 and 5 of Trial Exhibit No. 25, at p. 5.

Malibu knew that its inventors did not invent downwardly deploying trim tabs and that the written description of its patents wholly fails to disclose downwardly deploying trim tabs. Malibu's continued assertion of infringement despite this knowledge and its contrary positions as to trim tabs and patent validity make this case exceptional. *See, e.g., Marctec, LLC v. Johnson & Johnson*, 664 F.3d 907 (Fed. Cir. 2012). *Marctec* involved a patentee's appeal of a district court's grant of summary judgment of non-infringement and award of attorneys' fees under § 285 under the pre-*Octane Fitness* standard after finding prosecution history estoppel precluded

the patentee's sought-for claim construction. *Id.* at 909. In so doing, the district court found the patentee's claim construction and infringement positions to be baseless in view of, *inter alia*, the written description and prosecution history of the patent-in-suit. *Id.* at 917-18. On appeal, the Federal Circuit agreed with the district court's ultimate finding that the "written description and prosecution histories of the patents-in-suit, and other documentary evidence, demonstrate that the [patentee's] infringement case was baseless." *Id.* at 918-19.

Likewise, although Malibu was ultimately granted the broad claim construction it sought, that construction was not and could not be enabled or adequately supported by the written description of the patents-in-suit. Malibu's position that Skier's Choice systems infringe, despite its pre-suit acknowledgement that Skier's Choice systems use trim tabs and its prior statements to the PTO and in other litigation that trim tab devices do not anticipate, show that Malibu's infringement claims were exceptional and warrant an award of fees under § 285. *See, e.g., Marctec, supra; Microstrategy, supra.*[5] *See also Octane Fitness,* at 554.[6]

---

[5] *Accord, Kilopass Tech. Inc. v. Sidense Corp.*, No. C 10-02066, 2014 WL 3956703 at * 10 (N.D. Cal. Aug. 12, 2014); *Straight Path IP Grp, Inc.*, 411 F.Supp.3d at 1034-35 (N.D. Cal. Nov. 20, 2019) ("[T]he record shows that Straight Path pursued an objectively baseless infringement theory against defendants by attempting to renege on explicit representations made to the Federal Circuit — representations made repeatedly in order to preserve validity — which render the instant actions "one[s] that stand[] out from others.").

[6] Malibu's contradictory positions on validity and infringement are presumably why it sought to re-characterize its claimed invention for purposes of trial. As noted in prior briefing, before trial Malibu sought to "amend" its complaint to withdraw its claims that Skier's Choice's manual Flow 1.0 device infringes the '695 patent in order to argue at trial that its invention is directed to an "automated ability" to transfer wake from one side to the other for surfing (even though the '695 patent is directed to a manual device) and contend that Flow 1.0 is and was a non-infringing alternative for Skier's Choice (despite claiming for over two years that the same manual device infringed the '695 patent). *See, e.g.,* [Doc. 100].

Ultimately, Malibu could not and cannot distinguish the patents-in-suit from their own disclosures – a disclosure of an outwardly and rearwardly deploying device, not a downwardly deploying device like those in the prior art. Malibu's claims against downwardly deploying trim tabs were baseless as a result because, despite its attempts to broaden its patent monopoly through patent prosecution, Malibu cannot claim ownership to something it did not invent and was not described in its original disclosures. *See, e.g., Schriber-Schroth Co. v. Cleveland Trust Co., Chrysler Corp.*, 305 U.S. 47, 57 (1938) ("[T]he patent monopoly does not extend beyond the invention described and explained as the statute requires…[I]t cannot be enlarged by claims in the patent not supported by the description."). Malibu's attempt to do precisely that makes this case stand out from others, particularly in view of the above-referenced evidence and Malibu's failure to provide any evidentiary basis – other than unsupported expert opinion – that its sought-for claim scope was valid in view of the prior art and its patent disclosures. Accordingly, the Court should find this case exceptional under 35 U.S.C. § 285.

## V. THE COURT SHOULD DEFER ITS RULING ON THE AMOUNT DUE UNLESS AND UNTIL IT DETERMINES THIS CASE IS "EXCEPTIONAL."

Pursuant to Fed. R. Civ. P. 54(d)(2)(C), Skier's Choice asks that the Court first rule that this case is exceptional and warrants an award of attorneys' fees, expenses and costs, and later receive a detailed submission including invoices to prove the amount of the award at a later date. *See also* Fed. R. Civ. P. 54(d), 1993 Advisory Committee Notes ("The rule does not require that the motion be supported at the time of filing with the evidentiary material bearing on the fees. This material must of course be submitted in due course, according to such schedule as the court may direct in light of the circumstances of the case."). Skier's Choice estimates that its attorneys' fees and non-taxable expenses, excluding expert witness fees, are approximately $3.3 million to date.

# VI. CONCLUSION

For the reasons submitted above, the Court should this to be an "exceptional case" under 35 U.S.C. § 285 and award Skier's Choice its attorneys-fees, costs and expenses in an amount to be determined at a later date.

<div style="margin-left: 45%;">

*/s/ Zachary A.P. Oubre*

R. Bradford Brittian (007130)
John T. Winemiller (021084)
Ian G. McFarland (030549)
Merchant & Gould, P.C.
800 S. Gay Street, Suite 2150
Knoxville, TN 37929
Telephone: (865) 380-5960
Fax: (612) 332-9081
jwinemiller@merchantgould.com
bbrittian@merchantgould.com
imcfarland@merchantgould.com
-and-
*Admitted Pro Hac Vice*
Lindsay Jones
Merchant & Gould, P.C.
150 S. Fifth Street, Suite 2200
Minneapolis, MN 55402
(612) 332-5300
ljones@merchantgould.com

*Admitted Pro Hac Vice*
Michael J. LaBrie, OBA #16253
Spencer F. Smith, OBA #20430
Zachary A.P. Oubre, OBA #30666
McAfee & Taft A Professional Corporation
Tenth Floor, Two Leadership Square
211 N. Robinson
Oklahoma City, OK 73102
(405) 235-9621
(405) 235-0439 (fax)
mike.labrie@mcafeetaft.com
spencer.smith@mcafeetaft.com
zach.oubre@mcafeetaft.com

*Attorneys for Skier's Choice, Inc.*

</div>

24

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by U.S. Mail. Parties may access this filing through the Court's electronic filing system.

*s/Zachary Oubre*